# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JONATHAN CORRENTE, et al., | § | |
| | § | |
| *Plaintiffs,* | § | Civil Action No. 4:22-cv-00470 |
| | § | Judge Mazzant |
| v. | § | |
| | § | |
| THE CHARLES SCHWAB | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant.* | | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Motion to Dismiss Plaintiffs' Complaint (Dkt. #18). Having considered the motion, the response, and the applicable law, the Court finds that the motion should be **DENIED**.

## BACKGROUND

Plaintiffs Jonathan Corrente, Charles Shaw, and Leo Williams brought this case, individually, and on behalf of a putative class of similarly situated Plaintiffs, against Defendant The Charles Schwab Corporation ("Charles Schwab"), alleging violations of § 7 of the Clayton Act (Dkt. #1 ¶¶ 482–86).

### I.    Factual Background

Plaintiffs are "retail investors," meaning that they are individual, non-professional investors who typically trade securities in their own accounts (Dkt. #1 ¶ 1). Defendant is a large retail brokerage that attracts and services retail investors by offering commission-free trades on a variety of securities (Dkt. #1 ¶¶ 1; 26). According to Plaintiffs, Defendant is one of a handful of retail brokerages that make up what Plaintiffs characterize as the "Retail Order Flow Market" (Dkt. #1 ¶ 28). In the Retail Order Flow Market, retail brokerages aggregate and sell trades placed

by retail investors—their "order flow"—to market makers who execute the trades (Dkt. #1 ¶ 27). Rather than charging traditional commissions, these retail brokerages primarily rely on a "payment for order flow" model through which they receive payment from a market maker in exchange for routing their order flow to that particular entity (Dkt. #1 ¶ 94).  In turn, retail brokerages return some of that payment for order flow to retail investors through rebates paid directly to investors, price improvements on securities transactions, or some combination of the two (Dkt. #1 ¶ 30). According to Plaintiffs, retail brokerages attract investors by competing with one another on "price," which Plaintiffs define as "the share of payment for order flow that is remitted to retail customers as part of a trade" (Dkt. #1 ¶¶ 27; 369–72).

On November 25, 2019, Charles Schwab announced that it was merging with TD Ameritrade in a move that, according to Plaintiffs, "consolidated two of the largest retail brokerages" in the Retail Order Flow Market (Dkt. #1 ¶¶ 282–83).  On October 25, 2020, the merger was completed and a combined entity consisting of Charles Schwab's and TD Ameritrade's retail brokerage operations was created (Dkt. #1 ¶ 284).

## II.    Procedural History

On June 2, 2022, Plaintiffs initiated this case against Defendant alleging a single cause of action under § 7 of the Clayton Act.  Plaintiffs assert that the Charles Schwab-TD Ameritrade merger "has, had, and will have, the effect of substantially lessening the competition and tending to create a monopoly in the relevant market for Retail Order Flow" (Dkt. #1 ¶¶ 482–88).

On August 29, 2022, Defendant moved to dismiss Plaintiffs' complaint (Dkt. #18). Plaintiffs responded on September 27, 2022 (Dkt. #23).  Defendant filed its reply on October 11, 2022, and Plaintiffs filed their sur-reply on October 18, 2022.

**LEGAL STANDARD**

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 304–05 (5th Cir. 2015).  The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022).  The Court must then determine whether the complaint states a claim for relief that is plausible on its face. *Swindol v. Aurora Flight Scis. Corp.*, 832 F.3d 492, 494 (5th Cir. 2016).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion.  First, the Court should identify and

disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664.  Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.*  "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (internal citations omitted).  This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS

Defendant raises three arguments in support of its motion to dismiss Plaintiffs' claim (Dkt. #18 at p. 8).  First, Defendant argues that Plaintiffs have failed to state a claim under the Clayton Act because they have not alleged a relevant market or alleged that the Charles Schwab-TD Ameritrade merger substantially lessens competition in that relevant market (Dkt. #18 at p. 15).  Second, Defendant argues that Plaintiffs have failed to allege that they have suffered any antitrust injury (Dkt. #18 at p. 24).  And finally, Defendant argues that Plaintiffs' request for equitable relief fails as a matter of law both because it is inadequately pleaded and because it is barred by the doctrine of laches (Dkt. #18 at p. 34).  The Court concludes that each of these arguments are unavailing at this stage of the litigation, and it finds that Plaintiffs have stated plausible claims for relief for the purposes of defeating a Rule 12(b)(6) motion to dismiss.

I.      **Plaintiffs' Claim Under § 7 of the Clayton Act**

Section 7 of the Clayton Act prohibits mergers or acquisitions where the effect of the transaction may be "substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.  To state a claim under § 7, a plaintiff must (1) define the relevant market and (2) demonstrate the probability of anticompetitive results flowing from the challenged transaction. *See, e.g.*, *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491–92 (5th Cir. 1984). Defendant contends that Plaintiffs have failed to allege adequate facts in support of both prongs.

A.      **Market Definition**

A well-defined relevant market is an essential element to any antitrust claim as it is "the pool a court must assess to determine the ripple effect of any purported antitrust conduct on competition." *Shah v. VHS San Antonio Partners LLC*, __ F. Supp. 3d __, No. 5:18-CV-00751, 2020 WL 1854969, at *5 (W.D. Tex. Apr. 9, 2020), *aff'd sub nom. Shah*, 985 F.3d at 450.  Indeed, without a definition of a relevant market, there is no way to assess a defendant's ability to lessen competition or create a monopoly.  *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).

The definition of a relevant market has two components: (1) a product market and (2) a geographic market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).  The product market must include all products, the use of which is reasonably interchangeable.  *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002).  Whether a product is reasonably interchangeable with another depends on the ease and speed with which customers can substitute it, the desirability of doing so, and the cross-elasticity of demand between the product and its alleged substitutes.  *See, e.g.*, *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 377 (E.D. La. 2013) (citing *F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037

(D.C. Cir. 2008)).  A broad market may contain relevant submarkets which themselves "constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325.  "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

Likewise, courts define a geographic market with reference to the area of "effective competition." *Apani*, 300 F.3d at 626.  The area of effective competition is the "market area in which the seller operates and to which buyers can practicably turn for supplies." *Id.*  The geographic market must "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336.

Here, Defendant does not challenge Plaintiffs' proposed geographic market, which encompasses the entire United States (Dkt. #1 ¶¶ 347–54).  Rather, Defendant contends that Plaintiffs have failed to adequately allege a relevant product market (Dkt. #18 at pp. 15–20).

The definition of the relevant product market often presents a question of fact.  *See, e.g.*, *Honeywell Int'l Inc. v. MEK Chem. Corp.*, No. 3:17-CV-1390, 2018 WL 6737514, at *2 (N.D. Tex. July 5, 2018).  That said, the Fifth Circuit has indicated that dismissal is appropriate when a plaintiff completely fails to define a relevant product market.  *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010).  But product market definition is ultimately a fact-intensive inquiry, and courts generally "hesitate to grant motions to dismiss for failure to plead a relevant product market." *In re Pool Prods.*, 940 F. Supp. 2d at 386 (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011)); *Found.*

*for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery.").

Indeed, the cases in which dismissal on the pleadings is appropriate typically involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way. *See, e.g.*, *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1039 (5th Cir. 2023) (affirming dismissal and noting that plaintiff's product market consisted of only two tour brands rather than the larger market for cemetery tours); *Shah*, 985 F.3d at 454–55 (affirming dismissal where plaintiff failed to even attempt a plausible explanation as to why a market should be limited in a particular way).

This is not such a case. Rather, Plaintiffs allege a product market consisting of the "Retail Order Flow Market" (Dkt. #1 ¶¶ 26–29). They define this market as one in which retail brokerages like Defendant obtain order flow from retail investors and sell that order flow to market makers in exchange for payment (Dkt. #1 ¶¶ 294–95). Moreover, Plaintiffs specifically rely on the "practical indicia" identified by the Supreme Court in *Brown Shoe* to explain why the Retail Order Flow Market could be viewed as a distinct submarket of the larger brokerage industry. 370 U.S. at 325. For example, Plaintiffs allege that market participants, including retail brokerages, market makers, and the Securities and Exchange Commission ("SEC"), recognize that retail order flow is distinct from other segments of the general market for securities order flow (Dkt. #1 ¶¶ 313–19). In support of these allegations, Plaintiffs point to SEC reports and media coverage which indicate that the financial services industry views the Retail Order Flow Market as a distinct subset of the larger market for securities and options orders (Dkt. #1 ¶ 319). In addition, Plaintiffs allege that the Retail Order Flow Market "derives value from its unique characteristics"—namely, the relative

lack of sophistication of retail investors and the smaller order sizes that come with individual investors as opposed to the large orders that characterize institutional order flow (Dkt. #1 ¶ 320–23).  Accepting Plaintiffs' allegations as true—as it must at this stage—the Court finds that Plaintiffs' complaint sufficiently alleges a relevant product market.  *See Brown Shoe*, 370 U.S. at 325.

Rather than disputing these "practical indicia," Defendant argues that Plaintiffs' alleged product market is overly narrow because it fails to account for reasonably interchangeable alternatives like "brokerage firms employing different business models, including those that receive commissions" (Dkt. #18 at p. 16).  Essentially, Defendant argues that Plaintiffs' conception of the Retail Order Flow Market is contrived and that the appropriate product market is the overall market for brokerage services.

When faced with similar arguments, courts have concluded that "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."  *F.T.C. v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997).  In *Staples*, the Federal Trade Commission ("FTC") defined the relevant product market as "the sale of consumable office supplies through office superstores, with 'consumable' meaning products that customers buy recurrently, *i.e.,* items which get used up and discarded."  *Id.* at 1073.  The defendants in *Staples* characterized the FTC's alleged product market as contrived and argued that the appropriate market was the overall sale of office products.  *Id.* The court ultimately found that, although the products were the same whether they were sold through superstores or other types of retailers, office supplies sold through office superstores made up an economically significant submarket.  *Id.* at 1074–76.  In reaching this conclusion, the court relied on evidence that "office superstore prices [were] affected by primarily by other office

superstores and not by non-superstore competitors." *Id.* at 1076–77.  The court also noted differences between office superstores and other outlets, and the unique characteristics of office superstore customers.  *Id.* at 1078–80.

Similarly, Plaintiffs allege sufficient facts to support the assertion that the Retail Order Flow Market is an economically significant submarket of the larger market for brokerage services. Indeed, although retail brokerages in the alleged Retail Order Flow Market and commission-based brokerages offer similar execution services, Plaintiffs contend that the prices available to them through brokerages in the Retail Order Flow Market are distinct from the prices available through commission-based brokerages, which typically cater to institutional investors (Dkt. #1 ¶¶ 333–39). Relatedly, Plaintiffs allege that the price available to retail investors trading through the Retail Order Flow Market is primarily determined by the amount of payment for order flow that is remitted to investors through rebates or price improvements on a trade (Dkt. #1 ¶ 371).  According to Plaintiffs, this price is primarily determined through competition between competitors in the Retail Order Flow Market, rather than the commission rates or service fees offered by other brokerages (Dkt. #1 ¶ 372).  The Court finds that these allegations make it facially plausible that the Retail Order Flow Market is a distinct submarket of the larger market for brokerage services.

For these reasons, the Court concludes that Plaintiffs have adequately alleged a relevant product market with specific allegations of practical indicia supporting the conclusion that the Retail Order Flow Market is a distinct submarket for antitrust purposes.  Defendant contends that Plaintiffs' framing of the Retail Order Flow Market does not comport with "market realities," but the question of market definition is ultimately a fact-intensive inquiry, and the issue of market realities is better addressed after the parties have had an opportunity to conduct discovery.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (explaining that "in most

cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers").

### B.      Anticompetitive Results

A plaintiff asserting claims under § 7 of the Clayton Act can make a prima facie showing of probable anticompetitive results in one of two ways: (1) by showing that "the size of the entities involved makes them inherently suspect in light of Congress's design to prevent undue economic concentration, thereby resulting in a significant increase in market share and an undue market concentration" or (2) "by showing that other characteristics of the market make the merger or acquisition more economically harmful than the bare market share and market concentration statistics otherwise indicate." *Domed Stadium Hotel, Inc.*, 732 F.2d at 492 (quoting *United States v. Phila. Nat. Bank*, 374 U.S. 321, 363 (1963)) (cleaned up).  Typically, a § 7 plaintiff can survive a motion to dismiss by establishing a prima facie case that the "transaction in question will significantly increase market concentration." *Chi. Bridge & Iron Co. N. V. v. F.T.C*, 534 F.3d 410, 423 (5th Cir. 2008).  The inquiry into whether a transaction will lead to anticompetitive results is "industry specific and fact intensive." *United States v. Bertelsmann SE & Co. KGaA*, __ F. Supp. 3d __, No. 1:21-CV-02886, 2022 WL 16949715, at *28 (D.D.C. Nov. 15, 2022).

Here, Plaintiffs allege that Charles Schwab and TD Ameritrade accounted for approximately half of all retail order flow in 2020 and 2021 (Dkt. #1 ¶¶ 285–88).  Plaintiffs further allege that the merger resulted in significantly increased market concentration in the Retail Order Flow Market, as reflected by the fact that, in 2020, the Herfindahl-Hirschman Index ("HHI") of the market shares in that market grew from 2,279 pre-merger to 3,485 post-merger (Dkt. #1 ¶ 290).  At the pleadings stage, allegations of this nature, which indicate that a transaction has resulted in increased market concentration, are sufficient to survive a motion to dismiss.  *See, e.g.*, *In re Juul*

*Labs, Inc., Antitrust Litig.*, 555 F. Supp. 3d 932, 965 (N.D. Cal. 2021).  Thus, the Court finds that Plaintiffs have adequately alleged that anticompetitive results flow from the Charles Schwab-TD Ameritrade merger.

## II.     Antitrust Injury

To recover under the Clayton Act, a plaintiff must suffer an "antitrust injury"—that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful."  *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022). The antitrust injury requirement is a recognition of the basic idea that "the antitrust laws were enacted for the protection of competition, not competitors."  *Id.* (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)) (cleaned up).

An antitrust plaintiff must present plausible allegations establishing an antitrust injury in its complaint.  *See, e.g.*, *In re Pool Prods.*, 940 F. Supp. 2d at 399.  That said, the adequacy of a plaintiff's contentions regarding a transaction's effect on competition is often a fact-intensive inquiry that requires discovery.  *See Sanger Ins. Agency v. HUB Intern., Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015) (noting that antitrust injury and other standing issues "may present disputed issues of fact"); *Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 501 (E.D. Pa. 2018) (noting that "the adequacy of a plaintiff's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial") (cleaned up).  For this reason, "the existence of an antitrust injury is not typically resolved through motions to dismiss."  *TravelPass Group, LLC v. Caesars Entm't Corp.*, No. 5:18-CV-00153, 2019 WL 5691996, at *22 n.25 (E.D. Tex. Aug. 29, 2019), *R. & R.  adopted*, No. 5:18-CV-00153, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019) (quoting *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995)).  Indeed, in

assessing whether a plaintiff has adequately alleged an antitrust injury, the Court must assume that an antitrust violation has occurred. *Sanger Ins. Agency*, 802 F.3d at 738.

Here, Plaintiffs allege that, as a result of the anticompetitive effects of the merger, they pay higher prices for securities transactions due to reduced price improvements and rebates (Dkt. #1 ¶¶ 449–50). Plaintiffs further allege that they now pay higher transaction costs for their trades and that they suffer from diminished consumer choices in the wake of the merger (Dkt. #1 ¶¶ 451–56). Each of these alleged injuries are the "typical" anticompetitive effects that satisfy even the Fifth Circuit's narrow conception of an antitrust injury. *Anago, Inc. v. Tecnol Med. Products, Inc.*, 976 F.2d 248, 249 (5th Cir. 1992) ("Typical anticompetitive effects include increased prices and decreased output."). And so, the Court finds that Plaintiffs have adequately pleaded an antitrust injury.

## III.    Equitable Relief

In addition to monetary damages, Plaintiffs seek equitable relief in the form of an order divesting Defendant of the TD Ameritrade assets or otherwise segregating the Chales Schwab and TD Ameritrade lines of business (Dkt. #1 at p. 106). The Clayton Act provides that plaintiffs who are injured by a merger or acquisition that substantially lessens competition may seek monetary damages or equitable relief. 15 U.S.C. § 15(a). The equitable relief available under the Clayton Act includes prospective relief against threatened injury from a transaction that would lessen competition and retrospective relief that unwinds a completed transaction and divests a defendant of acquired stock or assets. *Cal. v. Am. Stores Co.*, 495 U.S. 271, 281–82 (1990). Although courts have typically ordered divestiture in suits brought by the government, divestiture is also available as a remedy in private suits when it is "appropriate in light of equitable principles." *Id.* at 285; *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 722 (4th Cir. 2021) (affirming divestiture

as a remedy in private Clayton Act action and noting that "[i]n both government and private suits, a court may order divestiture if it's needed to restore competition") (internal quotations omitted). That said, divestiture is an extraordinary remedy, and it is one that "courts have been reluctant to order . . . at the behest of a private plaintiff after consummation of the allegedly anticompetitive merger." *Id.* at 729 (Rushing, J., concurring).

Defendant argues that Plaintiffs' claim for inequitable relief is improper both because it is inadequately pleaded and because it is barred by the doctrine of laches.  The Court finds that both arguments do not support dismissal at this early stage of the case.

First, Defendant argues that divestiture is unwarranted on the face of Plaintiffs' complaint (Dkt. #18 at p. 36).  But, as noted above, Plaintiffs have adequately pleaded a claim for violations of the Clayton Act.  Thus, whether divestiture or another form of injunctive relief is appropriate in this case will ultimately turn on a balancing of the equitable principles presented by the facts of this case. *Steves & Sons, Inc.*, 988 F.3d at 703.  And, as Plaintiffs point out, this determination is one that requires discovery and findings of fact by the Court.

Second, Defendant argues that Plaintiffs' claim for equitable relief is barred by the doctrine of laches (Dkt. #18 at p. 35).  Defendant contends that Plaintiffs' claim for divestiture is barred because Plaintiffs knew of facts giving rise to their claims for years before they filed this case. Plaintiffs respond by arguing that their claim is presumptively timely because it was filed within the four-year limitations period provided by the Clayton Act (Dkt. #23 at p. 35).  These arguments notwithstanding, the "strictures of Rule 12(b)(6), wherein dismissal of the claim is based solely on the complainant's pleading, are not readily applicable to a determination of laches." *Maxus Liquidating Tr. v. Greenstone Assurance, Ltd.*, No. 2:19-CV-00401, 2020 WL 3447685, at *4 (E.D. Tex. June 24, 2020).  Defendant's laches defense will undoubtedly present disputed issues

of fact regarding the unreasonableness of any delay and the prejudice suffered by Defendant.  "At this early stage of the litigation, those factual issues cannot be decided against [Plaintiffs]," and, as a result, the Court finds that Defendant's laches defense is premature.  *Id.*

**CONCLUSION**

It is therefore **ORDERED** that Defendant's Motion to Dismiss Plaintiff's Complaint (Dkt. #18) is hereby **DENIED**.

**IT IS SO ORDERED**.

 **SIGNED this 24th day of February, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE