UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| Jonathan Corrente, et al., *Plaintiffs* v. The Charles Schwab Corporation., *Defendants*. | Case No. 4:22-cv-470-ALM Hon. Amos L. Mazzant, III |

### ***DAUBERT* MOTION TO EXCLUDE SINGER/TATOS REPORT [DKT. 205]**

"Judges are not like pigs, hunting for truffles buried in briefs."[1] Plaintiffs already pulled this stunt recently, claiming this Court should have *hunted* for exact deadlines in their 158-page preliminary approval motion. Dkt. 204.[2] Plaintiffs now offer *more last-minute truffles* in a 31-page report rife with complex terms, such as "NBBO", "E/Q ratio", "PFOF", "ERPP", "CAGR", "cross-sectional", or "time-series". Dkt. 205 ("Decl.")

But "[g]arbage in, garbage out. Everyone knows that much about computers: you give them bad data, they give you bad results."[3] **This report's authors gave it away:** "**At this stage, the benefits reasonably expected to redound to consumers** … **remain uncertain** as the parties have not yet finalized the Compliance Program's provisions. Moreover, we have **limited data** on the basis of which to estimate such potential benefits."

---

[1] *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991).
[2] Plaintiffs wanted fee motions to be due "forty-two (42) calendar days before" and objections "thirty (30) calendar days prior" to fairness hearing. Proposed Order, Dkt. 154-1, ¶¶ 22, 24. Plaintiffs caused **42 - 30 = only 12 days** for objectors' review, and even shorter window to finally disclose this report. *Contra.* Dkt. 204 at 3.
[3] *United States v. Esquivel-Rios,* 725 F.3d 1231, 1234 (10th Cir. 2013).

1

Decl. ¶ 57 (emphasis added). They repeatedly made caveats with any projected "value range, the accuracy of which is subject to **considerable uncertainty**" *Ibid.* (emphasis added). In other words, the report relied on unrealistic assumptions—because they had no basis to model benefits before knowing what actions might occur.

Plaintiffs, though, felt this paper seems cross-checked:[4] "[u]sing two statistical methodologies". Dkt. 197 at 20. Plaintiffs claim authors' "estimated value highlights the excellent result obtained by Plaintiffs' counsel on behalf of class members", or "significant and valuable relief", so good that their $9 million fee and expenses request is "comparably modest". Dkt. 199 at 17-18.[5] Yet, "[n]onmonetary relief is much more difficult to put a number on than a pot of cash is, and lawyers may give the court rosy numbers to justify fee awards." *Briseno v. Henderson,* 998 F.3d 1014, 1029 (9th Cir. 2021). "A class settlement that results in fees for class counsel but yields no meaningful relief for the class is no better than a racket. If the class settlement does not provide "effectual relief" to the class and its "principal effect" is to "induce the defendants to pay the class's lawyers enough to make them go away," then the class representatives have failed in their duty under Rule 23 to "fairly and adequately protect the interests of the class." *In re Subway Footlong Sandwich Mktg. Litig.,* 869 F.3d 551, 556 (7th Cir. 2017).

Objector Huang respectfully urges this Court to find Singer/Tatos' declaration as inadmissible and exclude it from *any* settlement-related analysis. *See Prantil v. Arkema*

---

[4] *But compare with e.g., Voulgaris v. Array Biopharma, Inc.*, 60 F.4th 1259, 1263, 1265 (10th Cir. 2023) (courts need not perform "lodestar cross-check" *and* "percentage-of-the-fund approach" in deciding a common-fund attorney's fee award)

[5] *See Ark. Tchr. Ret. Sys. v. State St. Corp.,* 25 F.4th 55, 65-66 (1st Cir. 2022) (affirming sanctions for class counsel after "paint[ing] a materially misleading picture" about expert evidence); *Natasha, Inc. v. Evita Marine Charters, Inc.,* 763 F.2d 468, 472 (1st Cir. 1985) ("Outside-chance opportunity for a megabucks prize must cost to play")

*Inc.,* 986 F.3d 570, 575 (5th Cir. 2021) ("if an expert's opinion would not be admissible at trial, it should not pave the way for certifying a proposed class."); *Amchem Prods. v. Windsor,* 521 U.S. 591, 619-20 (1997) (holding the terms of a "[s]ettlement is relevant to a class certification" and all relevant parts of Rule 23—"demand undiluted, even heightened, attention in the settlement context"); *Also see* Fed. R. Civ. Proc. 23(e)(2) (requiring inquiry on whether "the relief provided for the class is adequate").

This *Daubert* motion may relate to other pending motions in the following ways:

1. Named Plaintiffs' Article III standing to seek prospective relief is currently under challenge. *See* Dkt. 215 at 3-6. That Article III standing scrutiny is antecedent to deciding this motion. While precedents require Plaintiffs to support standing with competent proof,[6] this expert testimony is irrelevant for standing: "To the extent merits-based evaluations of expert testimony are necessary at the certification stage, they are premature in determining standing." *Wilson v. Centene Mgmt. Co., LLC,* No. 24-50044, ___F.4th___, *24 (5th Cir. Jul. 17, 2025). If Named Plaintiffs are found to lack standing to seek a settlement, then this motion is moot.

2. Plaintiffs' motion for leave to file this declaration under seal remains pending. *See* Dkt. 195. If this expert report is excluded, then that motion for leave—to seal an irrelevant report—may be granted.

---

[6] *Wittman v. Personhuballah,* 136 S. Ct. 1732, 1737 (2016) ("the party invoking federal jurisdiction bears the burden of establishing that he has suffered an injury by submitting affidavits or other evidence. When challenged by a court (or by an opposing party) concerned about standing, the party invoking the court's jurisdiction cannot simply allege a nonobvious harm, without more.") *McNutt v. GMAC,* 298 U.S. 178, 189 (1936) (When "his allegations of jurisdictional facts are challenged by his adversary ... he must support them by competent proof.")

3

## **LEGAL STANDARD**

All proposed expert testimony must meet "exacting standards of reliability" to be admissible under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). *See Weisgram v. Marley Co.,* 528 U.S. 440, 455 (2000). "[I]f an expert's opinion would not be admissible at trial, it should not pave the way for certifying a proposed class." *Prantil,* 986 F.3d at 575 (full *Daubert* is required for class certification). "The proponent [of expert testimony] must prove by a preponderance of the evidence that the testimony is reliable". *Moore v. Ashland Chem.,* 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*). "The expert's assurances that he has utilized generally accepted scientific methodology is insufficient" and courts "must evaluate whether there is an adequate "fit" between the data and the opinion proffered." *Ibid.*

"[E]xpert testimony is admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 244 (5th Cir. 2002). "The expert's testimony must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion." *Knight v. Kirby Inland Marine, Inc.* 482 F.3d 347, 355 (5th Cir. 2007). "[N]othing in either *Daubert* or the Federal Rules of Evidence … admit[s] opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). If "an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Eng'd Materials*, 555 F.3d 383, 388 (5th Cir. 2009).

## SUMMARY OF ARGUMENT

*First,* as "the [settling] parties have not yet finalized the Compliance Program's provisions", Decl. ¶ 57, the authors axiomatically "relied on assumptions wholly without foundation in the record." *Elcock v. Kmart Corp.,* 233 F.3d 734, 738 (3d Cir. 2000). **Authors' lack of analytical basis and data** can only lead to creation of an inadmissible report. *See Briseno,* 998 F.3d at 1029 (as the expert "testimony is unverifiable, it is ultimately worth as little as the settlement's injunctive relief.")

*Next*, the authors are **unqualified** as antitrust damage modelers to hypothesize impacts of a compliance programs (especially one subjected to many in-the-air factors).

*Lastly*, the proposed **methodologies relied on *ipse dixit*** of the authors. While not alone dispositive, *the authors did not cite a single academic literature* in its entire section of analytical steps (unless redaction was required even for academic journal citations.)

As the report is only available in a redacted form, if any redactions are truly critical to admissibility of this *redacted* report, such elements will need to be unsealed. *See In re Optical Disk Drive Prods. Antitrust Litig.,* 959 F.3d 922, 936 (9th Cir. 2020) ("Objectors noted some [] inconsistencies, but they were not well positioned to assess whether the discrepancies were significant because the [file] remained under seal.")

The report is rife with defects that doomed its admissibility. It should be excluded.

## ARGUMENT

***First*, the report is unreliable and inadmissible because the authors admitted to a total lack a foundation for their analysis.** This fatal defect alone is dispositive. In *Paz,* plaintiffs offered testimony of a Dr. Maier, "[who] assumed [another doctor] made additional cuts of the biopsy for his evaluation, and based on those additional cuts, Dr.

Maier concluded [the person suffered a medical condition], without additional evaluation." 555 F.3d at 388. Because this expert relied on a "supposed analysis" that never happened, the court concluded "Dr. Maier's diagnosis was fundamentally based on insufficient information, rendering her conclusion unreliable … the district court properly excluded the testimony and report." *Ibid.*

> Here, the report's authors joined Dr. Maier in one powerful paragraph #57:
>
> The parties in this litigation have also requested an analysis of the potential benefits in terms of execution quality that would reasonably accompany the implementation of the Compliance Program. At this stage, **the benefits reasonably expected to redound to consumers from the proposal above remain uncertain as the parties have not yet finalized the Compliance Program's provisions**. Moreover, we **have limited data on the basis of which to estimate such potential benefits.** Nevertheless, we can leverage the existing information, both from publicly available Forms 605 and 606, and from internal data produced in discovery to proffer initial estimates based on two alternative approaches. We preface our analysis with **the caveat that our estimates provide a value range, the accuracy of which is subject to considerable uncertainty.**

Decl. ¶ 57 (emphasis added). They could not stop adding more caveats:

- The authors admit the compliance program is mostly *make it how you want it be*. *See* Decl. ¶ 4 (if "the finalized provisions of the Compliance Programs diverge substantively and materially from the assumptions that constitute the basis of the findings in this report, we anticipate that the effects of the Compliance Program on trading costs will also differ.") (The authors' conclusion is quite unremarkable, *e.g.,* for all-you-can-eat buffets. *see* Brendan Lynch. *Study shows food choices at an "all-you-can-eat" buffet tied to likelihood for weight gain.* University of Kansas News (Aug. 2, 2021). https://news.ku.edu/news/article/2021/08/02/study-shows-food-choices-all-you-can-eat-buffet-tied-likelihood-weight-gain)

- The authors, imperfectly, "understand that the solutions contemplated herein are still subject to approval by both parties." Decl. ¶ 87. (If consultants are not as independent as Plaintiffs advertised, the authors' statement would be entire true.)

In sum, the authors conceded their analysis is **unreliable from the start.** The authors need help: How can they (or anyone) sketch a value for *unknowns*? *Contra Knight,* 482 F.3d at 355 ("testimony must be reliable at each and every step or else it is inadmissible.") *See Paz,* 555 F.3d at 388 ("insufficient information[] render[s] her conclusion unreliable"); *Curtis v. M&S Petroleum, Inc.,* 174 F.3d 661, 670-71 (5th Cir. 1999) (if expert's "opinion was not based on sufficient information … his methodology would not be reliable, rendering his causation opinion inadmissible."). *Moore v. Int'l Paint, L.L.C.* 547 F. App'x 513, 515 (5th Cir. 2013) (quoting *Hathaway v. Bazany*, 507 F.3d 312, 319 & n.4 (5th Cir. 2007)) ("[E]xpert testimony that relies on `completely unsubstantiated factual assertions' is inadmissible")

**The authors' base-less analysis is assured by data limitations.** *See* Fed. R. Evid. 702(b) ("sufficient facts or data" is required.) "Garbage in, garbage out" problem is real for this report. *Esquivel-Rios,* 725 F.3d at 1234. *See* Decl. ¶ 57 ("we have **limited data** on the basis of which to estimate such potential benefits." (emphasis added). The data limitation seemed so insurmountable that it warranted repetitions: "We caution that the analyses contained in this report rely on **limited data**". Decl. ¶ 82 (emphasis added). The lack of *sufficient* basis destroyed a "link between the facts and the conclusion" for admissibility. *Knight,* 482 F.3d at 355; *Joiner*, 522 U.S. at 146 ("too great an analytical gap between the data and the opinion proffered."); *Johnson v. Arkema, Inc.,* 685 F.3d 452, 462 (5th Cir. 2012) (a report without "direct correlation or fit" is inadmissible).

*Next,* **the authors are disqualified—hence incapable—of calculating what relief will come from a still-TBD compliance program.** In *Sullivan v. Rowan Companies,* plaintiffs complain that their "expert in mechanical engineering, should have been permitted to testify … [with] an opinion required the testimony of a metallurgist". 952 F.2d 141, 146 n.9 (5th Cir. 1992). The Fifth Circuit affirmed the exclusion because "such testimony was outside [of expert's] field of expertise." *Ibid. Cf. United States v. Davis,* 53 F.4th 833, 848 (5th Cir. 2022) (Rule 702 applies only to topics that "can be mastered only by specialists in the field with particularized expertise.")

Singer and Tatos were first hired as **antitrust modelers**, to "assist in building a model of antitrust injury, impact, and damages for purposes of class certification and, eventually, for the merits stage of the case." Bathaee Decl. Dkt. 199-1, ¶ 15. They wisely did not claim to know *anything* remotely related to compliance programs.[7] Therefore, they are unqualified. *See In Re Air Crash Disaster at New Orleans, Louisiana,* 795 F.2d 1230 at 1234-35 (5th Cir. 1986) ("Trial judges must be sensitive to the qualifications of persons claiming to be an expert.") *Christophersen v. Allied Signal Corp.,* 939 F.2d 1106, 1112-1113 (5th Cir. 1991) ("if the expert has an M.D. degree[,] [t]hat alone is not enough to qualify him to give an opinion on every conceivable medical question. This is because the inquiry must be into actual qualification — sufficient to assist the trier of fact.")

---

[7] For good reason: even "the Justice Manual also requires prosecutors to evaluate whether a compliance program "is merely a 'paper program'" and "[f]or the antitrust compliance program to be effective, those with operational responsibility for the program must have sufficient qualifications, autonomy, authority, and seniority within the company's governance structure, as well as adequate resources for training, monitoring, auditing and periodic evaluation of the program."). *See* U.S. D.O.J., Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations. justice.gov/d9/2024-11/DOJ%20Antitrust%20Division%20ECCP%20-%20November%202024%20Updates%20-%20FINAL.pdf at pp. 2, 5 (Nov. 2024 rev.)

**Lastly, the authors' analysis relied on *ipse dixit* for their methodologies.** "In sum, the law cannot wait for future scientific investigation and research. We must resolve cases in our courts on the basis of scientific knowledge that is currently available. … [A] scientific opinion, to have evidentiary relevance and reliability, must be based on scientifically valid principles." *Moore,* 151 F.3d at 276. *Johnson*, 685 F.3d at 459 ("Although there are `no certainties in science,' the expert must present conclusions `ground[ed] in the methods and procedures of science.'"). As the authors' lack qualifications, it is unsurprising to find methodology defects: In the report's key section chasing dollar-value projections (Decl. at pp. 19-27), the authors cited ***zero*** sources.

Also, "conclusions and methodology are not entirely distinct from one another." *Joiner,* 522 U.S. at 146. Some illustrations reveal the depth of flaws in authors' truffles:

- <u>Authors' methodology one</u> made a causal remark that Schwab's "E/Q ratio" declined *by the year* between 2006-2021.[8] Decl. ¶¶ 58-59 & n.64. Not only did the data points only include 1 year of post-merger data, authors' complexity-coated "CAGR" calculation projects the E/Q ratio will decline by merely ticking the clock, *without any compliance program*.[9] Thus, besides making Schwab find money to hire consultants, "[t]he injunction does not obligate [Schwab] to do

---

[8] Trend analysis of E-divides-Q ratio requires using interacting data variables, so that "denominator of the outcome variable suffers from considerable measurement error thus risking biased regression estimates". Bartlett & Partnoy. *The Ratio Problem*, at 2 (May 1, 2020). law.nyu.edu/sites/default/files/The%20Ratio%20Problem.pdf;  Or in such model, "important causal inference concepts, such as the consistency assumption, may be violated when including a ratio as the exposure." Mooldijk, Labrecque, Ikram, Ikram, *Ratios in regression analyses with causal questions,* Am. J. of Epidemiology, Vol. 194, Iss. 1, at 312 (2025). doi.org/10.1093/aje/kwae162.

[9] If authors' approach were admissible, internet speed increases over years (and not a compliance program) would also guarantee a better causal model of the E/Q ratio. *See* Statista. *Average internet connection speed in the U.S., 2007-2017.* (May 2017) https://www.statista.com/statistics/616210/average-internet-connection-speed-in-the-us/

anything it was not already doing." *Koby v. ARS Nat. Servs.,* 846 F.3d 1071, 1080 (9th Cir. 2017). But such featherweight claim is inadmissible: "Any scientist or statistician must acknowledge, however, that correlation is not causation." *Huss v. Gayden,* 571 F.3d 442, 460 (5th Cir. 2009). "It is axiomatic that causation testimony is inadmissible if an expert relies upon studies or publications, the authors of which were themselves unwilling to conclude that causation had been proven.") *See also Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 197 (5th Cir. 1996) (without "why and how mere "suggestiveness" scientifically supports a causal connection … this basis for [experts'] scientific opinion must be rejected". *Ibid.*

- Authors' methodology two largely hopes for an ideal world where other parties not named in this lawsuit will deliver the relief sought: the orders will be assigned *pro rata* to cheapest market makers—so ideal that authors had to "assume[] that every market maker has equal ability to absorb increased order flow, **which may not be the case."** Decl. ¶ 74. (emphasis added). Authors dedicated paragraphs to complicate average-of-averages calculations, and they ultimately found Jane Street helps improve average prices. Table 9 (*ibid.*) showed Jane Street *always* had the best "average" price for every dimension, but authors stopped short from an obvious fix to have Jane Street in *all* orders, recalling a basic adage that "plans based on assumptions about average conditions usually go wrong."[10]

  o Much of this essay assumes Jane Street (without injunction from a court) has the magic to deliver all the savings. But Jane Street likely *already did*. In Schwab's Q1 2021 disclosure, top 3 marketmakers (without Jane

---

[10] Sam Savage. *The Flaw of Averages.* Harvard Business Review (Nov. 2002). https://hbr.org/2002/11/the-flaw-of-averages

Street) had 80% of Schwab's orders. No longer is that the case for Q1 2025: 80% of order flow went to top-4 market makers including Jane Street. A rough HHI antitrust concentration calculation shows the scores favorably dropped from 2,441 to 1,845.[11] Again, "[t]he injunction does not obligate [Schwab] to do anything it was not already doing." *Koby,* 846 F.3d at 1080. At the same time, it's too speculative to expect Jane Street to trade 300% more shares. *Cf. Clapper v. Amnesty Int'l, USA,* 568 U.S. 398, 413 (2013) ("reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.")

- The last "order allocation wheel" theory fantasizes a dooms-day scenario where market makers would *race for the bottom,* and, disclose profit margins to get Schwab's orders. Decl. at 27. The authors did not even bother to offer an estimate.

**In summary:** Unqualified experts wrote this report, without analytical basis, sound methodology, or sufficient data. It is inadmissible. *Knight,* 482 F.3d at 355 ("[T]he expert's testimony must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion")

## CONCLUSION

The Singer/Tatos declaration (Dkt. 205) is inadmissible and should be excluded.

---

[11] *See* content.schwab.com/drupal_dependencies/psr/606/2025-Q1-Schwab-Quarterly-Report.pdf (2025 Q1 disclosure); public.s3.com/rule606/chas/606-CHAS-2021Q1.pdf (2021 Q1 disclosure) *State of N.Y. v. Kraft Gen. Foods, Inc.,* 926 F.Supp. 321, 362 (S.D.N.Y. 1995) (discussion of HHI index)

| | |
|---|---|
| Dated: July 27, 2025 | Respectfully Submitted,<br><br>Shiyang Huang<br>/s/ S<small>HIYANG</small> H<small>UANG</small><br>2813 SW Rother Rd<br>Topeka, KS 66614<br>314-669-1858<br>defectivesettlement@gmail.com |

## CERTIFICATE OF SERVICE

I certify that on July 27, 2025, the above document was served via CM/ECF.

/s/ Shiyang Huang

## CERTIFICATE OF CONFERENCE

L.R. CV-7(i) exempts *pro se* litigants from the meet-and-confer requirements. In any case, it is reasonable to assume this motion will be opposed.

/s/ Shiyang Huang