# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

JONATHAN CORRENTE, *ET AL.*,

    *Plaintiffs,*

v.

THE CHARLES SCHWAB CORPORATION,

    *Defendant,*

v.

STATE OF IOWA,

    *Objector.*

Case No. 4:22-cv-470-ALM

Hon. Amos L. Mazzant, III

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................3

STATE OF IOWA OBJECTION TO CLASS ACTION SETTLEMENT...........6

ARGUMENT ....................................................................................................9

A.   Plaintiffs Pleaded Defendant Caused Great Harm, Settlement Failes to Remedy that Harm to All ....................................................................9

B.   Iowa has Standing to Object ....................................................................12

C.   The Court Owes a Fiduciary Duty to Unnamed Class Members ...........14

D.   Settlements That Give No Unique Consideration to Class Members for their Release but More than $9 Million in Attorneys' Fees Cannot be Approved ...............................................................................................15

   1.   Alleged injunctive relief gives no relief to class members, so cannot justify waiving their claims.............................................16

E.   The *Reed* Factors Weigh Against Approving the Settlement .................19

F.   Plaintiffs' Counsels' Rates are Unreasonable—and the Fees Should be Scrutinized ..........................................................................................22

G.   Notice to the Class was Constitutionally Deficient.................................25

H.   Preliminary Approval Requirements for Objectors.................................27

CONCLUSION.................................................................................................27

# TABLE OF AUTHORITIES

Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
    458 U.S. 592 (1982) ............................................................................... 12

*Amchem Prods. Inc. v. Windsor,*
    521 U.S. 591 (1997) ............................................................................... 22

*Briseño v. Henderson,*
    998 F.3d 1014 (9th Cir. 2021) ............................................................... 16

*Broussard v. Meineke Disc. Muffler Shops,*
    155 F.3d 331 (4th Cir. 1998) ................................................................. 22

*Burford v. Cargill,*
    2013 WL 4506224 (W.D. La. Aug. 21, 2013) ........................................ 14

*Campbell v. Facebook, Inc.,*
    951 F.3d 1106 (9th Cir. 2020) ............................................................... 20

*Celeste v. Intrusion Inc.,*
    2022 WL 17736350 (E.D. Tex. Dec. 16, 2022) ...................................... 20

*Cent R. & Bank. Co. v. Pettus,*
    113 U.S. 116 (1885) ............................................................................... 12

*Center for Biological Diversity v. U.S. Environmental Protection Agency,*
    937 F.3d 533 (5th Cir. 2019) ................................................................. 13

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC,*
    662 F.3d 913 (7th Cir. 2011) ................................................................. 22

*Dennis v. Kellogg Co.,*
    697 F.3d 858 (9th Cir. 2012) ................................................................. 14

*Felix v. Northstar Location Servs.,*
    290 F.R.D. 397 (W.D.N.Y. 2013) ........................................................... 26

*In re Anthem, Inc. Data Breach Litig.,*
    2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ........................................ 24

*In re Baby Prods. Antitrust Litig.,*
    708 F.3d 163 (3d Cir. 2013) ................................................................... 15

*In re Bluetooth Headset Litig.,*
    654 F.3d 935 (9th Cir. 2011) ................................................................. 22

*In re Citigroup Secs. Litig.,*
    965 F. Supp. 2d 369 (S.D.N.Y. Aug. 1, 2013) ....................................... 24

*In re Dry Max Pampers Litig.,*
    724 F.3d 713 (6th Cir. 2013) ................................................. 14, 17, 19, 20

*In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
    55 F.3d 768 (3d. Cir. 1995) ................................................................... 15

*In re HP Inkjet Printer Litig.,*
    716 F.3d 1173 (9th Cir. 2013) ............................................................... 14

*In re IndyMac Mortgage-Backed Sec. Litig.,*
    94 F. Supp. 3d 517 (S.D.N.Y. 2015) ...................................................... 14

*In re Katrina Canal Breaches Litig.*,
  628 F.3d 185 (5th Cir. 2010) ........................................................... 17
*In re Mercury Interactive Corp. Sec. Litig.*,
  618 F.3d 988 (9th Cir. 2010) ........................................................... 14
*In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*,
  869 F.3d 551 (7th Cir. 2017) ..................................................... 18, 19
*Johnson v. NPAS Solutions, LLC*,
  975 F.3d 1244 (11th Cir. 2020) ................................................. 12, 15
*Jones v. Singing River Health Servs. Found.*,
  865 F.3d 285 (5th Cir. 2017) ..................................................... 19, 21
*Knight v. Carrollton R. Co.*,
  9 La. Ann. 284 (1854) ....................................................................... 8
*Koby v. ARS Nat'l Servs., Inc.*,
  846 F.3d 1071 (9th Cir. 2017) ......................................................... 16
*Kurtz v. Kimberly-Clark Corp.*,
  142 F.4th 112 (2d Cir. 2025) ..................................................... 13, 15
*Lobatz v. U.S.W. Cellular of Cal., Inc.*,
  222 F.3d 1142 (9th Cir. 2000) ......................................................... 22
*Mirfasihi v. Fleet Mortg. Corp.*,
  356 F.3d 781 (7th Cir. 2004) ........................................................... 15
*Morrow v. Washington*,
  2020 WL 5534486 (E.D. Tex. Sept. 15, 2020) ................................ 23
*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ......................................................................... 26
*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014) ........................................................... 14
*Reed v. Gen. Motors Corp.*,
  703 F.2d 170 (5th Cir. 1983) ........................................................... 20
*Sierra Club v. Robertson*,
  960 F.2d 83 (8th Cir. 1992) ............................................................. 13
*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ........................................................... 12
*Trump v. Casa, Inc.*,
  145 S. Ct. 2540 (2025) ....................................................................... 8
*Trustees v. Greenough*,
  105 U.S. 527 (1882) ......................................................................... 12
*Zimmerman v. GJS Group, Inc.*,
  No. 17-304, 2017 WL 4560136 (D. Nev. Oct. 11, 2017) ................. 13

Statutes

28 U.S.C. § 1715 ........................................................... 7, 12, 13, 25
Iowa Code § 13.2 ............................................................................ 13

Rules

Fed. R. Civ. P. 23 ....................................................... 7, 8, 13, 14, 15, 17, 19, 20, 21, 22

## STATE OF IOWA OBJECTION TO CLASS ACTION SETTLEMENT

This case asks whether injunctive relief of little value to a class can justify almost $9 million in attorneys' fees and costs. The answer required by the Court's role as a fiduciary for the unnamed class members, interpreting Federal Rule of Civil Procedure 23 is no. This Court should reject final approval of the settlement until it reflects fair and adequate relief to the class.

In 2019, Defendant The Charles Schwab Corporation purchased a competitor, the company formerly known as TD Ameritrade—and Plaintiffs allege that purchase harmed them in a way remediable by antitrust law. *See* Dkt. 40 at 1–2. As this Court recognized, two normally available remedies for that type of harm are damages or equitable relief undoing the merger. *Id.* at 12. Here, "Plaintiffs allege that, as a result of the anticompetitive effects of the merger, they pay higher prices for securities transactions due to reduced price improvements and rebates . . . and that they suffer diminished consumer choices." *Id.* The typical equitable relief—albeit normally reserved for anticompetition actions brought by the federal government—is "divestiture." *Id.* The Parties have proposed a settlement that gives no relief from the alleged damages—and gives no relief from the long-consummated merger.

And while the unnamed class members get no monetary relief, the named Plaintiffs will each get awards of up to $5,000. Dkt. 154 at 22. Oddly unmentioned in the preliminary approval brief is mention of "<u>Monetary Consideration</u>" of fifty more dollars to the named Plaintiffs' brokerage accounts to release the claims. Dkt. 197. If every class member were getting even that relief, Iowa would not see need to object here today.

Instead, the Parties' own experts admit that there is no proposed antitrust monitoring plan in place (and that they lacked access to significant amounts of Schwab's data). *See* Dkt. 205 ¶¶ 82 ("We caution that the analyses contained in this report rely on limited data compared to that available to Schwab, particularly the

data that Schwab obtains from S3. Those data were only available to us in very limited scope, from several Schwab reports."); 87 ("To the extent that the final agreed-upon Compliance Program differs in its provisions from the recommendations in this report, we assume the expected price improvement to differ as well. Moreover, our estimates rely on limited data."). Plaintiffs' experts do not detail but explain that there is an alternative approach that would lead to *more* transparency and savings. *Id.* ¶ 86.

States play a vital role under both Federal Rule of Civil Procedure 23 and under federal law to ensure the fairness, adequacy, and appropriateness of class-action settlements. *See*, *e.g.*, 28 U.S.C. § 1715(b). Attorneys General are responsible for protecting their States' consumers. The nationwide settlement here offers a theoretical injunction and monitoring to class members under Rule 23(b)(2) and gives very real attorneys' fees and costs to Plaintiffs' attorneys—more than $9 million. Despite the troublingly inadequate notice—including a notice-and-administration website that, to this day, does not include the final settlement documents or fee petition, *see* https://perma.cc/2URP-46WZ (last accessed July 29, 2025)—the State of Iowa recently became aware of the settlement and seeks to object on the basis provided by longstanding federal law.

The Class Action Fairness Act tasks Attorneys General with monitoring and protecting their citizens from class actions that violate Rule 23. *See* 28 U.S.C. § 1715(b). Indeed, even a cursory review of the statute's context shows the vital role Congress anticipated States to play in the class action process. S. Rep. No. 109-14, 2005 U.S.C.C.A.N. 3, 5 (requirement "that notice of class action settlements be sent to appropriate state and federal officials" exists "so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens"); *id.* at 35 ("[N]otifying appropriate state and federal officials . . . will provide a check against inequitable settlements"); *id.* ("Notice will also deter collusion

7

between class counsel and defendants to craft settlements that do not benefit the injured parties."). The notice section of the Class Action Fairness Act can only be read as an invitation to States to participate in the class action settlement process and to preserve their right to object going back to the misty origins of class action settlements found in the bill of peace. *See Trump v. Casa, Inc.*, 145 S. Ct. 2540, 2555 (2025) ("The bill of peace lives in modern form . . . evolved into the modern class action, which is governed in federal court by Rule 23 of the Federal Rules of Civil Procedure."); *see also Knight v. Carrollton R. Co.*, 9 La. Ann. 284, 286 (1854) (citing *Mayor of York v. Pilkington*, 1 Atk. 284 (1737) (in which a government official in his official capacity used the bill of peace)).

That said, this Court has an independent responsibility to review and confirm that the class action settlement is reasonable and complies fully with Rule 23.

Class action settlement principles require that class members—not class counsel—be the primary beneficiaries of a settlement, and that class representatives (both Plaintiffs' counsel and the named Plaintiffs) show undivided loyalty to the class. The proposed settlement violates these principles and should be rejected on five independent grounds. This objection applies to the entire class.

First, the gross imbalance between the concrete and significant attorneys' fees and amorphous benefits to the class renders the proposed settlement unfair. That is especially so because the settlement extinguishes the class members' equitable claims in return for the injunctive relief.

Second, the named Plaintiffs and class counsel receive significant benefits while class members receive none—showing a lack of adequacy. Class counsel stands to receive almost $9 million in attorneys' fees and costs while the named Plaintiffs will get $5,000 in an incentive award and $50 in brokerage credits. Class members get the supposed relief of expensive antitrust monitoring without any of the cash

benefits received by named Plaintiffs. Thus, named Plaintiffs have inadequately represented the class.

Third, even if the attorneys should be compensated for the time they have spent on this case, their proposed hourly rates are out of step with this Court's precedents.

Fourth, the alleged injury resolved in the settlement gives relief to non-party financial companies that compete on prices that the settling parties contend get passed along as benefits to the class. *See*, *e.g.*, Dkt. 205 ¶¶ 69–76 (repeatedly explaining the cost savings to non-Parties Jane Street, Virtu, Citadel, GIX, Two Sigma, and Hudgson River). The Parties' redacted expert report contending that retail investors benefit from antitrust monitoring is attenuated at best and unconvincing at worst. In effect, they say that the monitoring will ensure non-party financial firms get better prices or will offer better terms that will then be passed along in turn to the class. The antitrust monitoring may well help those non-party financial firms, but it seems quite attenuated to extend those benefits to the class. Even the experts fill their report with caveats based on lack of access to data, lack of specific terms of the antitrust program, and more. The antitrust monitoring program may have some effect, but whether that effect is good for the class is unclear.

Fifth, the Parties' notice in this case suffered from serious deficiencies. The Court should pay special attention given the proximity of the notice received to the objection deadline.

## ARGUMENT

### A.    Plaintiffs Pleaded Defendant Caused Great Harm, Settlement Failes to Remedy that Harm at All.

Plaintiffs' 106-page complaint goes into extensive detail about "the damage inflicted by the anticompetitive combination of two of the largest retail brokerages in the United States in October 2020: Charles Schwab and TD Ameritrade." Dkt. 1, ¶ 1.

They contend that the merged entity reduces competition for retail order flow and that, because of that merger, the class has suffered monetary damages. *Id.* ¶¶ 2–3.

After going through extensive background and history, Plaintiffs' theory of the case rests on the consolidation of Retail Order Flow Market resulting from the merger. *See, e.g., id.* ¶ 294. Schwab post-merger is alleged to have such breadth of the market that it can negotiate better deals for itself with its counterparties—not Plaintiffs, but massive trading companies like Citadel. *Id.* ¶ 296. In short, Plaintiffs allege that the merger decreases competition which, Plaintiffs theorize, will raise their costs or lower potential rebates by increasing Schwab's market power to set rates for the retail order flow market. *Id.* ¶ 369. That is despite the other big effect of the merger: a jump in the number of customers—that is, class members—with access to $0 fee retail trades. Plaintiffs do not address the possibility that such market power (and increase in zero-fee trades) will redound to the benefit of Schwab's customers—which would benefit Plaintiffs. But that is not their burden.

Another oddity of the complaint is the focus on potential harm through lack of bidding by the retail flow purchasers, thus leading to indirect harm to the consumers. *E.g., id.* ¶ 384 ("After the Merger, market makers, particularly Citadel, can control a large segment of all trades from the ROFM without having to contract with several entities."). But Plaintiffs' own experts show that there is a robust market in and competition for that order flow. *See, e.g.,* Dkt. 205, ¶¶ 16 ("Non-directed orders allow brokerages such as Schwab to trade order flow for compensation from market makers, such as Citadel, Jane Street, Virtu, and others."); 38 (including a chart with six competing firms for market flow); *compare e.g.,* ¶¶ 432–40 (alleging the merger created too much market power for non-parties Citadel and Virtu), *with* Dkt. 205, ¶¶ 38–39 (laying out an exemplar with six companies, including Citadel and Virtu, competing for order flow). If the theory of harm is that there will be less

competition, the lack of any analysis of the actual affected entities—all of which are competing for the market flow and none of which are plaintiffs—is troubling.

Plaintiffs' burden is to lay out a theory of harm: the merger itself hurts them through market concentration, effects on sale of retail flow, and other collateral consequences. According to their complaint, despite a robust market of competitors seeking to purchase order flow, the post-merger Schwab entity will make a bad deal for its customers. And that is despite pages of the complaint detailing the rise of new alternatives and competitors that already forced changes—including the significant $0 retail fee—like Robinhood. *See*, *e.g.*, Dkt. 1, ¶ 56 ("A New Competitor Emerges Catering Exclusively to Individual Investors"); *id.*, ¶¶ 254–93 (discussing the rise of a new competitor eating into market share despite arguments elsewhere in the complaint that new competitors are impossible to create).

That is why Plaintiffs laid out key remedies to protect them from this alleged antitrust harm: (1) damages "in the form of the amount of retail order flow payments"; (2) "injunctive relief to remedy the antitrust injury they have sustained due to the Merger, including to remedy their inability to control trade executions and how they pay for trade executions"; and (3) "injunctive relief to prevent further antitrust injury going forward from the Merger, including an appropriate divestiture or segregation order meaningfully separating the pre-merger TD Ameritrade and pre-merger Schwab lines of business." *Id.* ¶¶ 457–59.

The proposed settlement achieved none of these—and does not even attempt to resolve damages or divestiture. The settlement forgoes damages, creates no control over trade executions, and achieves nothing even approaching divestiture. Plaintiffs submit one, partially redacted expert report to justify the relief they claim to have "won" for the class and to justify their exorbitant fees. But even Plaintiffs' own experts all but describe the anticipated injunctive relief as milquetoast compared to other antitrust monitoring options. Dkt. 205 ¶ 86. And having achieved none of their goals,

Plaintiffs seek attorneys' fees of $8,250,000, expenses of nearly $700,000, and $15,150 in incentive awards.[1] Dkt. 199 ¶ 21. Taking an average of all the attorneys and staff working on the case, Plaintiffs' counsel worked 14,744.5 hours and assert a lodestar of $10,803,933.50. Dkt. 199-1 ¶ 29. That reflects a blended rate for all fees on the case of $731.26 per hour—including hours billed by nonlawyer staff.

## B.    Iowa has Standing to Object.

The Class Action Fairness Act requires notice to "the State attorney general" of documents relating to a potential class action settlement including the complaint, proposed settlement, proposed final settlement documents and more. 28 U.S.C. § 1715(b); *see* S. Rep. No. 109-14, 2005 U.S.C.C.A.N. 3, 5, 35. And the Iowa Attorney General has substantial legal interests in the settlement approval decision that justify bringing this objection. For one, the settlement strongly affects the State of Iowa's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 607 (1982). As the Fifth Circuit has recognized, when a statute creates an interest or procedural right, that weighs in favor of finding special solicitude for *parens patriae*-related standing. *See Texas v. United States*, 50 F.4th 498, 517 (5th

---

[1] At least one circuit court has held that incentive payments to named plaintiffs violate Supreme Court precedent. *See Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244, 1255 (11th Cir. 2020) (citing *Trustees v. Greenough*, 105 U.S. 527 (1882) & *Cent. R. & Bank. Co. v. Pettus*, 113 U.S. 116 (1885)). Beyond the broader issue of such awards is a troubling lack of disclosure. Plaintiffs' fee petition includes $5,000 in a service award for being named plaintiff. *See* Dkt. 199 at 21. But it does not include that Plaintiffs will also receive "in the form of brokerage account credits, the sum of USD $50 (fifty dollars) to each Plaintiff [defined term excluding unnamed class members] to settle and release the Plaintiffs' Released Claims." Dkt. 197-1 at 9.

It is acknowledged in the final approval motion—but there is no explanation for why these three named Plaintiffs are entitled to $50 of relief that the remaining millions of class members are not. Dkt. 197 at 13. Had Plaintiffs negotiated even that compensation to all class members, Iowa would not be here today.

Cir. 2022). The proposed settlement impairs the economic well-being of Iowa consumer class members by releasing the class's claims in return for obliging Schwab to engage in a costly exercise that is not guaranteed to provide them any economic benefit. Iowa law imposes an affirmative "duty" on the Attorney General to "[p]rosecute and defend" in all courts "all actions or proceedings, civil or criminal, in which the state may be a party *or interested*, when, in the attorney general's judgment, the interest of the state requires such action." Iowa Code § 13.2 (emphasis added).

The State's interests in the economic welfare of its citizens thus supports standing and an adequate legal interest to warrant its objection here. *See*, *e.g.*, *Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir. 1992) ("[T]he State has an interest in protecting and promoting the state economy on behalf of all of its citizens." (reversing denial of state's motion to intervene)); *Zimmerman v. GJS Group, Inc.*, 2017 WL 4560136, at *5 (D. Nev. Oct. 11, 2017) (Nevada had "protectable "interest[s] in the health and well-being—both physical and economic—of its residents in general.").

The State of Iowa has an interest in protecting consumers from unfair settlements. Most recently, the U.S. Court of Appeals for the Second Circuit agreed with the State of Iowa as *amicus curiae*, vacated a class-action settlement, and remanded to the district court to reassess that settlement. *See Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112, 121 (2d Cir. 2025).

So this Court should accept this objection filed on behalf of the State of Iowa in accord with Iowa law, federal law, federal rules, and Fifth Circuit precedent. *See* Iowa Code § 13.2; 28 U.S.C. § 1715(b); Fed R. Civ. P. 23(e); *Center for Biological Diversity v. U.S. Environmental Protection Agency*, 937 F.3d 533, 536 (5th Cir. 2019). In the alternative, Iowa respectfully asks this Court to construe its objection as an *amicus curiae* brief supporting objectors and opposing final approval.

### C.    The Court Owes a Fiduciary Duty to Unnamed Class Members.

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013). Unlike ordinary settlements, "class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations." *Id.* "[T]hus, there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Id.*

Guarding against that danger is why "the Court is a fiduciary for the class members who ultimately pay any fee." *In re IndyMac Mortgage-Backed Sec. Litig.*, 94 F. Supp. 3d 517, 522 (S.D.N.Y. 2015) (citation omitted); *see also Burford v. Cargill*, 2013 WL 4506224, at *7 (W.D. La. Aug. 21, 2013) ("Furthermore, under Rule 23(e), the Court is a fiduciary who must protect the rights of absent class members.") (citation omitted). That duty must be undertaken with "a jealous regard" for the rights and interests of absent class members. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010).

Courts placed in this role "must remain alert to the possibility that some class counsel may urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) (citation modified). They must not "assume the passive role" that is appropriate when confronted with an unopposed motion in a suit between two private parties. *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). And valuation "must be examined with great care to eliminate the possibility that it serves only the 'self-interests' of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious." *Dennis v. Kellogg Co.*, 697

F.3d 858, 868 (9th Cir. 2012). "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members. The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d. Cir. 1995) (citation modified).

And beyond approval, courts help ensure that "the class attorney . . . is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, 4 Newberg on Class Actions § 13:20 (4th ed. 2009). The Court must "make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (quoting *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004)). Just as class representatives have a duty to protect the interests of absent class members, so too does the Court.

### D. Settlements That Give No Unique Consideration to Class Members for their Release but More than $9 Million in Attorneys' Fees Cannot Be Approved.

Sometimes, a lawsuit—even a class action lawsuit—will not lead to a large recovery. That happens. But when the class receives a minimal benefit, there should not be an outsized reward for counsel. Rule 23(e) requires that class members—rather than attorneys—receive the primary benefit of any class action settlement. Here, Plaintiffs achieved none of the goals they set forth in their complaint, yet Plaintiffs' counsel seek $8,250,000 in fees at a rate of more than $731 per hour. Both of those are excessive. *See* Fed. R. Civ. P. 23(e)(2)(C) (requiring district courts to consider "the terms of any proposed award of attorney's fees" in determining whether "the relief provided for the class is adequate"); *see also Johnson*, 975 F.3d at 1263 n.16; *Kurtz*, 142 F.4th at 119 (the 2018 amendments to Rule 23(e) require balancing the proposed fee award with the relief provided for the class in determining whether the settlement

is "adequate" for class members") (quoting *Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021)).

Perhaps most importantly, the settlement agreement extinguishes "all injunctive, equitable, and non-monetary claims" for the class members. *See* Dkt. 197-1 at 57. That includes claims seeking to unwind, divest, or otherwise segregate Schwab's purchased business. *Cf.* Dkt. 1, ¶¶ 458–59. So in return for "antitrust monitoring" by expensive lawyers, millions of class members must surrender their claims for what Plaintiffs contended was vital relief. Essentially, the class surrenders its claim in exchange for a promise that whatever Schwab might have done to hurt its consumers through the merger, it will not do again. Nowhere in any of the settlement documents do Plaintiffs explain that result—or how that is adequate and fair for the class to surrender necessary relief in exchange for Schwab's paying yet another cadre of outside lawyers.

### 1. Alleged injunctive relief gives no relief to class members, so cannot justify waiving their claims.

The proposed monitoring here gives no meaningful relief to the class, so it cannot be the basis to approve a settlement. In an analogous circumstance, the Ninth Circuit rejected a class-action settlement that granted an injunction that did not clearly benefit the class. *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017). That settlement mandated some disclosures, creating "an obvious mismatch between the injunctive relief provided and the definition of the proposed class." *Id.* So too here: the alleged harms stem from the merger that the settlement does not undo—rather than from an expected failure to comply with antitrust obligations in the future. Just as the *Koby* plaintiffs were not likely to be at risk from the defendant's behavior going forward, there is little evidence here (1) that the actual order flow costs will increase and (2) that the increase will hurt the class rather than non-party financial order flow purchasers like Citadel. *Cf. id.* at 1080. Nothing in the

redacted expert report makes clear how the antitrust monitoring will benefit the *class members* who are having their claims extinguished rather than non-parties to the settlement. *See*, *e.g.*, Dkt. 1, ¶¶ 458–59.

Another exemplar case for this Court to review is *Pampers*, which vacated a settlement on similar—but less egregious—terms than the settlement agreement here. 724 F.3d at 716. *Pampers* included an injunction-only settlement that explicitly protected future damages claims but extinguished all equitable claims. *Id.* The class members had actual damages that were not resolved. *Id.* at 717. Named Plaintiffs received $1,000 incentive awards. *Id.* at 722. Attorneys received $2.73 million in fees. *Id.* at 716. Relying in part on Fifth Circuit precedent, the Sixth Circuit found that the settlement did not satisfy Rule 23's fairness requirements. *Id.* at 719 (citing *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196 (5th Cir. 2010)).

*Pampers* held that to approve the settlement, its value had to be "so great, for unnamed class members, as to render counsel's $2.73 million fee reasonable rather than preferential in light of it." *Id.* It was not. And that court found that the incentive awards for the named plaintiffs created an antagonistic misalignment of incentives between them and the unnamed class. *Id.* at 721–22. "The named plaintiffs," in the court's words, "exercise their Rule 23 rights and receive an award of $1000 per child in return; the unnamed members are barred from exercising those same rights and receive nothing but illusory injunctive relief." *Id.* at 722. More, it warned fellow courts that they should be "most dubious of incentive payments when they make the class representatives whole, or (as here) even more than whole; for in that case the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief." *Id.*

Reading what the settlement agreement here does not resolve—that is, any of the major problems for the class first identified in the complaint—leaves one wondering why the agreement's proposed antitrust monitoring is valuable at all,

much less so valuable that it justifies almost $9 million in fees and expenses. Indeed, the antitrust monitoring program will last only four years. *See* Dkt. 197-1 at 14. Why four years? There is no explanation of why the risk from market concentration from the merger dissipates after that time, or why the market will have changed so that concentration is no longer a concern. *See, e.g., In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) ("The plaintiffs and Subway defend this settlement by insisting that it actually provides meaningful benefits to the class because Subway has bound itself, for a period of four years, to a set of procedures designed to achieve better bread-length uniformity. A simple comparison of the state of affairs before and after the settlement exposes the cynicism in this argument.").

And Plaintiffs' own experts disclaim any actual results. *See* Dkt. 205 ¶ 87. As they explain, their proposed solutions "are still subject to approval by" Schwab—which makes sense, because the experts analyze two noncompatible antitrust monitoring plans. *Id.* "To the extent that the final agreed-upon Compliance Program differs in its provisions from the recommendations in this report, we assume the expected price improvement to differ as well." *Id.* That makes sense too—but the settlement agreement binds Schwab to neither of the expert report's suggested paths, making the analysis mere conjecture. Even on the experts' own terms, their "estimates rely on limited data." *Id.* The upshot is that the experts cannot say that monitoring would be successful—no huge surprise given that they were analyzing hypotheticals rather than a concrete proposal.

In the *Subway Footlong Marketing* litigation, the Seventh Circuit rejected a proposed four-year injunction that would impose "new measuring tools, protocols, and inspections" that left in place the "same small chance" that the harm alleged could recur. 869 F.3d at 557. The trading costs here, even under "antitrust monitoring," are similar—there is no way to be sure that price protections will actually give relief to

the class. *Cf. id.* at 557. Nor does the class have a meaningful chance of relief through enforcing compliance with an injunction for antitrust monitoring; the most to which they would be entitled is an order requiring Schwab to issue its planned reports. *See id.* "Zero plus zero equals zero"—the relief here cannot justify settlement approval. *Id.*

Little else in the record supports the proposition that the monitoring program would benefit the class. Indeed, a program that increases Schwab's costs will very well see those costs passed along to Schwab's customers, the class members. (So too for the almost $9 million in fees and expenses.) *Pampers* found that injunctive relief accompanied by $2.73 million in attorneys' fees was "not particularly subtle" in the windfall for attorneys. *Pampers*, 724 F.3d at 718. The settlement here, with similarly illusory injunctive relief but almost three times the fees, is garish by comparison.

Neither Plaintiffs nor their experts explain how this settlement is a net benefit to the class. At a minimum, the Court should postpone approval until the proposed settlement includes a concrete and agreed-on plan—and the terms of the settlement in full have been determined by neutral experts to give net benefits to the class. Until then, denying the settlement is a larger benefit to the class than this illusory, if not counterproductive, relief. *See Koby*, 846 F.4d at 1080; *Pampers*, 724 F.3d at 722.

### E. The *Reed* Factors Weigh Against Approving the Settlement.

The Fifth Circuit expects district courts to scrutinize potential class action settlements to ensure compliance with the federal rules. "Under Rule 23, a court must hold a hearing to consider whether a proposed class action settlement is 'fair reasonable, and adequate.'" *Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 293 (5th Cir. 2017) (quoting Fed. R. Civ. P. 23(e)). That is determined by applying the six factors of the *Reed* test:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage

> of the proceedings and the amount of discovery completed; (4) the
> probability of plaintiffs' success on the merits; (5) the range of possible
> recovery; and (6) the opinions of the class counsel, class representatives,
> and absent class members.

*Id.* (quoting *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)); *see* Dkt. 197 at 17. Iowa here focuses on (4), (5), and (6), along with the complementary 2018 amendment to Rule 23(e). *See, e.g., Celeste v. Intrusion Inc.*, 2022 WL 17736350, at *3 n.3 (E.D. Tex. Dec. 16, 2022) (relying on the amendment).

Here, the primary concern is the adequacy of the settlement given the originally identified risks. The antitrust monitoring program, at this stage purely hypothetical and not before the Court for its consideration, gives no effective relief to the class. Yet named Plaintiffs and counsel receive a windfall. This settlement fails under Rule 23(e)(2)(C), which requires considering, among other factors, the effectiveness of distributing relief to the class and the attorneys' fees to be paid.

So there is no effective relief—but there are windfalls to named Plaintiffs and to the attorneys. Preserving the ability to bring a damages action later does not rescue the inadequate injunctive relief. *See Pampers*, 724 F.3d at 718. Indeed, just look here, where one of the hooks for Plaintiffs' multi-million-dollar fee request is the hard work counsel put into developing a model to prove the damages to the class. Dkt. 199 at 7 ("Plaintiffs' counsel invested significant time working with experts to develop a damages model using the 6.5 terabytes of financial data provided by Schwab.") As the Parties explain, "the settlement's benefits must be considered by comparison to what the class actually gave up by settling." Dkt. 197 (quoting *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020)).

Thus Plaintiffs give up *all* equitable relief that could be brought related to the merger—including the harms detailed in the thorough 100+ page complaint. In return, they get some monitoring and annual notice, with no guarantee that they will get any meaningful price relief—even as the named Plaintiffs each get $5,000 in

incentives and $50 in their trading accounts. Class members get no benefit from any damages modeling performed by experts. And the attorneys will get almost $9 million. That does not reflect the adequacy outlined in Rule 23 or *Reed*.

Plaintiffs assert this is a complex case. As pleaded, it was. But the actual relief here does not resolve the class's equitable claims that require, according to the complaint, meaningful segregation of Schwab's services from those of the purchased TD Ameritrade. Plaintiffs, though, abandoned any divestiture or segregation in return for some monitoring—abandoned the cure for the purported ailment in exchange for a promise to not get any sicker. Having abandoned the patient to his malady, Plaintiffs cannot claim that the complexity of treating him justifies their fees.

The Parties also admit that there is a wide range of potential recovery for the class—but elide that their negotiated for relief is only a notch past the "lowest end of the range," which is "no recovery at all," and the rest of the belt away from the "high end," which is divestiture or segregation. Dkt. 197 at 24. They further admit that their "antitrust compliance program" is not the "drastic" remedy they sought. *Id.* Iowa is particularly skeptical that the actual value of this settlement is "$128.4 million to $174 million annually," *id.* at 25—an amount based on a hypothetical program that will perform unspecified tasks in pursuit of vaguely defined duties in return for an annual announcement that things for the class have gotten no worse. Schwab, that is, has agreed to change none of the alleged nefarious behavior that Plaintiffs claimed had distorted the market and cost them actual dollars, though it has agreed to pay some lawyers to watch it continue that behavior. The value of that settlement to anyone but the named Plaintiffs, who each get $5,050, is zero.

Tied into that are Plaintiffs' attorney fee request—along with a suspicious clear sailing agreement in which "Schwab agreed not to object to these [fee] applications." *Id.* at 26; *see Jones*, 865 F.3d at 295 ("[T]he district court, rightly concerned about the implications of the 'clear sailing' fee agreement . . . applied a

21

heightened standard of care in examining the allegations of collusion.") (quoting *In re Bluetooth Headset Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)).

Independently, the proposed settlement should not be approved due to inadequate representation. As described above, the class representatives have agreed to a settlement that gives zero benefit to the class but thousands of dollars to themselves and millions to their counsel. This is a comprehensive failure to guard the class's interests, sacrificing them for personal reward and a windfall to their lawyers.

This Court may scrutinize the terms of a settlement when evaluating whether class representatives are adequate. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 619–20 (1997). Rule 23(a)(4) conditions class certification upon a demonstration that "the representative parties will fairly and adequately protect the interests of the class." That section, along with "basic due process," demands that the named representatives and class counsel manifest "undivided loyalties to absent class members." *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998). Similarly, class counsel must "prosecute the case in the interest of the class … rather than just in their interests as lawyers who if successful will obtain a share of any judgment or settlement as compensation for their efforts." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011). When "class counsel agree[s] to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breache[s] their fiduciary duty to the class." *Lobatz v. U.S.W. Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000). The inexorable conclusion here—where the class gets nothing while the lawyers get millions—is that the Court is witnessing just such a breach.

### F.    Plaintiffs' Counsels' Rates are Unreasonable—and the Fees Should be Scrutinized.

The Eastern District of Texas recently found rates of $500 per hour excessive for a partner in a "complex class action civil rights case that involved Fourth and

Fourteenth Amendment equal protection issues, a significant plaintiff class, and widespread national coverage." *Morrow v. Washington*, 2020 WL 5534486, at *4 (E.D. Tex. Sept. 15, 2020). That case also disaggregated billing rates for different stages of the litigation and considered the appropriateness of those rates given both the time they were charged and the difference in difficulty in the case. *Id.*

Plaintiffs' hourly rates for attorneys here range from "$400 for attorneys focused on document review to $1,500 for senior partners"—not including one especially senior partner that charges $1,750 per hour. Dkt. 199 at 14–15. As calculated above, the blended rate here is more than $731 per professional—including associates, partners and even support staff. Plaintiffs contend that their fees in this no-recovery-for-the-class settlement are fair and appropriate. Not so. Even worse, they are far out of range for the market in the Eastern District of Texas. *Morrow*, 2020 WL 5534486, at *4. Even at an inordinately high blended rate of $400 per hour, attorneys' fees here would be $5,897,800 for the number of hours worked. *See* Dkt. 199 at 11. Applying the same multiplier (0.763) requested by Plaintiffs' counsel, *id.*, cuts that to $4,500,021.40. Even that number, roughly half the disproportionate award sought by Plaintiffs' counsel, is higher than the fees rejected in *Pampers* .

Looking at the specific requests rather than generalizing from the grand total does not help. Bathaee Dunne LLP includes in its lodestar request 7,086.5 total hours amounting to roughly $6.6 million in fees. Of those hours, more than half are attributed to partners with hourly rates between $1,095 and $1,295. *See* Dkt. 199-1, at 12. A staff attorney was billed out at $500 for another 1,048 hours. *Id.* In this district, $500 is appropriate compensation for a partner's work. *See Morrow*, 2020 WL 5534486, at *4. Even if all Bathaee Dunn's lawyers warranted such a partner rate, its request would be slashed by more than $3 million.

Korein Tillery LLC fares a little better—out of the 7,434.30 hours it bills, only 1,116.2 hours are from the partners—at rates ranging from $900 to $1,750. Dkt. 199-

2 at 6. But here the staff attorneys are billed out at $400 per hour—closer to rates for partners than for staff attorneys. Indeed, the blended rate still comes out at more than $522 per professional—including partners, associates, staff attorneys, and non-attorney staff. *Id.*

And at both firms, the "staff attorneys" appear to be contracted document reviewers for whom actual market participants would pay substantially lower rates than they would for permanent employees of white-shoe firms. *See, e.g., In re Citigroup Secs. Litig.*, 965 F. Supp. 2d 369, 393–399 (S.D.N.Y. Aug. 1, 2013) (concluding $200 was a reasonable rate for contract lawyers in a complicated securities case); *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, *16–20 (N.D. Cal. Aug. 17, 2018) (awarding rate of $240 for such lawyers after special master concluded $156 was appropriate).

And a third firm even acknowledged that the hourly rates are not specific to this jurisdiction. *See* Dkt. 199-5 ¶ 7. That firm's fee request—which declines to assign a total amount or to explain its inscrutable coding system—acknowledges that it charges "the same rates consistently without regard to jurisdiction." *Id.* Class actions do not warrant fees as participation trophies—Rule 23 requires adequate relief to justify such high fees.

"In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content*, 517 F.3d 220, 227 (5th Cir. 2008). Here, while there are declarations and billing rates attached to the request, those hours are unreasonable, are unreasonably allocated, and are unreasonably high. Even at the $500 per hour for partners and $200 per hour for staff and contract lawyers described above, the requested fee should be only $2,551,050 for 5,102.1 partner hours and $1,970,480 for 9,852.4 non-partner hours, totaling $4,521,530 (for the five firms whose fee matrices Iowa could

understand). Then, given that most generously Plaintiffs achieved one of the three goals they pleaded in their complaint (no damages, no divestment or segregation) a lode-star adjustment multiplier of 0.33. That leads to a total of $1,492,104.9.

### G.    Notice to the Class was Constitutionally Deficient.

Attorneys' fees are contemplated in the preliminary approval hearing but are not listed or determined until later. Yet the settlement website, which promises July 17 to post the attorneys' fee request, never did so. Now, on the objection deadline, it cannot be said that the class has reasonable notice as to attorneys' fees—nor that they have reasonable time to object to those fees.

There is another independent notice-related issue to deny final approval here: inadequate notice under federal law. *See* 28 U.S.C. § 1715. The Class Action Fairness Act includes certain requirements that must be included in the notice to States. *Id.* Those include "a copy of the complaint and any materials filed with the complaint[;]" "notice of any scheduled judicial hearing[;]" proposed notices; proposed settlement agreements; "if feasible, the names of class members who reside in each State" and some additional information or, in the alternative "a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement;" and "any written judicial opinion relating to" some of the above described materials. 28 U.S.C. § 1715(b)(1)–(8).

Here, attached as exhibit one, is what Iowa received: two pages, one of which lists two attachments (not attached) and the other of which lists a signature block. *See* Ex. 1 (attached to this objection). That is incomplete and deficient notice. *See id.*; 28 U.S.C. § 1715(b). On the notice that we received, we are missing many of the required aspects of section 1715(b). For example, there is no list of affected Iowans nor even an approximation of how many Iowans are affected. Given that each class

member has an account with Defendant that includes an address, such information should be easy to provide. Nor is there notice of any scheduled judicial hearing. Perhaps there was more intended to be sent—the signature page is numbered "4"—but the State lacks more. *Id.* at 2. That deficiency alone is enough to reject final approval.

The principle of disclosure through notice has been called the "first and perhaps most important principle for class action governance." Alexandra Lahav, *Fundamental Principles for Class Action Governance*, 37 Ind. L. Rev. 65, 118 (2003). Defendant possesses the contact information of every class member—after all, each member holds an account with all sorts of identity-verification requirements. Despite that, notice did not make it to every class member until close to the objection deadline. Even worse, the settlement website itself is missing key information—including information that it promised. On the website FAQ, the settlement agreement and attorneys' fees motions are promised to be posted no later than July 17, 2025. *See* http://bit.ly/3U1tUFy (Last accessed July 28, 2025). But those documents are not posted as of today, the objection deadline. *Id.*

This schedule, with millions of dollars at stake, shows notice that is not "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). As one court has recognized, "lip service" to the right to object is not enough. *Felix v. Northstar Location Servs.*, 290 F.R.D. 397, 408 (W.D.N.Y. 2013).

And the implication of this final rush to final approval is troubling. For the settling parties, inadequate notice means less resistance and less cost to settlement. But for class members, it means an abridgment of statutory and constitutional rights. "If plaintiffs and their attorneys are acting like they have something to hide from the absent class members, perhaps it's because they do." *Id.* at 408.

### H.    Preliminary Approval Requirements for Objectors.

The district court's preliminary approval order requires substantial compliance with the following requirements: objectors "must set forth the Settlement Class Member's: (1) name, address, and telephone number; (2) proof of membership in the Settlement Class; (3) all grounds for the objection; (4) the name, address, and telephone number of the Settlement Class Member's counsel, if any; and (5) a list of other cases in which the objector or counsel for the objector has appeared either as an objector or counsel for an objector in the last five years." Dkt. 157.

Objector State of Iowa is in a slightly different position but for purposes of this objection attempts to "substantially comply" with the Court's requirements:

**Objector:**

> State of Iowa/Iowa Attorney General's Office
> c/o Solicitor General Eric Wessan
> 1305 E. Walnut St.
> Des Moines, IA 50319
>
> Iowa is a State authorized to object by Iowa Code § 13.2 and 28 U.S.C. § 1715.
>
> The State of Iowa has not directly filed as an objector in any case in the last five years. But both the State of Iowa and its counsel have appeared as amicus in support of objectors in three cases: *Kurtz v. Kimberly-Clark Corporation*, 24-425 (2d Cir.); *In re Wawa, Inc. Data Sec. Litig.*, 24-1874 (3d Cir.); and *Patacsil v. Google LLC*, 24-3387 (9th Cir.)

**Counsel**:
> Eric Wessan
> 1305 E. Walnut St.
> Des Moines, IA 50319
> eric.wessan@ag.iowa.gov
> (515) 823-9117

## CONCLUSION

Objector State of Iowa respectfully asks this Court to deny the proposed settlement that gives almost $9 million to Plaintiffs' attorneys in fees and costs, and

is unfair and inadequate under Rule 23. In the alternative, it should approve the settlement contingent on (1) removal of the award of service fees, (2) removal of the award of $50 in account credit to each named Plaintiff, and (3) reduction of attorneys' fees to no more than $1,492,104.90.

BRENNA BIRD
Attorney General of Iowa

/s/ Eric H. Wessan
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Objector State of Iowa*