## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

|  |  |
|---|---|
| JONATHAN CORRENTE, et al., | Civil Action No. 4:22-CV-470-ALM |
| Plaintiffs, | Hon. Amos L. Mazzant, III |
| v. |  |
| THE CHARLES SCHWAB CORPORATION, |  |
| Defendant. |  |

## DEFENDANT'S RESPONSE IN SUPPORT OF SETTLEMENT APPROVAL

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 4

I.   The Settlement Is Narrowly And Effectively Tailored To The Claims Released ............... 4

II.  The Named Plaintiffs Have Article III Standing ................................................ 6

III. The Settlement Is Reasonable And Offers Real Value To The Class ................................. 7

IV. The Settling Parties Provided Ample Notice ................................................. 13

V.  The Service Award And Attorneys' Fees Cast No Doubt On The Settlement ................. 16

CONCLUSION ............................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ...................................................................................................9

*China Agritech, Inc. v. Resh*,
    584 U.S. 732 (2018) ...............................................................................................8, 9

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
    2020 WL 836348 (E.D. La. Feb. 20, 2020) ...........................................................17

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ..........................................................................10, 12

*Davis v. United States*,
    564 U.S. 229 (2011) ...................................................................................................6

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) .................................................................................................14

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    2013 WL 4399215 (S.D.N.Y. Aug. 13, 2013) ........................................................9

*Garcia v. L.A. Cnty. Sheriff's Dep't*,
    2015 WL 13646906 (C.D. Cal. Sept. 14, 2015) .................................................10, 12

*Hyland v. Navient Corp.*,
    48 F.4th 110 (2d Cir. 2022) .................................................................................7, 8

*In re Jan. 2021 Short Squeeze Trading Litig.*,
    2023 WL 6534502 (S.D. Fla. Sept. 7, 2023) ...........................................................9

*In re Katrina Canal Breaches Litig.*,
    628 F.3d 185 (5th Cir. 2010) ..................................................................................13

*Kincade v. Gen. Tire & Rubber Co.*,
    635 F.2d 501 (5th Cir. 1981) ....................................................................................7

*Koby v. ARS Nat'l Servs., Inc.*,
    846 F.3d 1071 (9th Cir. 2017) ..........................................................................12, 13

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................................6

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) ..................................................................................15

*McAlarnen v. Swift Transp. Co.*,
    2010 WL 365823 (E.D. Pa. Jan. 29, 2010) ............................................................10

*Meese v. Keene,*
　481 U.S. 465 (1987)................................................................................7

*Montelongo v. Meese,*
　803 F.2d 1341 (5th Cir. 1986) ...............................................................14

*Piambino v. Bailey,*
　610 F.2d 1306 (5th Cir. 1980) ...............................................................17

*In re Polyurethane Foam Antitrust Litig.,*
　168 F. Supp. 3d 985 (N.D. Ohio 2016)..................................................15

*Reed v. Gen. Motors Corp.,*
　703 F.2d 170 (5th Cir. 1983) .................................................................10

*In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.,*
　869 F.3d 551 (7th Cir. 2017) .................................................................12

*Uzuegbunam v. Preczewski,*
　592 U.S. 279 (2021)................................................................................7

*Wehlage v. Evergreen at Arvin LLC,*
　2012 WL 2568151 (N.D. Cal. June 25, 2012) .........................................7

**<u>Statutes</u>**

28 U.S.C. § 1715.............................................................................................3

**<u>Rules</u>**

Fed. R. Civ. P. 23 .............................................................................5, 9, 13, 16

**<u>Other Authorities</u>**

Anne Stanley, *Best Online Brokers List For 2025: These 3 Brokerages Top The
　Rest*, Investor's Business Daily (Jan. 24, 2025).....................................2

Maisha Shahid, 10 Best Online Brokers and Trading Platforms of 2025,
　Forbes Adviser (June 2, 2025),
　https://www.forbes.com/advisor/investing/best-online-brokers ................2

S. Rep. 109-14 (2005).....................................................................................16

Schwab Order Execution Advantage,
　https://www.schwab.com/execution-quality ............................................2

Settlement Website,
　https://www.schwabcorrentesettlement.com/documents ........................14

StockBrokers.com 2025 Annual Awards,
　https://www.stockbrokers.com/annual-awards-2025 (Jan. 28, 2025)........2

U.S. Department of Justice Antitrust Division, *Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations* (Nov. 2024)..........................6, 11

Pursuant to this Court's order (Dkt. 157 ¶ 25), Defendant The Charles Schwab Corporation ("Schwab") respectfully submits this memorandum in response to class members' objections to the Settlement Agreement (Dkt. 197-1) and in support of final approval for the settlement of this matter.

## **INTRODUCTION**

This lengthy antitrust suit arises from Schwab's acquisition of TD Ameritrade ("Ameritrade") in 2020. Plaintiffs represent a settlement class of current U.S. brokerage customers of Schwab or its affiliates, including customers who previously held accounts at Ameritrade. The complaint claims that Schwab's acquisition of Ameritrade violated Section 7 of the Clayton Act by reducing competition in a purported market for retail order flow, and that members of the proposed settlement class received less favorable execution prices on the securities they traded and lower "rebates" on their trades because of the acquisition.

Plaintiffs' case was never likely to succeed. The Department of Justice extensively reviewed the transaction under the Hart-Scott Rodino Act, and it allowed the acquisition to close without objection. Plaintiffs allege that they would have received better prices on their trades but for the merger, but their claims are purely speculative. Execution prices turn on a host of factors, including the timing of a trade, the size of the trade, the volatility of the security, and trading trends in the market that can change by the millisecond. And *each execution* would require an individualized inquiry: inquiries that would number in the thousands multiplied by the millions of alleged class members. Plaintiffs certainly could not have proven that Schwab would have paid them higher "rebates" absent the merger because Schwab *never* paid rebates to customers—not before or after the merger.

1

Contrary to Plaintiffs' claims, Schwab is confident that the evidence would have shown that its acquisition of Ameritrade only enhanced the services it delivers to its customers, including with respect to execution quality. Schwab calculates that *97%* of its customers' orders are filled at a price that is better than the applicable benchmark price (*i.e.*, National Best Bid and Offer or "NBBO").[1] This year, *Investor's Business Daily* ranked Schwab among the very top online brokers for "Trade Execution Speed & Price."[2] StockBrokers.com awarded Schwab its "Best in Class Overall" recognition for brokers in 2025.[3] And *Forbes* recently ranked Schwab as the "Best Online Broker Overall" for 2025, as well.[4] Schwab takes pride in these recognitions and in delivering unparalleled service to its customers, and it rejects the pure conjecture of Plaintiffs' claims.

Notwithstanding Schwab's confidence in the merits of its legal position, Schwab agreed to settle this case in mutually beneficial fashion to avoid the burden of protracted litigation. The parties negotiated the settlement at arm's length, with the assistance of a well-respected mediator who formerly served as a federal district court judge. Under the terms of the settlement, Plaintiffs will release only their claim for injunctive relief under Section 7 of the Clayton Act in exchange for Schwab's assessment, creation, and adoption of a robust antitrust compliance program designed

---

[1]  *See* Schwab Order Execution Advantage, https://www.schwab.com/execution-quality (last visited Aug. 7, 2025)

[2]  *See* Anne Stanley, *Best Online Brokers List For 2025: These 3 Brokerages Top The Rest*, Investor's Business Daily (Jan. 24, 2025), https://www.investors.com/news/best-online-brokers-list-2025 (last visited Aug. 7, 2025).

[3]  *See* StockBrokers.com 2025 Annual Awards, https://www.stockbrokers.com/annual-awards-2025 (Jan. 28, 2025) (last visited Aug. 7, 2025).

[4]  *See* Maisha Shahid, *10 Best Online Brokers and Trading Platforms of 2025*, Forbes Adviser (June 2, 2025), https://www.forbes.com/advisor/investing/best-online-brokers (last visited Aug. 7, 2025).

by a neutral third-party expert.  The proposed relief provides meaningful benefit and directly addresses Plaintiffs' claim that they and the class are at risk of prospective injury from future violations of the antitrust laws.  *See* Compl. ¶¶ 482, 485.  Schwab will not receive a release from class members for monetary claims.

On February 19, 2025, this Court preliminarily approved the settlement.  *See* Dkt. 157. Even before this Court's order, Schwab had sent detailed settlement information to relevant federal and state authorities to satisfy its notice obligations under the Class Action Fairness Act, 28 U.S.C. § 1715.  *See generally* Mendro CAFA Decl.  And in the ensuing months after this Court's preliminary approval, the parties administered a comprehensive campaign at Schwab's expense to provide notice to the class and to offer class members a full opportunity to understand and object to the settlement.  Ankura Consulting Group LLC ("Ankura"), the settlement's notice administrator, delivered emails and postcards to over 24 million class members—99.5% of the class—and established a settlement website viewed nearly 300,000 times and a settlement helpline that received nearly 25,000 calls.  Dkt. 197-7 ¶¶ 17, 31, 36.  Yet as of noon on August 13, from a class of 24,908,212 members, this Court had received only 71 objections on the docket, including both repeat objectors (*e.g.*, Dkts. 184, 215) and non-class members (*e.g.*, Dkt. 245).  And many of the "objections" were from Schwab customers who voiced their *support* for Schwab, who saw no "basis" for the suit, Dkt. 228, and who wrote merely to say that they were "entirely satisfied with [Schwab's] products, services and prices," Dkt. 239.  By a charitable count, less than *.0003%* of the class objected to the settlement—fewer than three out of every *million* class members.

That fact—and the meaningful relief proposed—weighs heavily in favor of approving the settlement.  And for the reasons explained below, the few discrete objections provide no basis for

denying settlement approval.  Schwab respectfully requests that the Court enter final approval of the settlement.  *See* Dkt. 197.

## ARGUMENT

As this Court found in preliminarily approving the settlement, the settlement satisfies Rule 23's requirements.  *See* Dkt. 157 ¶ 4.  Notice has been provided to the class, and no objector has raised any sufficient ground for rejecting the settlement now.

Taken together, the sparse objections fell into five general categories: (1) the claims lack merit; (2) the named Plaintiffs lack Article III standing; (3) the settlement offers inadequate relief because it does not provide monetary compensation and the value of the antitrust compliance program is supposedly speculative; (4) the settlement notice was insufficient; and (5) the service award and attorneys' fees are unreasonable.  None of these arguments warrants denial of settlement approval.

## I.    The Settlement Is Narrowly And Effectively Tailored To The Claims Released

Schwab appreciates the many supportive comments submitted by its customers during the objection period.  *See, e.g.*, Dkt. 240 (opining that "I have not experienced . . . financial damage" from the merger); Dkt. 249 ("I do not believe that Schwab's acquisition of TD Ameritrade caused any harm to me or to other retail investors."); Dkt. 252, at 3 (highlighting "the implicit approval" of the merger "from individuals who remained customers of Schwab during the highly publici[z]ed merger"); Dkt. 254 ("I have not suffered any damages"); Dkt. 258 ("We are very pleased to . . . be a Charles Schwab customer," and the "amount and quality of information and research available" has "improved" after the merger.).

Schwab agrees that Plaintiffs' "claim lacks merit" and "denies any loss or damage to Plaintiffs."  Dkt. 197-1, at 1 (Settlement Agreement).  As the State of Iowa's objection underscores,

Plaintiffs offered no cognizable theory of antitrust injury, both because "there is a robust market in and competition for" retail order flow, and because the merger benefitted customers by widening "access to $0 fee retail trades," which "redound[s] to the benefit of Schwab's customers." Dkt. 245, at 10. Even aside from the merits of their claims, Plaintiffs would have been unable to support class certification for several reasons, including that an individualized analysis would be required for each trade for thousands of trades for millions of customers. Schwab is confident that it would have prevailed if it litigated this case to judgment.

Although the weakness of Plaintiffs' claims is not a singular reason to deny settlement approval, it is a significant consideration in assessing the adequacy of the settlement. Schwab discusses this point below in response to objections related to the settlement consideration. *See* pp. 10, 12, *infra*; *see also* Fed. R. Civ. P. 23(e)(2)(C)(i) (requiring that the risks of trial and appeal be considered in assessing the adequacy of the relief).

The well-tailored relief proposed by the settlement addresses the single issue common to the alleged class: fear of future potential injury. This settlement, made after extensive, arms-length negotiations, was a difficult decision that took many factors into account. For example, continued litigation would be expensive, requiring internal and external resources and considerable work with outside experts. Some objectors expressed concern about the cost of the settlement, but it is unquestionable that the expense of continued litigation would be many times higher. Continued litigation also would impose excess burdens on Schwab's employees. And it would require the continued exchange of business and customer information that Schwab views as sensitive. On the other hand, settling the case provides mutually beneficial relief and resolves the certainty of cost and uncertainty of litigation. Schwab, therefore, strongly supports approval of the settlement, even though it agrees with several objectors who criticized or disputed the claims.

5

## II.    The Named Plaintiffs Have Article III Standing

Some objectors contend that the Court lacks jurisdiction to approve the injunctive relief provided in the settlement because the class representatives cannot demonstrate any future injury and thus lack Article III standing to seek prospective relief.  *See, e.g.*, Dkt. 215, at 2-6.  Another contends that the settlement gives rise to an Article III redressability problem merely because it promises a lesser form of injunctive relief than complete divestiture.  *See* Dkt. 251, at 5.  These contentions are incorrect.

To demonstrate Article III standing, a plaintiff must demonstrate (1) an "injury in fact" (2) traceable to the defendant's conduct and (3) that would be redressed by a favorable judicial ruling.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The class representatives have standing based on their allegations they "have been" and in the future "*will be injured* by the substantial lessening of competition as a result of the acquisition."  Compl. ¶ 485 (emphasis added); *see also id*. ¶ 482, Prayer for Relief ¶ H.  This Court previously found that Plaintiffs alleged antitrust injury based on these allegations.  Dkt. 40, at 4.  The settlement's proposed antitrust compliance program will directly address the risk of ongoing violations of the antitrust laws in the future and will therefore address the risk of resulting harm.  As the Antitrust Division of the Department of Justice has observed, an "antitrust compliance program should . . . minimize risk of civil antitrust violations."  U.S. Department of Justice Antitrust Division, *Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations* 2 (Nov. 2024), tinyurl.com/946k8mmn.  Although Schwab does not believe Plaintiffs would have been able to prove its allegations of antitrust injury on the merits, "weakness on the merits" is no basis for finding an "absence of Article III standing."  *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011).

6

Moreover, Article III does not require that a settlement provide the precise relief sought in a complaint.  Even "partially" redressing injuries suffices for standing's redressability requirement.  *See, e.g.*, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (a dollar in nominal damages satisfies redressability); *Meese v. Keene*, 481 U.S. 465, 476 (1987) (standard for redressability is whether the remedy could "partially redress" the alleged injury).  The requirement of partial redress is easily satisfied here.  Accordingly, this Court has jurisdiction to approve the settlement.

### III.    The Settlement Is Reasonable And Offers Real Value To The Class

Objectors contend that the settlement provides inadequate relief because it awards the class no monetary compensation and no ability to opt out, *see, e.g.*, Dkts. 168, 180, 187, 227, 253, and because the value of the promised relief is supposedly speculative, *see, e.g.*, Dkt. 176, at 6-7; Dkt. 245, at 16-19.  Those arguments provide no basis for denying settlement approval.

**1.**  There is no merit to the contentions that the settlement is inadequate merely because it promises no monetary compensation and precludes opt-outs.  Those are the defining features of a Rule 23(b)(2) class, and there is no inherent unfairness in settlements involving such classes.  *See, e.g.*, *Hyland v. Navient Corp.*, 48 F.4th 110, 119 (2d Cir. 2022) (affirming district court's approval of a Rule 23(b)(2) settlement under which the defendant agreed "to implement a number of business-practice enhancements"); *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 506-07 (5th Cir. 1981) (no opt-out rights in settlement involving Rule 23(b)(2) class).

Nor is there any unfairness under the facts of this case.  The settlement offers no monetary compensation to absent class members precisely *because* they are not releasing individual claims for damages and remain free to pursue those claims in standalone suits.  *See, e.g.*, *Wehlage v. Evergreen at Arvin LLC*, 2012 WL 2568151, at *1 (N.D. Cal. June 25, 2012) ("the absence of cash

compensation to the Class is reasonable" because "the Class members retain the ability to pursue separate claims for damages").[5]

One objector asserts that it would be impracticable to pursue individual damages claims because such damages will be "smal[l]," and class claims for damages are now time-barred. *See* Dkt. 251, at 3 (quoting *China Agritech, Inc. v. Resh*, 584 U.S. 732 (2018)). But some objecting class members claim (unpersuasively, in Schwab's view) to have lost significant sums, and those members would have every incentive to litigate individually if they believed their claims were meritorious. *E.g.*, Dkt. 255, at 1 (alleged losses of $509,231); Dkt. 227, at 1 (alleged losses of $267,000); Dkt. 253, at 2 (alleged losses of up to $15,200).[6] Conversely, if individual damages are indeed small, class members' interest in preserving those claims is correspondingly insignificant. Whatever interest they may lose "in practice" is no basis for rejecting the settlement. *Hyland*, 48 F.4th at 120 n.3 (approving settlement despite argument that "class members will not be able to bring individual actions in practice"). Most importantly, as the objections tacitly admit, any such calculations are highly individualized and inappropriate for class treatment.

The fact that class claims for damages are now time-barred is equally irrelevant to the settlement's reasonableness. Under *China Agritech*, class damages claims that were not filed

---

[5] One objector asserts that the $50 in monetary consideration paid to the named Plaintiffs alone precludes settlement approval. Dkt. 184, at 1, 3-9. But the class representatives are receiving that payment in exchange for their agreement to release their own individual damages claims. No other class members will release their damages claims.

[6] These types of purported losses are in no way related to Schwab's acquisition of Ameritrade. For instance, one objection claimed losses exceeding $500,000 based entirely on allegations that Ameritrade blocked purchases and sales of AMC shares and call options during January 2021. *See* Dkt. 255. Measures taken in response to unprecedented volatility in meme stocks are unrelated to Schwab's acquisition of Ameritrade and were the subject of separate litigation. *See generally In re: January 2021 Short Squeeze Trading Litig.*, No. 1:21-md-02989-CMA (S.D. Fla.). Nevertheless, objectors remain free under the settlement to pursue their own individual claims.

within the statute of limitations expired because they were not timely filed—not *because of the settlement*. 584 U.S. at 748 ("Time to file a class action falls outside the bounds of *American Pipe*" tolling.).  Furthermore, no objector even attempts to argue that this case had any reasonable prospect of being certified as a damages class.  It did not.  Plaintiffs claimed that they were damaged by unfavorable execution prices, but the execution price for any single securities transaction is idiosyncratic.  As explained above, it depends on a multitude of individualized factual variables that change by millisecond.  Here, Plaintiffs contended that hundreds of millions of trades transacted *over nearly five years* would have been executed at different prices if Schwab had never acquired Ameritrade.  Setting aside the merits, that theory could never have been proven on a classwide basis.  The individualized questions of fact it would raise would vastly predominate over any common questions.  Therefore, no damages class could have been certified in this case. *See* Fed. R. Civ. P. 23(b)(3).

In any event, a class action is "an exception to the usual rule" that litigation is a one-on-one endeavor, *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979), and no one has a right "to bring their own separate class action," *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 6534502, at *10 (S.D. Fla. Sept. 7, 2023) (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 4399215, at *6 (S.D.N.Y. Aug. 13, 2013)).  Class members "remain free to pursue their claims through an individual action, which would permit them to obtain a ruling on the merits of their claims" for damages. *Id.*

**2.**  The value of the settlement relief is far from speculative.  Schwab's antitrust compliance program will offer significant value to its customers, and it falls well within the range of reasonable remedies for settling the claim Plaintiffs assert.

9

The Fifth Circuit tasks courts assessing a class action settlement's adequacy to weigh the promised remedies against "the probability of plaintiffs' success on the merits" if the case were litigated to judgment. *Reed v. Gen. Motors Corp.,* 703 F.2d 170, 172 (5th Cir. 1983). In performing that "balancing task," courts are "entitled to rely upon the judgment of experienced counsel for the parties," and "absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). And courts should be especially hesitant to second-guess the fairness of injunction-only settlements, given the difficulty in "judg[ing] with confidence the value of the terms of" a settlement that "provides for injunctive relief" alone. *Garcia v. L.A. Cnty. Sheriff's Dep't*, 2015 WL 13646906, at *10 (C.D. Cal. Sept. 14, 2015) (quotation marks omitted) (approving injunction-only class action settlement); *see McAlarnen v. Swift Transp. Co.*, 2010 WL 365823, at *10 (E.D. Pa. Jan. 29, 2010) (finding that "proposed settlement falls within the range of reasonableness," even though it was "difficult to quantify the value of the settlement").

Judged against those deferential principles, the settlement here is more than fair, reasonable, and adequate. The parties settled after a robust mediation process before the Honorable Nancy F. Atlas, a highly respected mediator and former federal district court judge. Dkt. 197-6 ¶¶ 1, 3. Judge Atlas opined that "[t]he proposed settlement was reached through a robust negotiation process." *Id.* ¶ 6. "The negotiations were hard-fought" and "conducted at arm's length," with "no apparent collusion between the parties." *Id.* ¶ 7. That alone is reason to presume the settlement is reasonable. *See Cotton*, 559 F.2d at 1330.

Based on their hard-fought negotiation, the parties agreed that Schwab would implement an antitrust compliance program based on the recommendations of leading antitrust attorneys from the law firm Fried, Frank, Harris Shriver & Jacobson LLP. The program's principal consultant,

10

Bernard Nigro, previously served as the Department of Justice's Principal Deputy Assistant Attorney General for Antitrust and the Federal Trade Commission's Deputy Director for the Bureau of Competition. And contrary to objectors' concerns that the antitrust compliance program will be unenforceable, *e.g.*, Dkt. 176, at 6, the parties expressly agreed to "reques[t] that the Court retain jurisdiction to enforce the terms of the settlement," Dkt. 197-6 ¶ 9; *see* Dkt. 197-1 § 13.3. As explained above (and as Plaintiffs agree, *see* Dkt. 197, at 5-6), the compliance program will directly address the purported injuries alleged in the complaint.

That promises real, tangible value to the class. The Department of Justice has underscored that "[a]ntitrust compliance programs promote vigorous competition in a free market economy by creating a culture of good corporate citizenship." *Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations*, *supra*, at 1. "[W]hen potential antitrust issues arise, an effective compliance program should enable a company to swiftly detect and address them." *Id.* Thus, "[a] strong culture of compliance can allow a company to steer clear of civil antitrust violations and, if violations do occur, to promptly self-disclose and remedy them and cooperate with a civil antitrust investigation." *Id.* at 1-2. As Judge Atlas opined, the settlement "provides meaningful relief to the members of the settlement class." Dkt. 197-6 ¶ 10.

For their part, Plaintiffs attempt to demonstrate the value of the antitrust compliance program through an expert report purporting to quantify the monetary value of specific measures Schwab could introduce. *See* Dkt. 205. Schwab does not endorse that report's recommendations and has not agreed to adopt the measures it outlines. Since Schwab is not bound by the report's premature proposals, its value calculations are conjecture. But nothing turns on this Court's acceptance of that report's specific calculations. There is nothing conjectural about Schwab's implementation of a robust antitrust compliance program. The program will offer real value to

class members, even if the value may be difficult to quantify. *See Garcia*, 2015 WL 13646906, at *10; *accord* Dkt. 205 ¶ 87 ("the recommended features outlined in this report are not the only viable methods through which the Compliance Program could generate consumer benefits in the form of greater price improvement").

Schwab acknowledges, of course, that the settlement does not promise the divestiture remedy and damages that Plaintiffs requested in their complaint. But "compromise is the essence of a settlement," and it inherently requires "a yielding of absolutes and an abandoning of highest hopes." *Cotton*, 559 F.2d at 1330 (quotation marks omitted). Objectors questioning the adequacy of the settlement fail to acknowledge the weaknesses in Plaintiffs' suit, including the very real risk that laches serves as a complete defense. *See* Dkt. 40, at 13-14 ("laches defense will undoubtedly present disputed issues of fact regarding the unreasonableness of any delay and the prejudice suffered by Defendant"). That the settlement provides no monetary relief to class members—and that Schwab is willing to forgo a release of monetary claims—reflects the reality that Plaintiffs had no theory of damages or antitrust injury that was likely to succeed. The promised antitrust compliance program falls well within the range of reasonableness required for settlement approval.[7]

---

[7] This case is far afield from the cases disapproving injunction-only settlements discussed by objectors. In *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551 (7th Cir. 2017), Subway simultaneously promised both to take steps to ensure that the bread loaves of its foot-long sandwiches were all twelve inches long and to issue a disclaimer that it could even *possibly* provide consistent "uniformity in bread length" at twelve inches. *Id.* at 557. In the Seventh Circuit's view, that contradictory disclaimer confirmed that Subway's promised steps were "worthless" and did nothing in reality to reduce the risk that it might "sell a class member a sandwich that is slightly shorter than advertised." *Id.* at 556-57. And in *Koby v. ARS National Services, Inc.*, 846 F.3d 1071 (9th Cir. 2017), a defendant debt collection company promised to make disclosures in *future* voicemail messages for two years, but that promise was "worthless" to the class, which was defined to include those had received voicemail messages *years before* and were unlikely to be subject to future collection efforts by the defendant. *Id.* at 1079. For the reasons explained above, the settlement here is far from worthless. Unlike *Subway*, the settlement

## IV.    The Settling Parties Provided Ample Notice

Objectors also claim that the settling parties provided inadequate notice to the class, because (1) notice came late to some; (2) the notice failed to apprise class members that the statute of limitations has expired for class damages claims; and (3) Schwab failed to provide Iowa the required notice under the Class Action Fairness Act ("CAFA").  These objections lack merit.

**1.**  The settling parties administered a comprehensive notice plan with the aid of Ankura Consulting Group LLC, which has extensive experience in administering class-wide notice. Ankura developed a campaign that provided direct notice to all reasonably identifiable members of the settlement class via email or postcard and offered a dedicated website, class helpline, and helpdesk support.  Dkt 197-7 ¶¶ 8-28.  As of July 15, the campaign had sent 18,333,070 notices by email and 5,832,294 notices through the mail on a rolling basis, reaching 24,165,364 class members—97% of the class.  *Id.* ¶ 36.  Another batch of postcards followed on July 16, increasing coverage to 99.5% of the class.  *Id.*

That amply satisfies Rule 23 and due process.  Under Rule 23, courts must "direct notice *in a reasonable manner* to all class members who would be bound by" the proposed settlement. Fed. R. Civ. P. 23(e)(1)(B) (emphasis added); *see* Newburg on Class Actions § 11.53 (4th ed. 2002) ("Rule 23 does not require the parties to exhaust every conceivable method of identifying the individual class members.").  Due process similarly requires that "a settlement notice" satisfy only "broad *reasonableness* standards."  *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) (emphasis added); Newburg on Class Actions § 11.53 ("Due process does not require actual notice, but rather a good faith effort to provide actual notice.").  Those standards "requir[e]

---

will *in fact* reduce the risk of antitrust harms.  And unlike *Koby*, that reduced risk will redound to the benefit of the class of *current* Schwab customers.

only that notice be mailed individually to 'all class members whose names and addresses may be ascertained through reasonable effort.'" *Montelongo v. Meese*, 803 F.2d 1341, 1351-52 (5th Cir. 1986) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974)). Acting through Ankura, the settling parties' iterative and overlapping efforts to reach class members were more than reasonable—as the numerous objections filed in this Court, the hundreds of thousands of settlement website visits, and thousands of helpline calls all confirm. *See* Dkt. 197-7 ¶¶ 17, 31.

Nonetheless, one class member who received notification in the final batch of postcards objects that the objection period was too "short." Dkt. 219. But the parties made every reasonable effort to send emails and postcards by early May. Dkt. 197-7 ¶¶ 24-25. All 18 million emails and over 2 million postcards had been sent by May 2; those receiving postcards in July simply could not be reached via email. *Id.* ¶¶ 27-28. And even the objector who received a postcard in the final batch managed to submit a timely objection.

The State of Iowa alone claims that the settlement website was missing information, such as the settlement agreement and fee motion. Dkt. 245, at 26. But those purported deficiencies are either illusory or irrelevant. The website *did* include the settlement agreement; it was attached to the preliminary approval motion posted to the site. As for the fee motion, this Court's preliminary approval order required only posting of "the Stipulation and its exhibits, this Order, and a copy of the Notice"—not the fee motion, which the Court stated it would consider separately from the settlement itself. Dkt. 157 ¶¶ 12, 16, 26.[8] In any event, that website was merely offered as an additional resource, alongside a class helpline and helpdesk. Dkt. 197-7 ¶¶ 30-34. The

---

[8] Moreover, upon Iowa's objection, the settlement website was promptly updated to include the fee motion. *See* Settlement Website, https://www.schwabcorrentesettlement.com/documents.

comprehensive email and postcard campaign alone sufficed to provide constitutionally sufficient notice to all reasonably identifiable class members.

There can be no serious dispute that the settling parties made at least "good faith" efforts to effectuate timely and complete notice.  Newburg on Class Actions § 11.53.  Rule 23 and due process demand nothing more.

**2.**  Another objector contends that the notice is deficient because it "says nothing about the legal effect of a settlement approval on *class* claims for past damages."  Dkt. 251, at 4 (emphasis added).  But there is no legal entitlement to litigate damages on a classwide basis.  *See* p. 9, *supra*. And in any event, a settlement notice "need not explain . . . all the consequences involved in the settlement" or "provide a complete source of settlement information."  *Maher v. Zapata Corp.*, 714 F.2d 436, 452 (5th Cir. 1983).  Schwab is aware of no case declining to approve a settlement because of failure to apprise class members of an affirmative defense potentially applicable to claims the settlement does not even release.  *See In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1002 (N.D. Ohio 2016) ("cases where the court found notice was insufficient" involve "egregious" failures).  The objector cites none.  *See* Dkt. 251, at 3-4.

**3.**  Iowa objects that it received inadequate notice under CAFA, but Schwab fully complied with that statute.  On February 14, Schwab sent a CAFA notice to the attorneys general of all U.S. States, including Iowa, as well as to other authorities.  Mendro CAFA Decl. ¶ 3.  Schwab received confirmation that these letters reached all intended recipients (except the Attorney General of American Samoa).  *Id.* ¶ 4.

Iowa now objects that it received only two pages of the notice, attaching an exhibit to its objection that includes only pages one and four of the notice.  Dkt. 245-1.  Although the exhibit bears a stamp showing that the State received the notice on February 18, 2025, Iowa did not request

any missing pages before filing its objection more than five months later.  Nor has Schwab found any evidence that its notice to Iowa was incomplete when sent; other States whose notice was assembled and transmitted in the same way and at the same time confirmed receiving full notice.  And Ankura, which was responsible for mailing the CAFA notices, confirms its belief that Iowa's "notice was complete when sent" and complied with Ankura's quality control process for the notices.  Northeim CAFA Decl. ¶¶ 6-11.

Schwab's first record of communication from Iowa was on July 29, 2025, when—after filing the objection—counsel for Iowa requested full notice.  Schwab promptly provided it the next day.  *See* Mendro CAFA Decl. ¶ 3 n.1.  There is no basis for finding a CAFA violation on these facts, and any such error would be harmless in light of Iowa's timely objection.  As the Senate Committee Report on CAFA explained, CAFA "is not intended to allow settlement class members to walk away from an approved settlement based on a technical noncompliance (e.g., . . . failure of the official to receive notice that was sent), particularly where good faith efforts to comply occurred."  S. Rep. 109-14, at 35 (2005).

## V.    The Service Award And Attorneys' Fees Cast No Doubt On The Settlement

Several class members object that the service awards to the named Plaintiffs and the attorney's fees are unfair.  *E.g.*, Dkts. 187, 202, 208, 210; *see also* Dkt. 245, at 12 & n.1.  Neither offers a basis to reject the settlement.  The parties expressly agreed that "[t]he approval, finality and effectiveness of this Stipulation of Settlement shall not be contingent on an award of Attorney's Fees and Expenses, or on any Service Awards to Plaintiffs."  Dkt. 197-1 § 7.4.  This Court recognized the same in preliminarily approving the settlement.  Dkt. 157 ¶ 12.

Rule 23 requires courts to consider "the terms of any proposed award of attorney's fees" in assessing a settlement's adequacy.  Fed. R. Civ. P. 23(e)(2)(C)(iii).  That requirement exists

16

principally "to protect the class from an attorney fee award that usurps the class's recovery." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2020 WL 836348, at *5 (E.D. La. Feb. 20, 2020) (citing *Piambino v. Bailey*, 610 F.2d 1306, 1327-28 (5th Cir. 1980)).  There is no such concern here, where the fee award—made on its explicit terms at the Court's discretion—would not be deducted from the class recovery, but instead would be paid in full by Schwab.  Dkt. 197-1 § 7.1.

## **CONCLUSION**

Schwab respectfully requests that the Court overrule the objections and enter final approval of the settlement.

August 14, 2025

*/s/ Jason J. Mendro*
Daniel G. Swanson
dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel: (213) 229-7430

Jason J. Mendro
jmendro@gibsondunn.com
Cynthia Richman
crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M St, N.W.
Washington, D.C. 20036-5306
Tel: (202) 955-8500

Respectfully submitted,

*/s/ Veronica S. Moyé*
Veronica S. Moyé
vmoye@kslaw.com
KING & SPALDING LLP
2601 Olive Street
Suite 2300
Dallas, TX 75201
Tel:  214-764-4600

Melissa R. Smith
Texas Bar No. 24001351
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

*Attorneys for Defendant The Charles Schwab Corporation*

17

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this notice was served on all counsel of record who have consented to electronic service on this 14th day of August, 2025.

/s/ Melissa R. Smith
Melissa R. Smith

18