**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| Jonathan Corrente, et al., | Case No. 4:22-cv-470-ALM |
| *Plaintiffs*, | Hon. Amos L. Mazzant, III |
| v. | |
| The Charles Schwab Corporation, | |
| *Defendant*. | |

**PLAINTIFFS' RESPONSE TO OBJECTIONS TO THEIR
<u>MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

# TABLE OF CONTENTS

I.    PLAINTIFFS HAVE ARTICLE III STANDING ................................................................. 2

II.    THE CLASS RECEIVED REASONABLE NOTICE ...................................................... 6

III.    THE SETTLEMENT MERITS FINAL APPROVAL ..................................................... 9

    A.    The Settlement Was Negotiated at Arm's Length ................................................... 9

    B.    Plaintiffs' Expert's Opinions Concerning the Value of the Settlement Are Admissible ............................................................................................................... 10

        1.    Plaintiffs' experts are well qualified ............................................... 11

        2.    Plaintiffs' experts based their analysis on well-supported assumptions ...................................................................................... 12

        3.    Plaintiffs' experts used reliable data sources in their analysis ....... 13

        4.    Plaintiffs' experts employed reliable methodologies ..................... 14

    C.    The Relief Provided for the Class Is Adequate ..................................................... 17

        1.    The Settlement provides valuable injunctive relief while preserving Class Members' rights to pursue damages claims ......................... 18

        2.    This is an appropriate stage of the case for settlement ................. 30

        3.    The proposed award of attorney's fees is reasonable considering the valuable relief obtained ........................................................... 32

        4.    Plaintiffs' decision not to pursue classwide damages is no reason to reject the Settlement ...................................................................... 36

    D.    Granting a Reasonable Service Award to Plaintiffs Would Not Render the Settlement Unfair ............................................................................................... 38

    E.    The $50 Payments to Plaintiffs to Release Their Damages Claims Do Not Render the Settlement Unfair or Defeat Class Certification ................................ 39

    F.    The Opinions of Absent Class Members Weigh in Favor of Approval ................ 43

IV.    MISCELLANEOUS OBJECTIONS ........................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Allison v. Citgo Petroleum Corp.*,
 151 F.3d 402 (5th Cir. 1998) ................................................. 41

*Alves v. Main*,
 2012 WL 6043272 (D.N.J. Dec. 4, 2012) ................................ 45

*Ashok Babu v. Wilkins*,
 2023 WL 6532647 (9th Cir. Oct. 6, 2023) ............................... 20

*Babu v. Ahern*,
 2022 WL 568357 (N.D. Cal. Feb. 7, 2022) .............................. 20

*Bezdek v. Vibram USA, Inc.*,
 809 F.3d 78 (1st Cir. 2015) ............................................... 22, 33

*Bostick v. Herbalife Int'l of Am., Inc.*,
 2015 WL 12731932 (C.D. Cal. May 14, 2015) ........................ 21

*Campbell v. Facebook Inc.*,
 2017 WL 3581179 (N.D. Cal. Aug. 18, 2017) ......................... 35

*Caston v. Mr. T's Apparel, Inc.*,
 157 F.R.D. 31 (S.D. Miss. 1994) .......................................... 43

*Celeste v. Intrusion Inc.*,
 2022 WL 17736350 (E.D. Tex. Dec. 16, 2022) ..................... 7, 30

*China Agritech v. Michael H. Resh*,
 584 U.S. 732 (2018) ...................................................... 36, 39

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ............................................................ 3

*D'Amato v. Deutsche Bank*,
 236 F.3d 78 (2d Cir. 2001) ................................................ 43

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993) .......................................................... 11

*DeHoyos v. Allstate Corp.*,
 240 F.R.D. 269 (W.D. Tex. 2007) .......................... 25, 33, 39, 45

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ........................ 6, 7

*Fraley v. Batman*,
  638 F. App'x 594 (9th Cir. 2016) ........................................................ 23

*Fraley v. Facebook, Inc.*,
  966 F. Supp. 2d 939 (N.D. Cal. 2013) ...................................... 23, 30, 33

*G. F. v. Contra Costa Cnty.*,
  2015 WL 7571789 (N.D. Cal. Nov. 25, 2015) ...................................... 19

*Gonzales v. Cassidy*,
  474 F.2d 67 (5th Cir. 1973) ................................................................ 42

*Graves v. Walton County Bd. of Educ.*,
  686 F.2d 1135 (5th Cir. 1982) ............................................................ 37

*Hall v. AT & T Mobility LLC*,
  2010 WL 4053547 (D.N.J. Oct. 13, 2010) ..................................... 22, 33

*Hall v. Cnty. of Fresno*,
  2015 WL 5916741 (E.D. Cal. Oct. 7, 2015) ........................................ 21

*Heredia v. Sunrise Senior Living, LLC*,
  2024 WL 5416919 (C.D. Cal. Dec. 3, 2024) ...................................... 35

*Huval v. Offshore Pipelines, Inc.*,
  86 F.3d 454 (5th Cir. 1996) ................................................................ 12

*In re Beef Industry Antitrust Litig.*,
  607 F.2d 167 (5th Cir. 1979) .............................................................. 43

*In re Budeprion XL Mktg. & Sales Litig.*,
  2012 WL 2527021 (E.D. Pa. July 2, 2012) ..................................... 24, 33

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
  424 F. Supp. 3d 456 (E.D. La. 2020) .................................................. 31

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Pracs. Litig.*,
  2015 WL 7282543 (D.N.H. Nov. 16, 2015) ........................... 20, 23, 30, 33

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ........................................................... 4, 5

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ........................................ 44

*In re Google Location Hist. Litig.*,
  2024 WL 1975462 (N.D. Cal. May 3, 2024) ........................................ 21

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) ................................................ 44

*In re Integra Realty Res., Inc.*,
    262 F.3d 1089 (10th Cir. 2001) ........................................................ 7

*In re Johnson & Johnson Derivative Litig.*,
    900 F. Supp. 2d 467 (D.N.J. 2012) .............................................. 19, 45

*In re Katrina Canal Breaches Litig.*,
    628 F.3d 185 (5th Cir. 2010) ............................................................ 9

*In re LJ Int'l, Inc. Sec. Litig.*,
    2009 WL 10669955 (C.D. Cal. Oct. 19, 2009) ................................ 26

*In re Mex. Money Transfer Litig. (W. Union & Valuta)*,
    164 F. Supp. 2d 1002 (N.D. Ill. 2000) ............................................ 43

*In re Mex. Money Transfer Litig.*,
    267 F.3d 743 (7th Cir. 2001) .......................................................... 43

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    2015 WL 5010048 (D. Kan. Aug. 21, 2015) .................................... 28

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    2016 WL 4445438 (D. Kan. Aug. 24, 2016) .................................... 35

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    271 F.R.D. 263 (D. Kan. 2010) .................................................. 24, 26

*In re Nat'l Football League Players Concussion Inj. Litig.*,
    821 F.3d 410 (3d Cir. 2016) ............................................................ 11

*In re Philips Recalled CPAP, Bi-Level PAP, & Mech. Ventilator Prods. Litig.*,
    347 F.R.D. 113 (W.D. Pa. 2024) ...................................................... 43

*In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    2019 WL 6118267 (W.D. Okla. Nov. 18, 2019) .............................. 11

*In re Syngenta AG MIR 162 Corn Litig.*,
    357 F. Supp. 3d 1094 (D. Kan. 2018) .............................................. 26

*In re TD Ameritrade Account Holder Litig.*,
    2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ................................ 29

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F.Supp.2d 503 (E.D.N.Y. 2003) ................................................ 43

*In re W. Union Money Transfer Litig.*,
   2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004) ........................................................ 28

*Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*,
   497 F.3d 615 (6th Cir. 2007) ............................................................................... 11

*Jenkins v. Trustmark Nat. Bank*,
   300 F.R.D. 291 (S.D. Miss. 2014) ........................................................................ 32

*Johnson v. Ga. Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) ............................................................................... 33

*Jones v. Monsanto Co.*,
   2021 WL 2426126 (W.D. Mo. May 13, 2021) ...................................................... 22

*Jones v. Singing River Health Servs. Found.*,
   865 F.3d 285 (5th Cir. 2017) ......................................................................... 10, 32

*Kelly v. Bus. Info. Grp., Inc.*,
   2019 WL 414915 (E.D. Pa. Feb. 1, 2019) ............................................................ 20

*Kostka v. Dickey's Barbecue Restaurants, Inc.*,
   2022 WL 16821685 (N.D. Tex. Oct. 14, 2022) ..................................................... 10

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................ 14

*Larry James Oldsmobile-Pontiac-GMC Truck Co. v. Gen. Motors Corp.*,
   175 F.R.D. 234 (N.D. Miss. 1997) ....................................................................... 40

*Lopez v. State Farm Lloyds*,
   2025 WL 1202066 (W.D. Tex. Apr. 25, 2025) ..................................................... 13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .............................................................................................. 4

*M.D. ex rel. Stukenberg v. Perry*,
   675 F.3d 832 (5th Cir. 2012) ............................................................................... 41

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ................................................................................. 9

*Mathis v. Exxon Corp.*,
   302 F.3d 448 (5th Cir. 2002) ............................................................................... 14

*Miller v. Republic Nat. Life Ins. Co.*,
   559 F.2d 426 (5th Cir. 1977) ........................................................................... 7, 8

*Motio, Inc. v. BSP Software LLC*,
  2016 WL 105299 (E.D. Tex. Jan. 8, 2016) ............................................................. 13

*Mullane v. Cent. Hanover Bank & Trust. Co.*,
  339 U.S. 306 (1950) .................................................................................................. 7

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ............................................................................................... 3, 5

*Newby v. Enron Corp.*,
  394 F.3d 296 (5th Cir. 2004) .................................................................................. 31

*Nkansah v. Martinez*,
  2017 WL 2798520 (M.D. La. June 28, 2017) ........................................................ 13

*PharmacyChecker.com LLC v. LegitScript LLC*,
  137 F.4th 1031 (9th Cir. 2025) .............................................................................. 34

*Reed v. Gen. Motors Corp.*,
  703 F.2d 170 (5th Cir. 1983) .................................................................................. 30

*Romero v. Securus Techs., Inc.*,
  2020 WL 3250599 (S.D. Cal. June 16, 2020) ........................................................ 19

*Romero v. Securus Techs., Inc.*,
  2020 WL 6799401 (S.D. Cal. Nov. 19, 2020) ........................................................ 20

*Schwartz v. TXU Corp.*,
  2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ........................................................... 7

*Scott v. Dart*,
  99 F.4th 1076 (7th Cir. 2024) ................................................................................ 39

*Swinton v. SquareTrade, Inc.*,
  454 F. Supp. 3d 848 (S.D. Iowa 2020) ................................................................... 31

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................................. 3, 5

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972) ................................................................................................ 34

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
  2017 WL 11715451 (W.D. Tex. May 22, 2017) ..................................................... 12

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ................................................................................................ 34

## Statutes and Rules

15 U.S.C. § 15(a) ................................................................................................. 37

28 U.S.C. § 1715 .................................................................................................. 8

Fed. R. Civ. P. 23 ..........................................................................................*pasim*

## Other Authorities

3 Newberg and Rubenstein on Class Actions § 9:30 (6th ed. June 2025 update) ............... 37

4 Newberg and Rubenstein on Class Actions § 13:51 (6th ed. June 2025 update) ............. 19

4 Newberg on Class Actions § 11:58 (4th ed. 2002) ............................................. 45

## INTRODUCTION[1]

From a properly noticed class of approximately 25 million, the Court has received approximately 70 objections in this case.[2] So few objections from a class of this size is remarkable, and militates towards final approval. But the content of these objections is what truly makes clear that final approval should be granted. Simply put, none of the objections has substantive merit, and none mandates—or indeed, even strongly supports—rejecting the hard-won and concretely valuable proposed settlement.

First, nearly every objector criticizes the absence of monetary relief in the Settlement Agreement, and in criticizing this absence asserts that Class Members' damages claims were bargained away for nothing. These complaints fundamentally misunderstand—or misrepresent—the actual terms of the Settlement. Absent class members' damages claims have *not* been released, and in fact every Class Member *will* receive concrete value from the only class claims that *have* been released—those for injunctive relief challenging the Schwab-TD Ameritrade Merger.

Other objections (or parts of objections) criticize the Settlement's injunctive relief as "illusory" or "worthless." These objections are factually false; they ignore the actual record, and attack a strawman Settlement that simply does not exist. Further, these objections incorrectly benchmark the relief obtained in the Settlement against a fanciful hypothetical world in which Plaintiffs (costlessly) obtained every form, manner, and quantity of relief discussed in the Complaint, rather than measuring the Settlement's injunctive relief against an actual but-for world without any mandatory behavioral changes at all. Put differently, the theoretical maximum

---

[1] A chart summarizing all objections to the Settlement and/or fee request as of the filing of this brief is attached as Exhibit 1.

[2] This number includes a letter with objections from Rita Johnston, Maria Demelo, and William Grubbs that appear to have been mailed to the Court and all counsel but were not docketed. Copies of those objections are attached as Exhibit 2.

recovery after prevailing on all fronts at trial and then defending the victory on appeal is not the benchmark for evaluating the fairness of a settlement.

Further objections suffer similar factual and legal deficiencies. Two objectors allege a lack of Article III standing, yet the Settlement's injunctive relief squarely addresses a well-established constitutional injury—lost money due to reduced price improvements. By requiring Schwab to implement antitrust guardrails, the Settlement provides concrete, measurable benefits—preventing future harm and reinforcing competitive pressure on retail price improvement, calculated to yield better pricing and execution for Settlement Class Members. Another objector has filed a "*Daubert*" motion targeting expert declarations supporting the Settlement, but this objection elides the correct legal standard and does not seriously grapple with the well-supported, reliable opinions offered by two recognized experts in antitrust economics. Some objectors attack the adequacy of class notice, but upon factual examination they are simply wrong.

On the whole, the small number of objections to the valuable Settlement in this case do not move the needle on the governing standard for final approval. As explained in Plaintiffs' previously-filed Motion for Final Approval, Dkt. 197, all of the applicable Rule 23 and constitutional requisites are well-met by the proposed Settlement. No objection changes this calculus. The Court should grant final approval.

## I.    PLAINTIFFS HAVE ARTICLE III STANDING

Objectors Theodore Frank and Shiyang Huang argue that Plaintiffs lack Article III standing to seek the injunctive relief provided for in the Settlement.[3] They are wrong.

Both objectors claim Plaintiffs have failed to show a sufficiently "imminent" injury sufficient to establish standing to pursue injunctive relief. Both claim Plaintiffs must show a

---

[3] Dkt. Nos. 215 at 3-6 (Huang), 251 at 5-6 (Frank).

"certainly impending" injury, *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), though as the Supreme Court later clarified, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, *or* there is a substantial risk that the harm will occur," *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (emphasis added) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."). However the test is formulated, Plaintiffs meet it.

The central theory of this case is that the Merger of Schwab and TD Ameritrade has substantially lessened competition in an asserted Retail Order Flow Market ("ROFM"), resulting in Schwab brokerage customers being underpaid for their order flow in the form of reduced price improvement on their trades, and that this harm will continue, absent relief. Compl. ¶¶ 3, 35, 448-59 (Dkt. 1). The harm from the anticompetitive Merger is ongoing, and brokerage customers will continue to suffer harm unless something is done to mitigate it—which is exactly what Plaintiffs' Counsel have obtained for every Class Member through the Settlement. *See id.* ¶¶ 35 (since the Merger, "[r]etail investors—including Plaintiffs and the Class Members—receive even less of the payments their trades generate, whether through rebates or through price improvement"), 450 ("the Merger reduced competition in the ROFM significantly enough that Plaintiffs and the Class were ***(and continue to be)*** per-share underpaid for the equities and options trades they have made since the Merger." (emphasis added)); Settlement Agmt. ¶ 2.2 (Dkt. 197-1); Singer & Tatos Decl. ¶ 84-85 ((Dkt. 196 (sealed), 205 (redacted)) (estimating that implementation of the compliance program could yield price improvement gains of approximately 1.8% to 2.4%, translating to $10.7 million

to $14.5 million in monthly savings—or roughly $128.4 million to $174 million annually—for Schwab's retail customers).

Each named Plaintiff clearly has standing—each attests that they "intend to remain a retail brokerage customer of Schwab," have executed trades on the Schwab retail brokerage platform, and "intend to execute additional trades in the near future."[4] Like other class members who are Schwab current customers, each named plaintiff continues to receive reduced—anticompetitively deflated—price improvement on their trades on Schwab platform due to the Merger. Reduced price improvement—out-of-pocket monetary loss on trades, due to reduced competition—is constitutionally cognizable injury. This ongoing economic injury is the heart of this case.[5]

The Settlement directly targets this ongoing injury by mitigating the anticompetitive effects of the Merger—namely, reduced price improvement and execution quality for Class Members—through measures aimed at restoring, preserving, and promoting competitive pricing and execution standards for Plaintiffs and Settlement Class Members who trade on the Schwab platform. Each Plaintiff will therefore concretely and materially benefit from the injunctive relief obtained in this case. And everyone else who trades on Schwab after the Settlement is finally approved, and its remedial measures implemented—*i.e.*, the entire Settlement Class—will concretely and materially benefit too. The objectors who argue against Article III standing are attacking some other, strawman settlement—not this one.

---

[4] Corrente Suppl. Decl. ¶ 4; Shaw Suppl. Decl. ¶ 4; Williams Suppl. Decl. ¶ 4.

[5] Frank correctly notes that "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation,'" Dkt. 251 at 5 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), but declines to tell the Court what that "manner and degree" are at the Rule 23 settlement-approval stage. The Fifth Circuit has decided that question—plaintiffs need only "allege," not prove, standing. *See In re Deepwater Horizon*, 739 F.3d 790, 804 (5th Cir. 2014) (with respect to class certification and settlement approval under Rule 23, "it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they *allege* they have suffered" (citation omitted)).

Other specific claims are simply wrong—or further attack strawmen. For example, Frank claims that "the plaintiffs have made no showing that Schwab *currently* lacks adequate information barriers among the market makers in a way that they will suffer 'certainly impending' harm." Dkt. 251 at 6. This is a red herring. To establish standing, a plaintiff seeking injunctive relief must show they will suffer an injury that is "fairly traceable to *the challenged action*." *Murthy*, 603 U.S. at 57 (emphasis added) (citation omitted). Here, the challenged action is the Merger itself, not simply the lack of "adequate information barriers among the market makers"—though to be sure, Plaintiffs do also allege that due to the Merger, the opportunity for collusion among Schwab and market makers has "measurably heightened." Compl. ¶ 34. As just discussed, Plaintiffs have alleged that their future harm is fairly traceable to the Merger. *See In re Deepwater Horizon*, 739 F.3d at 804 (allegations sufficient to establish Article III standing at settlement-approval stage).

Finally, Plaintiffs' injury "would likely be redressed by" the injunctive relief provided for in the Settlement, as required for Article III standing. *See TransUnion*, 594 U.S. at 423. The antitrust compliance program to be implemented under the Settlement will "motivate[] Schwab to adopt certain changes in business practices relating to, *inter alia*, Schwab's interaction with market makers who provide PFOF [payment for order flow], . . . with a focus on the types of communication between Schwab and the market makers." Singer & Tatos Decl. ¶ 6 (Dkt. 196 (sealed), 205 (redacted)). As explained by Dr. Singer and Mr. Tatos, the program called for in the settlement will materially benefit Settlement Class Members and may provide on the order of more than one hundred million dollars per year of benefit to Class Members in the form of increased price improvement—regardless of whether the remedial measures specifically include "information barriers among the market makers." *See id.* ¶¶ 81-87.

## II.     THE CLASS RECEIVED REASONABLE NOTICE[6]

Direct notice was successfully delivered to nearly 25 million settlement class members, representing over 99% of the total class. Northeim Suppl. Decl. ¶ 37. Thousands of class members engaged with the notice administrator and/or class counsel via phone, email, and the settlement website. Northeim Suppl. Decl. ¶ 36. In the majority of cases, inquiries were addressed within 48 hours.[7] Northeim Suppl. Decl. ¶ 31; Bathaee-Burke Suppl Decl. ¶ 6. In addition, CAFA notice was properly disseminated to the relevant state authorities. Northeim Suppl. Decl. ¶¶ 12-14. Overall, the notice program met—or exceeded—the requirements of Federal Rule of Civil Procedure 23 and the standards of due process. Nonetheless, a handful of objectors have complained about the timing of class notice, claiming they or the Settlement Class were not given sufficient time to meaningfully object.[8] This objection is without merit.

To begin, the reasonableness of notice is determined with respect to the class as a whole, not individual class members. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *3 n.1 (N.D. Tex. Apr. 25, 2018) (due process does not require "actual notice to each party" to

---

[6] Pursuant to paragraph 17 of the Court's Order Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Issuance of Notice to the Settlement Class (Dkt. 157), the concurrently filed Supplemental Declaration of Michael T. Northeim constitutes "proof of the dissemination of the Summary Notice and public posting of the Notice as required by [the] Order."

[7] One objector, Christopher Madden, states that he "tried to call the lawyers on the website that are supposed to be representing me. NONE of them have called me back! After a couple of tries, I did get ahold of Chad Bell (but I caught him directly he didn't return my message.) So these guys are representing me?" Dkt. 235 at 1. This statement does not accurately reflect Plaintiffs' Counsel's communications with Mr. Madden. On or around July 21, Mr. Madden reached out to a number of attorneys representing Plaintiffs via phone. He spoke to Chad Bell of Korein Tillery LLC that same day. Bell Reply Decl. ¶¶ 5-7. On July 24, Mr. Madden reached out to a group of Plaintiffs' counsel, including co-lead counsel. Andrew Wolinsky (of Bathaee Dunne LLP) and Christopher Burke exchanged a number of emails with Mr. Madden that same day. Bathaee-Burke Suppl. Decl. ¶ 8. On July 25, Messrs. Burke and Wolinsky spoke to Mr. Madden for approximately fifteen minutes to discuss his questions about the settlement. *Id.*

[8] Dkt. Nos. 219, 235, 242, 245 at 25-26, 256.

be bound by the settlement (citing *Mullane v. Cent. Hanover Bank & Trust. Co.*, 339 U.S. 306, 313-14 (1950); *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1110-11 (10th Cir. 2001))). And the Fifth Circuit has held that a period of "***four weeks*** between the mailing of the notices and the settlement hearing" is sufficient. *Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 430 (5th Cir. 1977) (emphasis added); *see, e.g.*, *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *11 (N.D. Tex. Nov. 8, 2005) (62 days between mailing of notice and fairness hearing was sufficient).

By this measure, the timing of class notice was clearly reasonable. Out of a total of 24,908,212 Class Members, 18,333,070 (73.6%) were provided notice by email by May 2, 2025, Northeim Suppl. Decl. ¶¶ 11, 25[9]—nearly three months before the July 29 objection deadline and nearly four months before the August 28 Fairness Hearing. In addition, on April 10, 2025, notices were sent by postcard to 2,000,070 Class Members who did not have a valid email address. This alone would have constituted reasonable timing. *See Celeste v. Intrusion Inc.*, 2022 WL 17736350, at *8 (E.D. Tex. Dec. 16, 2022) (timing reasonable where notice distributed 40 days before objection deadline); *Erica P. John Fund, Inc.*, 2018 WL 1942227, at *3 n.1 (citing *In re Integra*, 262 F.3d at 1110-11, for its holding that Rule 23 and due process requisites were satisfied where 77% of class members actually received notice of the settlement). But Plaintiffs' efforts to provide direct notice did not end there. Additional postcard notices were mailed to Class Members who could not be reached via their email on July 7 (1,779,833 notices), July 12 (2,172,898 notices), and July 16 (622,341 notices). Northeim Suppl. Decl. ¶¶ 26-29. All told, by July 15—two weeks before the objection deadline and six weeks before the Fairness Hearing—notice had been

---

[9] The Supplemental Declaration of Michael T. Northeim filed herewith is cited as "Northeim Suppl. Decl." The Declaration of Michael T. Northeim (Dkt. 154-7) filed February 4, 2025, with Plaintiffs' Motion for Preliminary Approval is cited as "Northeim PA Decl."

successfully sent to 97.0% of the class, and after a final batch of postcards was mailed on July 16, a full 99.5% of the class received direct notice. *Id.* ¶ 37.

The few objectors who complained about the timing of their individual notices all received notice in mid-July and were evidently among those who could not be reached by email or the April 10 postcard batch.[10] This was still two weeks before the objection deadline and six weeks before the Fairness Hearing, which itself is sufficient notice as to those individuals. *See Miller*, 559 F.2d at 430 (four weeks between mailing of notice and fairness hearing sufficient).

Further, objector State of Iowa[11] ("Iowa") complains that Class Members had insufficient time to review the terms of the Settlement because the Stipulation and Agreement of Settlement ("Settlement Agreement") allegedly was not posted to the Settlement Website by the July 29 objection deadline.[12] Dkt. 245 at 26. Here, Iowa is simply wrong. From the time it launched on March 5, 2025, the Settlement Website has allowed Class Members to read, download, and print the Settlement Agreement, which is an exhibit to the also-available Motion for Preliminary Approval. Northeim Suppl. Decl. ¶¶ 15-16. Since March 5, the Settlement Website has also made available the Notice of Proposed Class Action Settlement ("Notice"), *id.* ¶¶ 15-16, which discloses that Plaintiff's Counsel would "move for an award of up to $8,250,000 in attorney's fees, plus

---

[10] Dkt. Nos. 219, 235, 242, 256.

[11] Iowa's objections are joined by objector Theodore Frank, who adopts them by reference. Dkt. 251 at 3.

[12] Iowa raises the same complaint with respect to Plaintiffs' counsel's motion for attorney's fees. *See* Dkt. 245 at 26. That issue is addressed in Plaintiff's counsel's concurrently filed Response to Objections to Their Motion for an Award of Attorney's Fees, Litigation Expenses, and Service Awards. Iowa also complains about Schwab's compliance with the notice requirements under the Class Action Fairness Act, 28 U.S.C. § 1715. *See* Dkt. 245 at 25. Plaintiffs understand Schwab will address this issue in its own response to objections.

payment of no more than $700,000 for litigation expenses," Northeim PA Decl. at 26 (Dkt. 154-7).

Moreover, the Notice—to which Class Members were directed by the email or postcard notices they received, *see* Northeim PA Decl. ¶ 16, Exs. B (email/summary notice), C (postcard notice)—provides information about the core components of the Settlement, including a description of "the nature of the pending action, the claims asserted therein, and the general terms of the proposed settlement," and also "informed [class members] of the time and place for the settlement hearing and their right to participate therein," *Maher v. Zapata Corp.*, 714 F.2d 436, 451 (5th Cir. 1983) (finding settlement notice sufficient). *See* Northeim PA Decl. Ex. D (Notice). Class Members could also get this information by phone through an interactive voice response system, and as of March 5, 2025, were able to have questions about the Settlement answered by contacting a dedicated helpdesk or email support inbox maintained by Ankura. Northeim Suppl. Decl. ¶¶ 30-35.

As explained in Plaintiffs' Motion (at 14-16), the notice plan gave Class Members "information reasonably necessary for them to make a decision whether to object to the settlement," *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010), and thus provided the "reasonable" notice required by Rule 23(e)(1)(B).

## III.    THE SETTLEMENT MERITS FINAL APPROVAL

Several objectors raise objections to the fairness of the Settlement itself. *See* Fed. R. Civ. P. 23(e)(2) (settlement must be "fair, reasonable, and adequate"). These objections are without merit and should be rejected.

### A.    The Settlement Was Negotiated at Arm's Length

Objector Gavin Rozzi seeks to cast doubt on the arm's-length nature of the settlement negotiations, claiming Judge Atlas's declaration (Dkt. 197-6) should not be credited because it

does not provide a sufficiently detailed assessment of the substance of the Settlement.[13] This misconstrues the purpose of the declaration and the law of this circuit. Plaintiffs rely on Judge Atlas's declaration to establish not the *substantive* fairness of the Settlement—which is ultimately the province of the Court—but rather its *procedural* fairness, meaning that it was not the product of collusion. In *Jones v. Singing River Health Services Foundation*—a controlling precedent not discussed by Rozzi—the Fifth Circuit held that "[t]he involvement of an experienced and well-known mediator" such as Judge Atlas (a retired and highly respected United States district judge) is "a strong indicator of procedural fairness." 865 F.3d 285, 295 (5th Cir. 2017). And though Rozzi downplays Judge Atlas's attestation that the negotiations were "hard-fought" and "professional[]," Dkt. 197-6 at ¶ 7, the mediator's affidavit credited by the Fifth Circuit in *Jones* similarly affirmed that "the participating parties' negotiations were civil, professional, but hard fought," 865 F.3d at 295; *see also Kostka v. Dickey's Barbecue Restaurants, Inc.*, 2022 WL 16821685, at *10 (N.D. Tex. Oct. 14, 2022), *report and recommendation adopted*, 2022 WL 16821665 (N.D. Tex. Nov. 8, 2022) (crediting mediator's affidavit that "these negotiations were adversarial, conducted at arm's length, and in good faith . . . [and] the parties reached a hard-fought and honest compromise"). This objection is without merit.

### B. Plaintiffs' Expert's Opinions Concerning the Value of the Settlement Are Admissible

The value of the Settlement is supported by expert analysis from two well-qualified economists, Dr. Hal Singer and Ted Tatos, whose declaration employs two alternative methodologies to quantify the benefits of the antitrust compliance program provided for in the Settlement. Both approaches are grounded in established economic and statistical principles.

---

[13] Dkt. 176 at 5-6.

Plaintiffs' experts opined that, following successful implementation of the compliance program, increased price improvement for Schwab's retail customers could be quantified at approximately $10.7 million to $14.5 million per month. Singer & Tatos Decl. ¶ 85 (Dkt. 196 (sealed), 205 (redacted)).

Objector Huang attacks the qualifications of Plaintiffs' experts and the reliability of their analysis. *See* Dkt. 221. Huang frames his objections as a *Daubert* motion. Though the Fifth Circuit has not addressed the issue, two other courts of appeal have opined that Federal Rule of Evidence 702 and *Daubert* do not strictly apply in the context of class action settlement fairness hearings. *See Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 636-37 (6th Cir. 2007) (rejecting application of Rule 702 and *Daubert* because "[i]n a fairness hearing, the judge does not resolve the parties' factual disputes but merely ensures that the disputes are real and that the settlement fairly and reasonably resolves the parties' differences"); *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 443 (3d Cir. 2016) ("We have never held that district courts considering the fairness of a class action settlement should consider the admissibility of expert evidence under *Daubert*."); *see also In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2019 WL 6118267, at *3 (W.D. Okla. Nov. 18, 2019). Regardless, the expert opinions offered in support of the Settlement do satisfy the standards of reliability and relevance under Rule 702 and *Daubert. See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (holding that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

### 1.    Plaintiffs' experts are well qualified

Objector Huang's claim that Plaintiffs' experts "do not know anything remotely related to compliance programs" is incorrect. Dkt. 221 at 8. Dr. Singer and Mr. Tatos are microeconomists

with extensive experience in antitrust matters, including within financial services matters. They have been retained in numerous cases, testified at deposition and trial, and published on competition-related topics. Singer & Tatos Suppl. Decl. ¶¶ 19-22.

While Dr. Singer and Mr. Tatos certainly do construct econometric models to evaluate antitrust harm and quantify damages (it is not clear why this would weigh against, rather than in favor, of their relevant expertise here), their expertise extends well beyond modeling. Assessing the likely benefits of a compliance program in the financial services industry—particularly its impact on competition and price improvement—is squarely within their domain informed by their experience as expert economists at the SEC. Singer & Tatos Suppl. Decl. ¶¶ 21, 22. Such analysis is a standard component of antitrust work, especially when constructing a counterfactual "but-for" world absent the challenged conduct. Singer & Tatos Suppl. Decl. ¶ 20. Their qualifications and experience make them well suited to this task. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 2017 WL 11715451, at *3-*4 (W.D. Tex. May 22, 2017) (finding the expert to be "a highly qualified antitrust economist," citing the expert's extensive scholarly publications, experience as an expert, and work experience); *see Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454, 458 (5th Cir. 1996) (holding an expert with "broad, general experience" in the relevant industry was sufficient to "qualifying him as an expert witness").

### 2. Plaintiffs' experts based their analysis on well-supported assumptions

Objector Huang's critique of Plaintiffs' experts' analysis—namely, that it relies on assumptions because the antitrust compliance program has not yet been finalized (Dkt. 221 at 5-7)—misapprehends both the nature of forward-looking economic analysis and the governing legal standards for expert opinion admissibility.

To be clear, Plaintiffs do not dispute that their experts included caveats and acknowledged data limitations and uncertainties in their analysis. But such limitations are inherent in any forward-

12

looking assessment, Singer & Tatos Suppl. Decl. ¶¶ 14-16, and indeed can indicate reliability and care—not the opposite. It is well established that expert testimony may rely on estimated inputs or reasonable assumptions, provided the methodology itself is sound. *See Lopez v. State Farm Lloyds*, 2025 WL 1202066, at *3 (W.D. Tex. Apr. 25, 2025) ("[C]ourts routinely admit expert testimony that relies on estimated inputs or reasonable assumptions, so long as the methodology itself is sound." (citing *Nkansah v. Martinez*, 2017 WL 2798520, at *4 (M.D. La. June 28, 2017) (collecting cases))).

Here, the assumptions underlying Plaintiffs' experts' analysis are neither speculative nor unfounded. They are firmly anchored in the express terms of the Settlement Agreement, which explicitly contemplates the implementation of an antitrust compliance program designed by a third-party consultant and outlines the key attributes of that program. Relying on this framework, Plaintiffs' experts developed two alternative implementation scenarios and applied rigorous statistical methodologies, supported by reliable data sources, to estimate the potential benefits to Settlement Class members.

The experts' assumptions are drawn from a sufficient factual foundation and are not speculative in nature; accordingly, they do not render the analysis unreliable. *See Motio, Inc. v. BSP Software LLC*, 2016 WL 105299, at *2–3 (E.D. Tex. Jan. 8, 2016) (Mazzant, J.) (notwithstanding defendants' objections that the analysis was speculative, finding that "[c]ertain underlying factual assumptions are appropriate" and expert testimony based on such assumptions is "relevant and sufficiently reliable").

### 3.    Plaintiffs' experts used reliable data sources in their analysis

Objector Huang's assertion that Plaintiffs' experts' analysis is unreliable due to flawed data—characterized as "garbage in, garbage out," Dkt. 221 at 7—is entirely unfounded.

13

Plaintiffs' experts relied on robust, publicly available datasets, including SEC-mandated Form 605 reports (filed by market makers) and Form 606 reports (filed by brokers such as Schwab), as well as the Schwab's own data, the very same data source Schwab itself uses to evaluate execution quality outcomes. Singer & Tatos Decl. ¶¶ 55-56 (Dkt. 196 (sealed), 205 (redacted)); Singer & Tatos Suppl. Decl. ¶ 12. The data are regulatorily required, industry-standard, and directly relevant to the analysis performed.

At no point did Plaintiffs' experts suggest their analysis lacked sufficient data to produce reliable or reasonably accurate results. While they acknowledged that the dataset was not as comprehensive as the full complement of internal data available to Schwab, such completeness is not a prerequisite for sound economic analysis. Singer & Tatos Decl. ¶ 55 (Dkt. 196 (sealed), 205 (redacted)); Singer & Tatos Suppl. Decl. ¶¶ 11, 14, 16. The relevant standard is sufficiency—not exhaustiveness—and the data meet that threshold. *See* Fed. R. Evid. 702.

### 4.     **Plaintiffs' experts employed reliable methodologies**

Objector Huang's claim that the expert methodology relies on *ipse dixit* assertions is meritless. Dkt. 221 at 9-11. The Fifth Circuit has noted that a court "must bear in mind the purpose of [the expert's] testimony when addressing its reliability." *Mathis v. Exxon Corp*., 302 F.3d 448, 461 (5th Cir. 2002); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (emphasizing that *Daubert* analysis is "flexible" and must take account of "the nature of the issue, the expert's particular expertise, and the subject of his testimony"). Here, the purpose of the experts' opinions is to help the Court evaluate the benefit the antitrust compliance program confers on the Settlement Class. To achieve this goal, the experts' analysis draws directly from the DOJ Antitrust Division's *Evaluation of Corporate Compliance Programs*, incorporating specific provisions that mirror DOJ guidance on effective compliance. Singer & Tatos Suppl. Decl. ¶ 24. These include periodic reporting and review of market maker performance, trend-based

benchmarking of price improvement, and statistical screening for deviations—each grounded in empirical data and designed to enhance antitrust oversight. *Id.*

Huang's critique of Plaintiffs' experts' methodology reveals his fundamental misunderstanding of both the case theory and the statistical analysis at issue. His mischaracterization of Methodology One—suggesting it makes a causal claim about Schwab's execution quality (E/Q) ratio decline—is incorrect. In fact, the expert declaration treats the observed decline in Schwab's E/Q ratio from 2006 to 2021[14] as a competitive benchmark. Singer & Tatos Decl. ¶ 58 (Dkt. 196 (sealed), 205 (redacted)); Singer & Tatos Suppl. Decl. ¶ 25. The methodology does not assert causation; rather, it proposes that deviations from this historical trend may signal potential anticompetitive effects, which the compliance program would serve to prevent or terminate. *Id.* This benchmarking approach aligns precisely with the purpose of the proposed compliance program: to ensure that competition is not diminished by the Schwab-TD merger. If the market remains competitive, execution quality should continue to improve in line with the benchmark trend. If it does not, the compliance program is designed to detect and address such deviations.

Huang's assertion—that the E/Q ratio will decline simply with the passage of time, absent any compliance oversight—reflects a misunderstanding of the case's central concern. Without an antitrust compliance program, retail customers cannot reasonably presume that Schwab will maintain or improve execution quality post-merger. That presumption is precisely what the compliance program is intended to safeguard.

---

[14] Huang's criticism that "the data points only include one year of post-merger data" once again reflects a fundamental misunderstanding of both the methodology and the factual context of the case. The benchmark period is intended to capture pre-merger market conditions—not post-merger outcomes. Although the merger was finalized in October 2020, Schwab did not complete the integration of TD Ameritrade accounts until May 2024. Singer & Tatos Suppl. Decl. ¶ 25.

Huang's criticisms of Methodology Two similarly misrepresent Singer and Tatos's analysis. Methodology Two is designed to ensure that the market maker does not provide inferior price improvement—either over time or relative to other market makers. Singer & Tatos Decl. ¶¶ 67-77 (Dkt. 196 (sealed), 205 (redacted)). Drawing on Form 605 data, Plaintiffs' experts identified Jane Street as consistently providing superior price improvement, yet it was not ranked as the top market maker among those receiving Schwab's order flow. *Id.* at ¶ 70. To ensure that order routing is guided by competitive pricing and other best execution criteria rather than extraneous considerations, Methodology Two anticipates that the compliance program will require documentation of any rationale for deviations between the order-allocation wheel ranking and the price improvement ranking among market makers. Where warranted, the program will also mandate reallocation of order flow to better reflect market makers' relative price improvement performance. *Id.* at ¶¶ 72-74. Contrary to Huang's suggestion that the solution is simply to "have Jane Street in all orders," Plaintiffs' experts explicitly acknowledged that reallocating order flow based solely on price improvement must account for operational constraints. Specifically, the market maker offering the most price improvement—Jane Street, in this example—may not be able to absorb the full volume of order flow currently directed to Citadel without compromising overall execution quality. *Id.* at ¶ 74; Singer & Tatos Suppl. Decl. ¶ 27. To address this, Plaintiffs' experts propose a balanced approach: reallocating shares such that each market maker receives a proportion of shares commensurate with its percentage of orders. Singer & Tatos Decl. ¶¶ 75-77 (Dkt. 196 (sealed), 205 (redacted)). This method ensures that improvements in execution quality are pursued without destabilizing market performance.[15]

---

[15] Huang's calculation of the Herfindahl–Hirschman Index (HHI), offered in support of his seemingly argument that market competitiveness improved post-merger—and therefore the

Finally, Huang's dismissal of the "order allocation wheel" theory as a "race to the bottom" misunderstands the competitive logic underpinning antitrust law. Encouraging market makers to compete on price improvement benefits consumers, and the data required for such analysis is already disclosed under Rule 605. His critiques lack specificity and fail to propose viable alternatives, underscoring the rigor and relevance of the expert's approach.

In summary, Plaintiffs' well-qualified experts employed reliable methodologies grounded in sufficient facts and data, as required for admissible expert evidence. Their analysis demonstrates that the antitrust compliance program outlined in the Settlement Agreement, once implemented, will offer substantial benefits to Class Members.

## C.    The Relief Provided for the Class Is Adequate

In evaluating whether a proposed settlement is fair, reasonable, and adequate under Rule 23, the court must consider whether "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

---

compliance program does not obligate Schwab to do anything—is fundamentally flawed and reflects a misunderstanding of basic antitrust concepts. HHI is a standard tool in merger analysis used to assess whether changes in market share before and after a merger indicate increased concentration that could facilitate the exercise of market power. It is calculated as the sum of the squares of the market shares of firms competing in the relevant market. Singer & Tatos Suppl. Decl. ¶ 13.

Huang misapplies this tool by calculating HHI based not on the market shares of participants in the relevant market—namely, the retail order flow market—but instead on the distribution of Schwab's order flow among market makers. This approach is incorrect. Schwab does not supply all retail order flow in the market (*i.e.*, Schwab is not alleged to be a monopsonist in the retail order flow market), and its internal allocation of order flow cannot serve as a reliable proxy for market maker market shares. Even if it could, the concentration among market makers receiving Schwab's flow is not probative of the competitive effects of the Schwab-TD Ameritrade merger. Singer & Tatos Suppl. Decl. ¶ 13.

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C). As Plaintiffs explained in their Motion for Final Approval, the Settlement is adequate under Rule 23(e)(2)(C). Dkt. 197 at 19-27. Nothing identified by any objector changes this calculus, as explained at length below.

### 1. The Settlement provides valuable injunctive relief while preserving Class Members' rights to pursue damages claims

The Settlement provides valuable injunctive relief, while at the same time preserving Class Members' rights to pursue damages claims. Objectors' criticisms broadly misunderstand the Settlement's treatment of their damages claims, misrepresent the actual injunctive relief and its classwide benefits, and otherwise attack strawmen that do not cut against the adequacy of the Settlement, and its propriety for final approval.

First, nearly all objectors criticize the settlement's absence of monetary relief.[16] These objections fundamentally misunderstand what has been settled, as the Settlement does not extinguish a single absent Class Member's damages claim. Contrary to the concerns of these objectors, they (and other Class Members) *retain* their monetary claims against Schwab arising from the Merger.

Here, all Class Members benefit going forward through the Settlement's hard-won injunctive relief, and yet at the same time, Class Members *retain their full claims for past damages*. This Settlement here lies squarely in the heartland of Rule 23's design: it obtains meaningful behavioral relief through the implementation of a new antitrust compliance program, specifically

---

[16] *See* Dkt. Nos. 160, 161, 163, 164, 165, 166, 167, 168, 171, 172, 173, 176, 179, 180, 181, 187, 188, 192, 193, 194, 201, 202, 206, 208, 210, 213, 217, 220, 224, 225, 226, 227, 233, 234, 236, 236, 237, 240, 245, 246, 248, 251, 252, 253, 255, 257, 259, 260, objections of Maria Demelo, William Grubbs, and Rita Johnston (unfiled, *see* Ex. 2).

designed to restore and preserve competition in the relevant market. This forward-looking remedy is expected to yield substantial benefits—including better price improvements—for Class Members, while leaving their monetary damages claims entirely intact. "[T]here is no requirement a class action settlement yield monetary relief and many cases are litigated for other forms of relief." 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 13:51 (6th ed. June 2025 update). Thus, class settlements are regularly approved that provide injunctive relief with no cash component. *See, e.g.*, *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 485 (D.N.J. 2012) ("I find compelling that Plaintiffs' counsel was able to achieve significant injunctive relief that is tailored to remedy the corporate governance failings inherent in J & J's decentralized management structure. Below, in my attorney's fee analysis, I explain in more detail the significance of the corporate governance reforms incorporated into the settlement here. Moreover, while some may argue that monetary relief would amount to a greater recovery, the Supreme Court and Court of Appeals have made clear that injunctive relief, on its own, may constitute a significant benefit for the [nominal plaintiff] corporation." (citations omitted)); *G. F. v. Contra Costa Cnty.*, 2015 WL 7571789, at *1 (N.D. Cal. Nov. 25, 2015) (granting final approval of settlement providing injunctive-only relief in discrimination suit).

Courts regularly hold that injunction-only class settlements are appropriate where damages claims are not released. *See, e.g.*, *Romero v. Securus Techs., Inc.*, 2020 WL 3250599, at *2, *10 (S.D. Cal. June 16, 2020) ("The terms of the proposed settlement include only injunctive relief, and no monetary relief, to the class members. . . . Additionally, subject to the court's approval, Securus will pay each Plaintiff a service award of $20,000, and attorneys' fees and costs in the amount of $840,000. Only the named Plaintiffs, not class members, will release their claims for injunctive relief and for damages. . . . The court preliminarily approves the settlement for

19

injunctive relief only as fair, reasonable, and adequate for members of the class."); *Romero v. Securus Techs., Inc.*, 2020 WL 6799401, at *9 (S.D. Cal. Nov. 19, 2020) ("For the foregoing reasons, Plaintiffs' Motion for Approval of Class Action Settlement [] is GRANTED. Additionally, Plaintiffs' motion for $840,000 in attorneys' fees and costs [] is GRANTED. Plaintiffs' motion for $60,000 in incentive awards, however, is DENIED IN PART. Instead, each of the three Plaintiffs is awarded $10,000 for a total of $30,000.").

Indeed, as here, classwide relief is regularly recognized as valuable—and accepted as appropriate for the class—without monetary relief. *See Kelly v. Bus. Info. Grp., Inc.*, 2019 WL 414915, at *14 (E.D. Pa. Feb. 1, 2019) ("Moreover, despite receipt of these benefits, the members in the Injunctive Relief class retain their right to bring any individual claims for damages and waive only their right to participate in a collective action arising from reports produced in the period between December 17, 2013 and June 27, 2016. We conclude that these final *Girsch* factors counsel in favor the parties' settlement even as to the Injunctive Relief Class."); *Babu v. Ahern*, 2022 WL 568357, at *3 (N.D. Cal. Feb. 7, 2022) ("[O]bjectors also raised concerns about the lack of monetary relief for Class Members or preclusion from future recovery. This complaint sought only injunctive relief, so Class Members are not barred from suing for individual damages."), *aff'd sub nom. Ashok Babu v. Wilkins*, 2023 WL 6532647 (9th Cir. Oct. 6, 2023); *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Pracs. Litig.*, 2015 WL 7282543, at *11 (D.N.H. Nov. 16, 2015) ("Finally, several objectors oppose the Settlement Agreement because it provides no monetary relief to class members. *See* Doc. Nos. 99 at 2 ('there are viable damage claims that class counsel has not pursued'); 96 at 1 ('The Class receives no monetary value for the settlement!'). These objections are unpersuasive for two reasons. First, and most importantly, the Settlement Agreement preserves class members' right to bring a subsequent lawsuit seeking

monetary relief based on these same facts. As explained above, under the terms of the Settlement Agreement (and the parties' subsequent clarification), unnamed class members release only non-monetary claims against Colgate."); *Hall v. Cnty. of Fresno*, 2015 WL 5916741, at *6 (E.D. Cal. Oct. 7, 2015) ("Further, objections to the lack of money damages are meritless because this is a class action certified pursuant to Rule 23(b)(2) that seeks only injunctive relief. Therefore, the absence of an award of money damages is neither unfair nor unreasonable.").

Several objectors criticize the Settlement's injunctive relief as inadequate, including by arguing that its benefits are "illusory" for an alleged lack of enforcement mechanism.[17] These objections either misunderstand or misrepresent the actual facts of the Settlement, and are contrary to a wall of legal authority. As to the facts, the Settlement requires Schwab to adopt "all recommendations in the Final Report" of the antitrust compliance monitor, and the Court retains jurisdiction to enforce the terms of the Stipulation. Settlement Agmt. ¶ 2.2(e) (Dkt. 197-1). This type of structure is regularly approved as adequate—and specifically found to be not "illusory"—by courts evaluating injunctive relief under Rule 23. *See, e.g.*, *Bostick v. Herbalife Int'l of Am., Inc.*, 2015 WL 12731932, at *22 (C.D. Cal. May 14, 2015) ("The objectors also contest the lack of an enforcement mechanism for ensuring that Herbalife in fact abides by the reforms. The Court does not find this argument to be persuasive. The Settlement Agreement vests the Court with continuing jurisdiction to enforce its terms." (internal citation omitted)); *In re Google Location Hist. Litig.*, 2024 WL 1975462, at *16 (N.D. Cal. May 3, 2024) (rejecting objections that injunctive relief "illusory" where objected-to relief required company to do things it was not already required to do; noting that provisions were enforceable in court going forward); *Jones v. Monsanto Co.*,

---

[17] Dkt. Nos. 165, 166, 167, 168, 173, 176, 179, 180, 181, 187, 188, 192, 193, 201, 203, 209, 210, 224, 226, 227, 228, 233, 234, 236, 237, 239, 245, 248, 249, 251, 252, 253, 255, 260, objections of Maria Demelo, William Grubbs, and Rita Johnston (unfiled, *see* Ex. 2).

2021 WL 2426126, at *10 (W.D. Mo. May 13, 2021) ("The Court has also considered the injunctive relief. Contrary to the Objector's argument, the injunctive relief is not 'illusory, unenforceable, and [of] no settlement value.' This is not a case in which Defendant is simply ordered to follow the law." (internal citation omitted)), *aff'd*, 38 F.4th 693 (8th Cir. 2022).

More generally, courts evaluating the adequacy of injunctive relief under Rule 23 emphasize that the relief must be judged on its own merits, within the real world, against a but-for world in which the company (absent the settlement) may not have been required to do anything at all. *See Hall v. AT & T Mobility LLC*, 2010 WL 4053547, at *8 (D.N.J. Oct. 13, 2010) ("As to the contentions that the non-cash benefits are inadequate, that the injunctive relief provides no actual value to the Class and that the prepaid calling cards are overly restricted (thereby diminishing their actual value), such distinct provisions were the result of an arm's length negotiation between Class Counsel and ATTM. Such negotiations resulted in a compromise. If this case is not settled, for instance, ATTM would be under no obligation to cease its practices of charging flat-rate ETFs. Thus, the fact that the Harter Objectors would prefer that all Class members receive greater cash benefits (and fewer prepaid calling cards), or to extend the two year injunction to five years has no bearing on whether the terms of the Settlement Agreement itself are fair and reasonable. After all, a settlement is, by its very nature, a compromise that naturally involves mutual concessions."); *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 84 (1st Cir. 2015) ("The objectors argue that the injunctive relief in the settlement is 'illusory and amount[s] to no relief at all' because it obligates Vibram not to do things that Vibram is legally obligated not to do anyway. The district court directly considered and rejected this objection. The settlement requires Vibram to discontinue its purportedly false advertising campaign unless Vibram obtains 'competent and reliable scientific evidence to substantiate' such claims. This is a meaningful concession given that the falsity of the

advertising was the central disputed issue in the suit. The district court did not abuse its discretion in concluding that injunctive relief against continuation of the allegedly false advertising was 'a valuable contribution to this settlement agreement.' The fact that changes in future Vibram marketing will not remedy past harm to consumers does not make such relief meaningless to those consumers.").

Rule 23 does not require (or indeed, permit) the Court to evaluate agreed-to classwide relief solely against the maximal relief raised in a Complaint, without considering what the class would actually obtain if a settlement were—or were not—approved. *See, e.g.*, *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 941 (N.D. Cal. 2013) ("The injunctive relief, while not incorporating all features that some of the objectors might prefer, has significant value and provides benefits that likely could not be obtained outside the context of a negotiated settlement, even if plaintiffs were to prevail on the merits."), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016); *In re Colgate-Palmolive*, 2015 WL 7282543, at *10 ("Class members, in an ideal world, may have wished for a broader injunction. Yet, after years of arms-length negotiations, plaintiffs have secured a significant benefit to the class. The reality that plaintiffs did not achieve another 'possible but perhaps unattainable variation[] on the proffered settlement' does not make this settlement inadequate.").

As a result, courts regularly approve injunctive relief similar to that here—and over objections similar to those lodged by Frank, Iowa, and others that couch as "illusory" or "unenforceable" meaningful relief that does not, in the objectors' view, go as far as they would ideally prefer. *See, e.g.*, *In re Budeprion XL Mktg. & Sales Litig.*, 2012 WL 2527021, at *19 (E.D. Pa. July 2, 2012) ("According to Anderson, the settlement here is illusory as the Class walks away with nothing. She argues that a number of the changes required by the settlement agreement were

already put in place prior to the agreement. She also takes issue with some of the monitoring provisions in the settlement agreement because '[t]here is no requirement that Defendants act on what they find in the monitoring. . . . [A] requirement to monitor does not provide any benefits for how the Defendants must act in response to the result of their monitoring or to the benefit of consumers.' The Court does not agree with this assessment of the settlement agreement, as the relief provided is neither meaningless nor illusory. With respect to monitoring, this forces Defendants to take actions previously not required. Though it is ultimately unclear what action, if any, the monitoring will spur, Defendants nonetheless must report to Class Counsel. Furthermore, Defendants' failure to comply with the terms of the settlement agreement can lead to sanctions, including a finding that they are in contempt of court. The settlement agreement also makes permanent certain changes Defendants implemented. Absent the settlement agreement, Defendants would face no compulsion to keep these changes in place. Thus, the settlement agreement undeniably works a change in the relationship between the parties, and the relief afforded the Class is not illusory." (internal citations and ellipses omitted)); *In re Motor Fuel Temperature Sales Pracs. Litig.*, 271 F.R.D. 263, 292 (D. Kan. 2010) ("Some objectors complain that the proposed settlement does not contain a provision to enforce, monitor or publicize compliance with the settlement. The proposed settlement requires Costco to provide class counsel a compliance report every six months. If the parties restructure the settlement, it should require Costco to file regular compliance reports with the Court. With that modification, the proposed settlement would provide adequate information for the Court and class members to monitor and enforce Costco's compliance with the proposed settlement." (internal citations omitted)).

To that end, the assumption—or outright assertion—of objectors like Frank and Iowa that the injunctive relief obtained here is "worthless" is not only logically incorrect (it is unquestionably

better than a but-for world without an antitrust compliance program), but is evidentiarily incorrect as well. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 304-05 (W.D. Tex. 2007) ("Indeed, plaintiffs' expert, Dr. John J. Donohue III, economist and professor of law at Yale Law School, explained how Allstate's agreement to use the settlement algorithm brings significant value to the class. He concluded the new formula will have a significant economic impact, given the overall societal benefit of reducing discrimination and the large numbers of minority policyholders who stand to benefit from the settlement credit scoring formula. Professor Donohue also concluded that the algorithm change provided by the settlement will further overall fairness and the goals of the Civil Rights Act and the Fair Housing Act by providing 'economic benefits to a class of individuals that is generally less affluent than the population at large' by ensuring that minorities pay the same insurance rates as non-minorities for the same level of risk and by promoting home ownership by minorities." (internal citations omitted)).

Frank and several other objectors argue that the Settlement will not benefit Class Members because it will simply pass settlement costs onto retail customers.[18] This objection—presented with absolutely no evidence—does not make economic sense, and has been rejected when previously raised by Frank and those in his orbit. Here, Frank and others complain that the costs of the compliance program (and of attorney's fees and costs) will be borne by Class Members, and, it is said, outweigh any benefits to the Class Members from the injunctive relief. Starting with the first part of this equation, there is no economic evidence that costs of antitrust compliance, nor the costs of this lawsuit, will be borne by Schwab retail investors, and Frank et al. do not even explain the mechanism by which these zero-commission traders will bear such "increased costs."

---

[18] Dkt. Nos. 164, 165, 166, 168, 181, 187, 188, 192, 193, 210, 211, 220, 224, 234, 235, 240, 242, 245, 246, 251, 252, 256, 261, objections of Maria Demelo and William Grubbs (unfiled, *see* Ex. 2).

Courts have rejected similar "cost pass-through" objections offered without proof that the challenged settlement will have the adverse economic effects urged by the objectors. *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1104 (D. Kan. 2018) ("[T]he class member states . . . that the settlement will increase the cost of doing business[.] . . . The objection, however, does not include any explanation why any aspect of the settlement or fee request is unfair or unreasonable, or why the settlement will have an adverse economic effect. Accordingly, the Court overrules this objection."); *In re LJ Int'l, Inc. Sec. Litig.*, 2009 WL 10669955, at *7 (C.D. Cal. Oct. 19, 2009) (rejecting objection that settlement payment would result in higher prices because objector did not explain how nor offer evidence thereof).

Meeting Frank and others more than halfway and assuming they are implying the costs of settlement will be borne by Class Members through *decreased price improvement on retail trades*, the injunctive relief obtained in the Settlement will enhance competition and mitigate the risk of future antitrust or unfair conduct, which may generate over $100 million annually in improved pricing on retail trades. *See* Singer & Tatos Decl. ¶ 85 (Dkt. 196 (sealed), 205 (redacted)). Moreover, to actually play out Frank's exact logic concerning Settlement expenses passing through to retail traders, the Settlement has the ancillary benefit of ending Schwab's expenditure on defense counsel before class certification, summary judgment, and trial, which would far exceed the amount paid to compliance counsel. *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 271 F.R.D. 263, 289 (D. Kan. 2010) ("[T]he Court notes that if Costco continued to litigate these cases, class members who purchase fuel and other goods from Costco would presumably subsidize those costs as well.").

Contrary to the assertion that injunctive relief will increase Schwab's costs and ultimately burden Class Members, the adoption of the antitrust compliance policy is expected to be a net

positive for Schwab itself. Not only will customers benefit from competition-enhancing measures, but Schwab stands to gain from improved regulatory compliance, reduced exposure to litigation, and early identification of potential antitrust issues. These guardrails are likely to lower operating expenses over time and generate long-term efficiencies—benefits that will ultimately accrue to Schwab's customers as well.

Further, as an economic matter, competition will determine how much (if any) of Schwab's costs can and will be passed on to retail customers. There is no evidence that—but for the very Merger-related lessening of competition alleged in this case, and specifically sought to be remediated in the Settlement—Schwab has unilateral pricing power in the ROFM. As a result, any assertion that costs from this case will be passed through to Schwab retail investors is speculative in general, and economically illogical when those costs are specifically *settlement costs*. There is, economically, a greater likelihood that Schwab retail investors would bear litigation costs *absent settlement*, given that the settlement not only constrains actual legal costs, but implements a compliance program that will specifically minimize the amount of *any* costs that Schwab is able to supracompetitively pass through to consumers. (And, to be clear, Frank and others neither grapple with any of this, nor provide any economic or other evidence to the contrary.)

Moreover, Frank and others' "cost pass-through" objection applies no less to the injunctive relief and fees called for here than it would for any other relief *not* included in the settlement—for example, divestiture or even a classwide common fund. Everything required of Schwab in *any* injunction, or indeed paid by Schwab in a classwide monetary award, would be an expenditure of the company and have some theoretical possibility of being passed along to customers. If Frank's "costs" objection were truly credited, no class settlement could *ever* benefit a class of consumers,

because *anything* required of a corporate defendant could impose costs on the company, which could theoretically be passed through to the class.

Perhaps that is Frank's true objection: that no class settlement is ever actually beneficial to consumers. But the evidence—including expert economic analysis—is against objectors like Frank in this particular case, and Rule 23 unquestionably permits a settlement like the one. Frank's "costs" objection has been previously found wanting by courts. *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 2015 WL 5010048, at *18 (D. Kan. Aug. 21, 2015) ("The Frank Objectors assert that ATC will not benefit class members because defendants can choose to pass along additional costs to their customers. The Court rejected similar objections with regard to the Costco settlement. There, the Court found that the retail motor fuel market is a competitive one, that competition will determine whether Costco can raise prices and if so by how much, and that competitive pressures are particularly strong since not all retailers propose to change to ATC. The same analysis applies here. . . . [C]ompetitive market forces will determine the prices which the settling defendants can charge. The Court overrules the Frank Objection on this ground.", *aff'd*, 872 F.3d 1094 (10th Cir. 2017); *In re W. Union Money Transfer Litig.*, 2004 WL 3709932, at *19 (E.D.N.Y. Oct. 19, 2004) (rejecting objection that defendant would compensate for cost of settlement by raising prices).

Several objectors complain, essentially, that Plaintiffs' case is weak and never should have been brought.[19] According to these objectors, "Schwab should win the case," there was no need for a lawsuit in the first place, and (according to one objector) Plaintiffs' case is "illegal." Not only do these objections not impugn the actual fairness of the Settlement, they underscore the significant care and effort required by Plaintiffs to secure meaningful relief as memorialized in the

---

[19] Dkt. Nos. 161, 170, 177, 226, 227, 228, 239, 240, 246, 249, 252, 254, 258.

settlement—even if this relief did not rise to the level of divestiture, and even though the settlement does not resolve damage claims. In any event, this type of objection does not address the substantive fairness of the Settlement and is therefore not relevant to whether a settlement is fair, reasonable, and adequate. *See In re TD Ameritrade Account Holder Litig.*, 2011 WL 4079226, at *12 (N.D. Cal. Sept. 13, 2011) (overruling objection "on the ground that [objector] believes the claims 'to be unjustified, frivolous and fostered by opportunistic shysters with a low sense of morality,'" explaining: "Ms. Lamy's apparent concern for Ameritrade is inapposite, since the purpose of Rule 23(e)'s final approval process is the protection of absent class members, and not the defendant.").

A handful of objectors—including Iowa and Frank—assert that the Settlement "achieves nothing" sought in the Complaint.[20] *See, e.g.*, Dkt. 246 at 11; *id.* at 9 ("Plaintiffs Pleaded Defendant Caused Great Harm, Settlement Fails to Remedy that Harm at All."). This criticism is, on its face, simply untrue. As explained at length earlier in this brief, the Complaint pleads that the Merger reduces (anticompetitively deflates) price improvement on Schwab retail trades, and the central term of the Settlement directly addresses this—creating a program to ensure that competitive forces are restored in the execution of Schwab retail orders, aimed at *increasing price improvement*. *See supra* at § III.C.1; Settlement Agmt. ¶ 2.2; Singer & Tatos Decl. ¶ 84-85 (Dkt. 196 (sealed), 205 (redacted)) (estimating that implementation of the compliance program could yield price improvement gains of approximately 1.8% to 2.4%, translating to $10.7 million to $14.5 million in monthly savings—or roughly $128.4 million to $174 million annually—for Schwab's retail customers). Iowa, Frank, and similar objectors object to the specific manner by which Schwab will adopt antitrust guardrails that enhance competitive forces leading to better

---

[20] Dkt. Nos. 245, 251, 252.

pricing and execution for Settlement Class Members. This is a misguided complaint addressed at length earlier in this brief—but to assert that the Settlement "Fails to Remedy [the Harm Pleaded in the Complaint] At All" is, while pithy, simply false. As to the specific criticism that the Settlement fails to achieve divestiture, objectors point to no authority requiring that only the maximal injunctive relief sought in a Complaint can satisfy fairness and adequacy in a class settlement—and the actual authority is to the contrary. *See, e.g., Fraley*, 966 F. Supp. 2d at 941; *In re Colgate-Palmolive*, 2015 WL 7282543 at *10.[21]

### 2.    This is an appropriate stage of the case for settlement

As Plaintiffs explained in their Motion for Final Approval, an examination of the governing *Reed* factors, *see Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983); *see also Celeste*, 2022 WL 17736350, at *3 n.3 (E.D. Tex. Dec. 16, 2022) (noting applicability of *Reed* factors), in connection with Rule 23(e)(2)(C)(i) ("the costs, risks, and delay of trial and appeal") strongly supports approval of the Settlement. *See* Dkt. 197 at 21-25. The complexity, expense, and likely duration of litigation absent the Settlement are substantial. *Id.* at 21-22. Significant litigation and discovery have already been completed, including several depositions, document production comprising more than a million pages and data production comprising 6.5 terabytes of financial data, and both pleadings-stage and discovery motions. *Id.* at 22-23. Significant hurdles would face Plaintiffs at the class certification, summary judgment, and trial stages of litigation. *Id.* at 23-24.

---

[21] Frank fleetingly frames his same "lack of concrete relief" objection as a class certification issue, Dkt. 251 at 5, but does not really finish the thought. Even if Frank's two-sentence missive of class certification is taken as a substantive objection to Rule 23(b)(2) certification, it is clearly wrong: as explained above in this subsection and *supra* in connection with Article III, the Settlement will fully and equally benefit all Schwab retail traders (*i.e.*, the full Settlement Class) once the Settlement is approved and its injunctive relief implemented. Further, to the extent that Frank's class certification musing is based on his (incorrect) view that there is simply no relief for anyone, that is not a class certification issue.

And the significant injunctive relief memorialized in the Settlement is well within the "reasonable range of recovery" for the class. *Id.* at 24-25.

Against the above, one objector argues that this case is too nascent, and discovery insufficient to permit a class settlement.[22] This objection should be overruled. First, it is factually incorrect: substantial documentary and testamentary discovery as well as substantial expert analysis by Plaintiffs' suite of financial and antitrust experts indeed occurred in this case, as explained earlier in this brief. *See supra* at § III.B. Further, courts reject the assertion that litigation must have reached a certain stage or completed a certain amount of discovery for a classwide settlement to be approved. *See Newby v. Enron Corp.*, 394 F.3d 296, 306 (5th Cir. 2004) ("Generally speaking, a settlement should stand or fall on the adequacy of its terms. The overriding theme of our caselaw is that formal discovery is not necessary as long as (1) the interests of the class are not prejudiced by the settlement negotiations and (2) there are substantial factual bases on which to premise settlement." (citation omitted)); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 424 F. Supp. 3d 456, 487 (E.D. La. 2020) ("Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed." (citation omitted); *Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 877-78 (S.D. Iowa 2020) ("There is no inherent problem with the parties settling this case in its early stages. The Federal Rules do not prescribe a procedural posture after which settlement may be pursued, and the Court will not create a precedent that would graft such a requirement onto Rule 23.").

---

[22] Dkt. 176.

Indeed, settlements have been and regularly are approved with no or very little formal discovery—which, again, is contrary to the record of extensive discovery and general on-the-merits litigation in this case. *See Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 300 (5th Cir. 2017) ("But the lack of discovery is not necessarily fatal to a settlement agreement, provided the parties demonstrate the case cannot be characterized as an instance of the unscrupulous leading the blind. The trial court is entitled to rely upon the judgment of experienced counsel for the parties." (cleaned up)); *Jenkins v. Trustmark Nat. Bank*, 300 F.R.D. 291, 304 (S.D. Miss. 2014) ("At the same time, the law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations. Indeed, a settlement may be approved even where plaintiffs have not conducted formal discovery where plaintiffs have access to the desired quantum of information necessary to achieve a settlement." (cleaned up)).

### 3.    The proposed award of attorney's fees is reasonable considering the valuable relief obtained

Several objectors criticize the proposed award of attorney's fees.[23] As an initial matter, the requested fees are analyzed, justified, and explained in detail in connection with Plaintiffs' Counsel's separate Motion for an Award of Attorney's Fees, Litigation Expenses, and Service Awards (Dkt. 199). In any event, these objections to the amount of requested attorney's fees are largely conclusory, and uniformly misguided.

First, none of the fee objectors meaningfully contend with the applicable legal standard—Fifth Circuit law concerning lodestar and the *Johnson* factors. *See Johnson v. Ga. Highway*

---

[23] Dkt. Nos. 161, 165, 166, 167, 168, 169, 171, 172, 173, 176, 179, 181, 187, 188, 192, 193, 194, 208, 210, 217, 220, 223, 224, 225, 226, 227, 233, 234, 235, 236, 237, 238, 240, 242, 245, 246, 248, 251, 252, 255, 256, 257, 261, objections of Maria Demelo, William Grubbs, and Rita Johnston (unfiled, *see* Ex. 2).

*Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Instead, nearly all fee objectors narrowly focus (without articulating where this fits into a complete reasonableness analysis) on what is *Johnson*'s eighth factor: "[t]he amount involved and the results obtained." *Id.* at 718. But the analysis of the "results obtained" in these objections suffers from the same factual misapprehension and logical fallacy already discussed at length earlier in connection with objections to the value of the Settlement, principally that the Settlement's value must be judged on its own terms, not in comparison to some abstract maximalist award that does not exist and may never have been obtained. *See supra* at § III.C. That is, each fee objection logically rises and falls with the incorrect belief amongst objectors that the Settlement is "valueless" because it does not meet the objectors' idealized settlement, rather than reckoning with the substantial value to all class members of the injunctive relief actually memorialized in the Settlement here. *See Fraley*, 966 F. Supp. 2d at 941; *In re Colgate-Palmolive*, 2015 WL 7282543 at *10; *Hall*, 2010 WL 4053547 at *8; *Bezdek*, 809 F.3d at 84; *In re Budeprion XL Mktg. & Sales Litig.*, 2012 WL 2527021, at *19.

Simply put, the fee objectors do not meaningfully address the reasonableness of Plaintiffs' Counsel's fee request when they simply compare the request to an unbargained-for (and not released) hypothetical damages award, and do not meaningfully address the value of the actually obtained injunctive relief on its terms. This is both contrary to the true record—which includes an actual quantification of value to Class Members by expert economists, *see* Singer & Tatos Decl. ¶ 85 ((Dkt. 196 (sealed), 205 (redacted))—and to relevant legal authority. For example, in *DeHoyos*, various objectors argued that the bargained-for injunctive relief had no value, or that the court should ignore its value in evaluating the class counsel's fee request. 240 F.R.D. at 336-37. Judge Biery rejected these arguments, explaining

> if [injunctive relief] were valueless, attorneys would rarely accept
> civil rights or other socially valuable cases not involving monetary

> damages. This is not how the justice system operates. Instead, recognizing it is difficult to value injunctive and declaratory relief, courts use the lodestar method, which compensates attorneys based on their reasonable time and rates. . . . [C]lass counsel properly filed and has predicated their fee application using the lodestar method, coupled with a reasonable 1.68 enhancement. The objections to the requested attorneys' fees based on these arguments are overruled.

*Id.* (citation omitted).

Judge Biery's remarks in *DeHoyos* have direct weight here, where the case at bar is an antitrust case, in which the injunctive relief serves a public good of improving the competitive functioning of a market in which tens of millions of Americans participate. Congress has formally recognized the importance of antitrust enforcement by private actors such as Plaintiffs' Counsel through the fee provision of the Clayton Act, which preempts the "American rule" on fees generally in the specific context of private antitrust enforcement, awarding treble damages to a prevailing private antitrust plaintiff, on par with federal civil rights statutes. *See* 15 U.S.C. § 15. As the Supreme Court has explained, "the purpose of giving private parties treble-damage and injunctive remedies [in the Clayton Act] was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969) (citation omitted); *see also PharmacyChecker.com LLC v. LegitScript LLC*, 137 F.4th 1031, 146 (9th Cir. 2025) ("[W]e continue to side with the goal of vigorous enforcement of our antitrust laws, 'the Magna Carta' for 'the preservation of our economic freedom and free-enterprise system.'" (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); additional citations and quotation marks omitted)).

Thus, the objectors' simple dismissal of, and refusal to engage on meaningful terms with the value of, the significant injunctive relief actually obtained in this case renders essentially beside the point their criticisms of Plaintiffs' Counsel's requested fees. This is legally erroneous and does not weigh against approval of the requested fee award. *See, e.g., Heredia v. Sunrise Senior Living,*

34

*LLC*, 2024 WL 5416919, at *6 (C.D. Cal. Dec. 3, 2024) ("The Court first notes that neither objector considers the economic value to the Class of the Injunction, which the Court "must expressly consider" when awarding attorneys' fees."); *In re Motor Fuel Temperature Sales Pracs. Litig.*, 2016 WL 4445438, at *6–7 (D. Kan. Aug. 24, 2016) (rejecting objections to fee because the objectors ignored the substantial benefit of the injunction-only settlement). As the court explained in *Campbell v. Facebook Inc.*, 2017 WL 3581179, at *5 (N.D. Cal. Aug. 18, 2017), *aff'd*, 951 F.3d 1106 (9th Cir. 2020):

> Objector's real concern relates less to the terms of the settlement in itself, and more to the proportionality between the benefits for the class and the attorneys' fees sought. . . . Because the benefits to the class here are declaratory and injunctive in nature, it is difficult to put a dollar figure on their value and compare them to the attorneys' fees sought. Nonetheless, as explained above, the privacy interests of the class vindicated by the settlement and through this litigation are substantial, and the court rejects Objector's characterization of them as having 'no value.'

Here, unlike in *Campbell*, not only does the injunctive relief obtained have "some" value, that value has actually been *quantified* by expert economists, with an estimated worth of more than $100 million per year in the form of increased price improvement, improved execution, and other material benefits to the Settlement Class upon compliance policy adoption. *See* Singer & Tatos Decl. ¶ 85 ((Dkt. 196 (sealed), 205 (redacted)). At the same time, the fees actually requested by Plaintiffs' Counsel here are—like in *Campbell*—less than Plaintiffs' Counsel's actually incurred lodestar amount.

Objectors' fee criticisms do not warrant rejection of the Settlement, or of Plaintiffs' Counsel's fee request.

### 4. Plaintiffs' decision not to pursue classwide damages is no reason to reject the Settlement

Objector Frank argues that because the class claims for damages are not tolled, approval of the Settlement would foreclose future classwide recovery and render the Settlement inadequate. Dkt. 251 at 3-5. This argument misstates both the legal effect of the Settlement and the practical realities of the litigation.[24]

After over three years of active litigation and comprehensive discovery, Plaintiffs and their counsel have concluded that pursuing classwide damages is exceptionally difficult and fraught with risk in the trial court and, if appealed, in the Fifth Circuit. Plaintiffs would need to show, by common proof, that all or nearly all Class Members were damaged as a result of the Merger. Schwab has consistently claimed that the individualized nature of the relevant issues—such as trading patterns, account configurations, and investment strategies—creates substantial obstacles to class certification under Rule 23(b)(3) for a potential class of approximately 25 million. Schwab's position is reinforced by multiple objectors who affirmatively state they do not believe they were harmed by the Merger and, in fact, continue to receive competitive pricing from Schwab. These divergent experiences among Class Members underscore the difficulties for Plaintiffs in demonstrating a uniform theory of antitrust impact flowing from the Merger.

---

[24] In describing the scope of the release provided under the Settlement, Plaintiffs' Motion accurately notes that the Settlement Agreement does not release absent Class Members' right to bring damages claims on behalf of a class. *See* Mot. at 6. However, in his objection, Frank points out that under *China Agritech v. Michael H. Resh*, 584 U.S. 732 (2018), the statute of limitations for classwide damages claims filed after approval of the Settlement would not receive the benefit of tolling. This is correct. It is also not a basis to reject the Settlement, which, again, does not release a single absent Class Member's claim for damages. To the extent Frank's argument is that, absent the settlement, a damages class encompassing all Class Members would have been certified, this is pure speculation.

Fundamentally, Frank is incorrect in asserting that the class mechanism is the only avenue for recovering damages. The settlement notice clearly states that Class Members' damages claims are not released. Those who believe they have viable claims remain free to pursue them individually or, prior to final approval of the Settlement, on behalf of a damages class. The Clayton Act expressly permits prevailing plaintiffs in private antitrust actions to recover reasonable attorney's fees and costs, making individual litigation a feasible and potentially rewarding path. *See* 15 U.S.C. § 15(a). Additionally, collective action remains available. In *Brown, et al. v. Google LLC*, No. 4:20-cv-03664-YGR (N.D. Cal.), after the damages class was denied certification, plaintiffs settled for injunctive relief only. *See Brown*, Dkt. No. 1096. Because the settlement preserved individual damages claims, over 375,000 users filed more than 2,300 individual lawsuits in California state court. *See* Bathaee-Burke Suppl. Decl. Ex. A at 6 (*Luna, et al. v. Google LLC*, No. 24CV434093 (Santa Clara Cty. Super. Ct.), Ex. 1 to Google LLC's Notice of Petition for Coordination of Potential Add-On Cases). This precedent demonstrates that meaningful individual redress is possible even without a certified damages class.

Finally, Frank fails to acknowledge that none of the objectors—including himself, a sophisticated legal professional and serial objector, the Iowa Attorney General, and Huang, (another serial objector in class action proceedings)—have moved to intervene or expressed any intention to pick up the baton and pursue the class's damages claims through continued litigation. *See* 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 9:30 (6th ed. June 2025 update) ("An absent class member may also intervene to protect her own rights, including . . . preventing dismissal of either class-wide or individual claims."); *see also Graves v. Walton County Bd. of Educ.*, 686 F.2d 1135, 1138 (5th Cir. 1982) ("It is firmly established that where a class action exists, members of the class may intervene or be substituted as named plaintiffs in order to keep

the action alive after the claims of the original named plaintiffs are rendered moot."). Moreover,
following the notices of the injunctive-only settlement, no parallel or subsequent actions were filed
seeking monetary relief. This absence of further litigation efforts underscores the practical and
equitable nature of the Settlement, suggesting that even the most engaged and capable stakeholders
recognized the limited viability of obtaining monetary damages and implicitly affirmed the
reasonableness of the injunctive relief as a fair resolution.

Neither Frank nor any of the other objectors are willing to "walk the walk" and preserve
the classwide damages claims he asserts are so valuable. It is not reasonable to hold the Settlement
hostage to an objector's armchair musings about the purported merits of proceeding with a
classwide damages suit, particularly when neither he nor any other Class Member has stepped
forward to litigate it. Frank's objection is, stripped to its essence, an attack on the class device, and
he remains unwilling to say the quiet part out loud. The truth is that if the Settlement is rejected,
the most likely outcome is that no damages will be recovered, no injunctive relief will be obtained,
and Class Members will be left with nothing—while still losing their right to bring damages claims
against the Merger due to the passage of time. The proposed settlement reflects a sound and
strategic resolution that preserves individual rights while securing meaningful relief for the Class.

### D.    Granting a Reasonable Service Award to Plaintiffs Would Not Render the Settlement Unfair

Several objectors claim that granting Plaintiffs' request for service awards of up to $5,000
would make the Settlement unfair.[25] This objection is meritless.

Rule 23(e)(2)(D) asks whether the proposed settlement "treats class members equitably
relative to each other," not whether it treats them identically. Courts routinely grant service (or

---

[25] Dkt. Nos. 171, 173, 176, 215, 225, 237, 240, 242, 245, 248, 251, 252, objection of Rita Johnston
(unfiled, *see* Ex. 2).

incentive) awards to class representatives "to compensate named plaintiffs for the services they provide and burdens they shoulder during litigation," *DeHoyos*, 240 F.R.D. at 339, and reasonable awards are perfectly consistent with Rule 23(e)(2)(D)'s principle of equitable treatment, *see Moses v. New York Times Co.*, 79 F.4th 235, 245 (2d Cir. 2023); *see also China Agritech*, 584 U.S. at 747 n.7 (noting that a class representative stands to gain "a share of class recovery above and beyond her individual claim" in the form of an incentive award). Furthermore, a service award of $5,000 would be in line with what courts in this circuit and others typically award. *See* Mot. at 28 (collecting cases); *Scott v. Dart*, 99 F.4th 1076, 1087 (7th Cir. 2024) ("The most recent empirical study on incentive awards reviewed approximately 1,200 class actions from 2006 to 2011 and found that the median incentive award per named plaintiff was $5,250 (or $7,125 in 2023 dollars).").

As detailed in the briefing on Plaintiffs' Counsel's Motion for an Award of Attorney's Fees, Litigation Expenses, and Service Awards, a $5,000 service award per Plaintiff would reasonably compensate them for their service to the Class. But regardless of whether the Court awards $5,000 or a lesser amount, a modest sum that compensates Plaintiffs for their service would be inequitable under Rule 23(e)(2)(D).

### E.    The $50 Payments to Plaintiffs to Release Their Damages Claims Do Not Render the Settlement Unfair or Defeat Class Certification

Objectors Huang and the State of Iowa complain about Schwab's payment of $50 to each Plaintiff (credited to their Schwab brokerage accounts) in exchange for the release of their individual damages claims.[26] The objection to this payment rests on a fundamental misunderstanding: the $50 awarded to each Plaintiff is not part of the classwide injunctive-relief

---

[26] Dkt. Nos. 215 at 11-13 (Huang), 245 at 20-21 (Iowa).

settlement. Rather, it reflects consideration for resolving their personal damages claims, which were already at issue in the litigation.

The named plaintiffs pursued this action both in their individual capacities and as representatives of a putative class. In settling the case on a classwide basis, they secured injunctive relief benefiting all Settlement Class Members and released all equitable claims on their behalf. That constitutes the entirety of the class settlement. Separately, in their individual capacities, Plaintiffs resolved their personal damages claims for $50 each. This individual settlement has no bearing on the rights of the broader Settlement Class, whose damages claims remain expressly preserved and may be pursued individually or collectively in future litigation.

No Class Member is prejudiced by the $50 individual relief, which was disclosed solely for transparency in the Settlement Agreement. The payment does not create any intraclass conflict, nor does it place Plaintiffs in a preferential position relative to other Class Members.

***The $50 payments do not undermine the equitableness of the settlement under Rule 23(e)(2)(D).*** Rule 23(e)(2)(D) requires that class members be treated equitably relative to one another. Here, all Settlement Class Members benefit equitably from the injunctive relief—most critically, better price improvement in future trading due to Schwab's antitrust compliance program. While Plaintiffs are the only ones who settled their individual damages claims, the $50 payment is not a premium derived from leverage provided by the class action. *See Larry James Oldsmobile-Pontiac-GMC Truck Co. v. Gen. Motors Corp.*, 175 F.R.D. 234, 238 (N.D. Miss. 1997). The $50 payment is purely nominal, serving only as consideration to effectuate a binding settlement between the Plaintiffs and the Defendants.

If absent class members wish to pursue damages, they remain free to do so. While Plaintiffs voluntarily assumed fiduciary obligations to the putative class, those obligations do not require

them to pursue every conceivable class claim at substantial personal cost and risk. Their decision to settle individual damages claims does not compromise their adequacy or the fairness of the classwide settlement.

***The $50 payments do not render class certification improper.*** Huang accuses Plaintiffs of a "creative use of Rule 23(b)(2)—to seek monetary relief for only themselves." *See* Dkt. 215 at 8-9. This accusation is entirely meritless. The monetary compensation received by each Plaintiff is not part of the classwide injunctive-relief settlement. Its inclusion in the Settlement Agreement serves solely to promote transparency, not to circumvent Rule 23(b)(2)'s limitations on monetary relief.

Huang's reliance on *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012), is misplaced. In *Stukenberg*, a proposed class of foster care children sought "at least twelve broad, classwide injunctions." 675 F.3d at 845. The Fifth Circuit reversed class certification under Rule 23(b)(2) because the requested injunctive relief did not apply uniformly to all class members—for example, some proposed injunctions targeted only those with more than four placements or those in state custody for over two years. *Id. at* 846. Here, by contrast, Plaintiffs seek a single, uniform injunction: implementation of an antitrust compliance program by Schwab, benefiting all Settlement Class Members. The $50 payment is unrelated to the classwide relief and does not undermine the uniformity required under Rule 23(b)(2).

Similarly, *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), is inapposite. There, Rule 23(b)(2) certification was denied because monetary damages predominated. In this case, the relief provided is entirely injunctive. *Id.* at 425. The $50 payment in this case is not part of the classwide settlement; it is consideration for Plaintiffs' release of their individual damages claims.

***The $50 payments do not compromise adequacy under Rule 23(a)(4).*** Adequacy under Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class, and that no fundamental conflicts exist between the representatives and the class. The $50 payment does not render Plaintiffs inadequate. Contrary to Huang's objection, the payment is neither a "special reward" nor a "VIP ticket" for "throwing away" the Class's damages claims. *See* Dkt. 215 at 9–11. To the contrary, class members' damages claims are expressly preserved. The payment is nominal and pertains solely to the release of Plaintiffs' damages claims. No absent class members are harmed or adversely affected by this arrangement.

In *Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1973), the Fifth Circuit addressed the adequacy of class representation in the context of *res judicata*. Plaintiff Gonzales had been a member of a prior class action in which the named plaintiff, Gaytan, was awarded both retrospective monetary relief and prospective injunctive relief, while the rest of the class— including Gonzales—received only prospective relief. *See Gonzales*, 474 F.2d at 70–71. Crucially, Gaytan did not appeal the district court's denial of retrospective relief to the absent class members. *Id*. at 71. When a subsequent class action was filed asserting identical claims against the same defendant, the defendant invoked *res judicata* as a bar to relief. The Fifth Circuit rejected that defense. The issue ***was not that Gaytan alone obtained retrospective relief***, but that his failure to appeal the adverse judgment on behalf of the class constituted inadequate representation, thereby preventing the prior judgment from binding the absent class members. *Id.* at 75.

That concern is plainly absent here. Plaintiffs in this case released only their individual damages claims and did not attempt to release or adjudicate the damages claims of absent Settlement Class members. As a result, there is no *res judicata* effect on the claims of those absent

class members. *See Caston v. Mr. T's Apparel, Inc.*, 157 F.R.D. 31, 34 (S.D. Miss. 1994) (citing *In re Beef Industry Antitrust Litig.*, 607 F.2d 167 (5th Cir. 1979)).

### F.    The Opinions of Absent Class Members Weigh in Favor of Approval

*Reed* requires a court to consider "the opinions of the class counsel, class representatives, and absent class members" regarding the fairness of a proposed settlement. 703 F.2d at 172. Plaintiffs' Motion (at 28-30) showed that this factor supports approval, but its discussion regarding absent class members was necessarily incomplete given that it was filed before the July 29 objection deadline. Plaintiffs can now report there are, in total, 70 objectors as of the date of this brief—including objections that are sealed, were filed after the objection deadline, or were unfiled but still received by Plaintiffs' Counsel. *See* Ex. 2. This quantity of objections—for a class of approximately 25,000,000 members in which notice was distributed comprehensively, early, and through multiple media, *see supra* at § II—is consistent with classes of similar (indeed, smaller) size that passed Rule 23 muster and were finally approved. *See, e.g.*, *In re Philips Recalled CPAP, Bi-Level PAP, & Mech. Ventilator Prods. Litig.*, 347 F.R.D. 113, 131 (W.D. Pa. 2024) (approving settlement despite 78 objections when there were "over 10 million Recalled Devices[] and millions of putative class members"); *In re W. Union Money Transfer Litig.*, 2004 WL 3709932, at *7 (E.D.N.Y. Oct. 19, 2004) (approving settlement for class of 17.9 million individuals where 38 individuals objected and 3,335 requests for exclusion had been received); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (where 18 objections received out of 27,883 class notices, weighed in favor of settlement); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 511 (E.D.N.Y. 2003) ("the extremely small number of objectors—a mere 18 out of approximately five million Class members-heavily favors approval"); *In re Mex. Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000), *aff'd sub nom. In re Mex. Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001) (99.9% of class members having neither opted

43

out nor filed objections indicated strong circumstantial evidence in favor of the similar settlement proposal);[27] *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 485 (S.D.N.Y. 2009) ("[O]ver seven million notices were sent to potential class members, and . . . GCG . . . has received 371 requests for exclusion. As of the date of this Opinion, the Court has received objections from approximately 140 class members—less than a hundredth of one percent."); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020) (approving settlement with 147 million class members and 388 objections), *aff'd settlement, rev'd as to incentive awards only and remanded*, 999 F.3d 1247 (11th Cir. 2021).

Further, as to the objections that were actually received here, a healthy majority mischaracterize and appear to significantly misunderstand what has actually been settled, complaining principally about a purported absence of monetary relief for damages claims that have not in fact been extinguished.[28] This combination of relatively few objections as a proportion of class size, coupled with a widespread misunderstanding of the settlement terms as to the most common substantive objection, "significantly weigh[]" in favor of final approval. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *10 ("In contrast to the 15 million claims, including over 3.3 million claims for credit monitoring that already have been filed by verified class members, only 2,770 settlement class members asked to be excluded from the settlement and only 388 class members directly objected to the settlement—many in the wake of incomplete or misleading media coverage, or at the behest of serial class action objectors, and

---

[27] The objection rate in this case—70 out of approximately 25,000,000—is about one objection per 357,000 class members, or 0.00028%.

[28] Dkt. Nos. 165, 166, 167, 168, 173, 176, 179, 180, 181, 187, 188, 192, 193, 201, 203, 209, 210, 224, 226, 227, 228, 233, 234, 236, 237, 239, 245, 248, 249, 251, 252, 253, 255, 260, objections of Maria Demelo, William Grubbs, and Rita Johnston (unfiled, *see* Ex. 2). These "no monetary payment" objections are addresses substantively earlier in this brief, *supra* at § III.

often demonstrating a flawed understanding of the settlement terms. This miniscule number of objectors in comparison to the class size is entitled to significant weight in the final approval analysis."); *see also, e.g.*, *DeHoyos*, 240 F.R.D. at 293 ("The Court must next decide whether the objections provide a compelling reason to reject the settlement. Once the court has given preliminary approval, an agreement is presumptively reasonable, and an individual who objects has a heavy burden of demonstrating that the settlement is unreasonable. General objections without factual or legal substantiation do not carry weight." (citing 4 NEWBERG ON CLASS ACTIONS § 11:58 (4th ed. 2002); further citations omitted)); *Alves v. Main*, 2012 WL 6043272, at *15-16 (D.N.J. Dec. 4, 2012) ("Some of the objections are difficult to understand. Some are also repetitive in the sense that there are a number of objections stating, in verbatim fashion, the same grievances but signed by different residents. And, as mentioned before, a number of additional objections appear to be 'the result of a fundamental misunderstanding of the underlying purpose of the class action, a lack of knowledge of the ramifications to class members of a court-approved settlement, and unrealistic or overly optimistic expectations.' There are a number of objections that seek monetary damages, often tens of millions of dollars. These objections are meritless because this is a class action certified pursuant to Rule 23(b)(2) that seeks only injunctive relief." (citations omitted and ellipses removed)), *aff'd*, 559 F. App'x 151 (3d Cir. 2014); *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d at 482 ("the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement" (citations omitted)).

## IV.    MISCELLANEOUS OBJECTIONS

One objector appears to take issue with the process of objecting itself. *See* Dkt. 252 ("The onerous requirements placed upon class members to object to the settlement, including formal written submissions, filing with the Clerk of Court, and physical service on multiple parties, create

substantial barriers for individual class members to meaningfully participate in this process."). This objection is not directed to the substantive fairness of the Settlement, but rather appears to take issue generally with Rule 23, the operation of the federal courts, and the local rules of the Eastern District of Texas. In any event, the objection does not warrant (nor even support) rejecting the Settlement.

## CONCLUSION

For at least the foregoing reasons, the objections raised are without merit. The Settlement Class should be certified and the Settlement should be approved.

Dated: August 14, 2025

Respectfully submitted,

/s/ Christopher M. Burke
Christopher M. Burke (*pro hac vice*)
cburke@burke.law
**BURKE LLP**
402 West Broadway, Suite 1890
San Diego, CA 92101
Tel: (619) 369-8244

Chad E. Bell (*pro hac vice*)
cbell@koreintillery.com
**KOREIN TILLERY P.C.**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel: (312) 641-9750

/s/ Yavar Bathaee
Yavar Bathaee (NY 4703443)
yavar@bathaeedunne.com
Andrew Wolinsky (NY 4892196)
awolinsky@bathaeedunne.com
**BATHAEE DUNNE LLP**
445 Park Avenue, 9th Floor
New York, NY 10022
Tel: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (TX 24081931)
egrauman@bathaeedunne.com
**BATHAEE DUNNE LLP**
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel: (213) 462-2772

Elizabeth L. DeRieux (TX 05770585)
ederieux@capshawlaw.com
S. Calvin Capshaw (TX 03783900)
ccapshaw@capshawlaw.com
**CAPSHAW DERIEUX LLP**
114 E. Commerce
Gladewater, TX 75647
Tel: (903) 236-9800
Fax: (903) 236-8787

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 14, 2025, the above document was served on all parties via the CM/ECF system.

<u>/s/ Yavar Bathaee</u>