# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| Jonathan Corrente, Charles Shaw, and Leo Williams, each individually and on behalf of all others similarly situated, | Case No. 4:22-cv-470 |
| *Plaintiffs*, | |
| v. | Supplemental Declaration of Hal J. Singer, Ph.D. and Ted P. Tatos, MS, PStat |
| The Charles Schwab Corporation, | August 14, 2025 |
| *Defendant*. | |

I.     INTRODUCTION AND ASSIGNMENT ...................................................... 1

II.    RESPONSES TO OBJECTOR SHIYANG HUANG'S CRITICISMS ............. 2

       A.    Objector Huang Appears Unfamiliar with the Relevant Terms in
             This Matter ..................................................................................... 2
       B.    Objector Huang Misrepresents the Nature of "Uncertainty" in Our
             Estimates of Potential Price Improvement ...................................... 3
       C.    Objector Huang Misrepresents Our Qualifications ........................... 5
       D.    Contrary to Objector Huang's Misleading Claims That We Rely on
             "*Ipse Dixit*" Assertions, We Ground Our Analysis in the Facts of the
             Case and Commonly Accepted Methodologies and Data ..................... 7

III.   CONCLUSION .................................................................................... 11

# I.    INTRODUCTION AND ASSIGNMENT

1.    We previously produced an Analysis of Proposed Settlement report dated July 17, 2025 (the "Settlement Analysis Report") relating to the *Corrente et al. v. Charles Schwab* class action litigation ("*Corrente*"). We explained our understanding that the parties in *Corrente* have entered into a Stipulation and Agreement of Settlement (the "Stipulation of Settlement"), whereby Schwab has agreed to create and implement an antitrust compliance program to address Plaintiffs' concerns regarding the now combined TDA and Schwab investment trading platform.

2.    As noted in our Settlement Analysis Report, Section 2.2 of the Stipulation of Settlement addresses the contemplated injunctive relief, *i.e.*, antitrust guardrails meant to promote competition and safeguard against anticompetitive conduct. The principal contemplated guardrail takes the form of a proposed antitrust compliance program (the "Compliance Program"). In its November 2024 guidelines titled, Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations, the U.S. Department of Justice (DOJ) Antitrust Division explained the purpose of a compliance program:

> Antitrust compliance programs promote vigorous competition in a free market economy by creating a culture of good corporate citizenship. Although even an effective antitrust compliance program may not deter every violation, it should prevent many of the most egregious violations…a well-designed antitrust compliance program should also minimize risk of civil antitrust violations…civil antitrust violations expose companies to substantial risk: civil actions resulting in equitable relief to restore competition to affected markets, treble damages actions…A strong culture of compliance can allow a company to steer clear of civil antitrust violations and, if violations do occur, to promptly self-disclose and remedy them and cooperate with a civil antitrust investigation.[1]

3.    Consistent with the above, we also cited former DOJ Assistant Attorney General of the Antitrust Division Makan Delrahim's explanation that, "If violations do occur, robust compliance programs should lead to prompt detection, which not only nips the conduct in the bud earlier, *minimizing the harm to consumers*, but also gives companies the greatest chance of winning the race for leniency under the Antitrust Division's Corporate Leniency Policy."[2]

4.    Thus, as a general matter, an effective antitrust compliance program benefits both the firm that implements it and its customers by reducing or minimizing the risk of violations that could raise prices and/or reduce quality. Consistent with our assignment, in our Settlement Analysis Report, we attempted to quantify the benefit to Settlement Class Members while acknowledging the uncertainty surrounding the specific provisions that the Compliance Program will contain in its final form. To address such uncertainty, we provided two specific methodologies, which, if included, would reasonably lead to greater price improvement and thus consumer benefits. We further

---

1.    U.S. Department of Justice, Antitrust Division, Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations, November 2024, [hereafter, "DOJ Evaluation of Corporate Compliance Programs"] at 2-3.

2.    U.S. Department of Justice, Antitrust Division, Wind of Change: A New Model for Incentivizing Antitrust Compliance Programs, Remarks as Prepared for Delivery at New York University School of Law Program on Corporate Compliance and Enforcement, July 11, 2019, at 2, *available at*, https://www.justice.gov/d9/speeches/attachments/2019/07/11/final_delrahim_nyu_compliance_remarks_07112019-link-added_formatted_0.pdf. (emphasis added). *See also id.* at 4 ("Enforcement often is of inherently limited deterrent value because it is retrospective. On the other hand, a company with a robust compliance program actually can prevent crime or detect it early, thus reducing the need for enforcement activity; minimizing the harm to consumers earlier and saving precious taxpayer resources.").

-2-

quantified such an expected effect, reiterating the caveat that considerable uncertainty accompanies our estimates, as a result of (1) their prospective nature, and (2) the Consultant's decision regarding the final provisions that the Compliance Program will include.

5.      In a July 27, 2025 filing styled as a "*Daubert* Motion" (the "Huang Motion"), Objector Shiyang Huang ("Objector Huang") levied certain criticisms of our Settlement Analysis Report.[3] Counsel for Class Plaintiffs have asked us to address Objector Huang's arguments to the extent they bear on the analysis and opinions contained in our initial declaration.

## II.      RESPONSES TO OBJECTOR SHIYANG HUANG'S CRITICISMS

6.      As a general economic matter, we find Objector Huang's critiques lacking in substance, misleading, and inapposite. They do not cause us to reconsider our analysis or amend our opinions. We address Objector Huang's arguments *seriatim*.

## A.      Objector Huang Appears Unfamiliar with the Relevant Terms in This Matter

7.      In his opening paragraph, Objector Huang states, "Plaintiffs now offer more last minute truffles in a 31-page report rife with complex terms, such as "NBBO", "E/Q ratio", "PFOF", "ERPP", "CAGR", "cross-sectional", or "time-series".[4] With the exception of "ERPP", each of the terms to which Objector Huang refers as "complex" are either basic economic or accounting terms or terms that describe the relevant issues in this case. Antitrust cases frequently involve the use of industry-specific terms of art such as these. "ERPP", which refers to Effective Retained Profit Percentage, is a term we used and described in our Settlement Analysis Report to inform one of the proposed methodologies to ensure consumers receive price improvement as a result of the Compliance Program.

8.      Objector Huang complains about our use of "complex" terms such as "NBBO," "PFOF," and "E/Q Ratio." Each of these concepts bears directly on the issues in this case. NBBO refers to the National Best Bid Offer price, the very benchmark for price improvement. PFOF refers to Payment for Order Flow, a concept critical to both the retail order flow market and to Plaintiffs' allegations in this matter.[5] Likewise, the E/Q ratio informs the price improvement in this matter, as the ratio between the effective and quoted spreads. While one unfamiliar with the relevant issues in this matter may regard such critical industry terms as "complex," accuracy necessitates the use of industry vernacular that market participants including brokers, traders, market makers, and regulators would all employ and would thus recognize when discussing the settlement agreement.

9.      We also referenced the term Compound Annual Growth Rate (CAGR), i.e., the annualized compounded growth rate, another basic term that Objector Huang appears to find overly complex. Likewise, terms such as "time series" and "cross sectional" describe the types of panel data that we leveraged in our report, based on Form 605 and 606 filings. While Objector Huang may

---

3.   Shiyang Huang, *Daubert* Motion to Exclude Singer/Tatos Report, July 27, 2025, hereafter "Huang Motion"
4.   Huang Motion, p. 1.
5.   As we explained in our report, Plaintiffs alleged that Schwab's increased share of ROFM customers allowed it to leverage its increased market power by limiting the pass-through of payment for order flow ("PFOF") from wholesalers (a.k.a., market makers or liquidity providers) like Citadel or Virtu to retail customers (a.k.a., retailer traders) in the form of reduced trading costs (rebates, price improvement, or liquidity improvement). Settlement Analysis Report ¶9.

lack familiarity with these financial concepts, they inform the nature of data available for evaluating potential price improvement. As we explain infra, these considerations also follow the DOJ's own guidelines.

**B.     Objector Huang Misrepresents the Nature of "Uncertainty" in Our Estimates of Potential Price Improvement**

10.     Objector Huang further repeatedly mispresents our caveats as to the uncertainty surrounding point estimates of consumer benefits attendant to a Compliance Plan that still remains to be finalized. Such acknowledgments regularly accompany prescriptive analyses. Indeed, if metaphysical certainty were the operative standard for such forward-looking analysis, the tools of statistical inference such as regression, hypothesis testing, and so on would have nothing to offer.

11.     Objector Huang claims that our report "relied on unrealistic assumptions" because we did not know the ultimate provisions that the Compliance Program will contain. Even having full knowledge of such provision would likely not permit us to provide an exact figure of consumer benefits that would occur in the future. As we explained above, estimates of the future are exactly that: estimates. Even knowing the exact medicine one takes does not guarantee exact results, as side effects or other intervening factors may complicate its effectiveness. As economists, we accompany such analyses with the appropriate caveats, to inform the fact finder of the attendant uncertainties of prospective claims.

12.     Objector Huang falsely claims that we "relied on assumptions wholly without foundation in the record," and that we "admitted to a total lack of foundation" for our analysis.[6] Yet, on the very next page of his motion, he cites a key passage of our report explaining that, "we can leverage the existing information, both from publicly available Forms 605 and 606, and from internal data produced in discovery to proffer initial estimates based on two alternative approaches."[7] In fact, we relied on the very same data and analysis that Schwab used in its Order Routing Committee Meetings, namely the execution quality results that Schwab obtained from S3 Matching Technologies. In addition, we used publicly available (and regulatorily required) Form 605 (reported by market makers) and Form 606 (reported by brokers such as Schwab).

13.     Nonetheless, Objector Huang relies on Schwab's Q1 2025 Form 606, the very same data upon which we relied and for which he gave our analysis no credit, to calculate his erroneous "rough HHI antitrust concentration calculation."[8] His application of the HHI does not comport with the standard use of this metric in practice. "The term 'HHI' means the Herfindahl–Hirschman Index, a commonly accepted measure of *market* concentration."[9] The two regulatory agencies, the Department of Justice and Federal Trade Commission (the "Agencies") explain the proper use of HHI:

> In highly concentrated markets, a merger that eliminates a significant competitor creates significant risk that the merger may substantially lessen competition or tend to create a monopoly… The Agencies generally measure concentration levels using the Herfindahl-Hirschman Index ("HHI"). The HHI is defined as the sum of the squares of the market shares;

---

6.     Huang Motion, p. 5.
7.     Huang Motion, p. 1.
8.     Huang Motion, p. 11.
9.     U.S. Department of Justice, Antitrust Division, Herfindahl-Hirschman Index, *available at* https://www.justice.gov/atr/herfindahl-hirschman-index.

it is small when there are many small firms and grows larger as the market becomes more concentrated, reaching 10,000 in a market with a single firm.[10]

In other words, the HHI is a tool used in merger analysis to analyze the degree to which market shares before and after a proposed merger provide evidence of concentration that could lead to the exercise of market power. Paradoxically, Objector Huang cites to *State of N.Y. v. Kraft Gen. Foods,* which explained that "The pre-acquisition Herfindahl-Hirschman Index ('HHI') for the *RTE cereal market* was 2215; the increase in the HHI resulting from the Acquisition is approximately 66 points."[11] Objector Huang incorrectly applies this tool not to market shares, but rather to shares of Schwab's order flow that market makers purchase. Schwab alone does not delineate the entire retail order flow market ("ROFM"). As such, Objector Huang's analysis reveals his misunderstanding of the relevant analytical tools, a practice consistent with his lack of familiarity with industry-standard concepts such as NBBO and PFOF, as discussed above.

14.     We do not dispute our inclusion of caveats and acknowledgment of limitations to our analysis. Objector Huang confuses such acknowledgments with "assumptions wholly without foundation in the record."[12] On the contrary, published peer-reviewed research regularly includes a "Limitations" section. Indeed, in a 2023 paper, Sumpter et al. advocated for making such an inclusion mandatory in scientific papers. The authors explained that,

> Our suggestion is to include a 'Limitations' section in all scientific papers…Evidence is provided showing that such a section must be mandatory. Adding a 'Limitations' section to scientific papers would greatly increase honesty, openness and transparency, to the considerable benefit of both the scientific community and society in general…All research involves compromise. It is impossible to think of research ever having unlimited time or resources available…There is no shame in these compromises, it is the common reality of science.[13]

In our Settlement Analysis Report, we identified the limited internal data available to us at the time of preparing the report and the uncertainty of the Compliance Program's final provisions as two key limitations. Moreover, as we explain, predicting the success of this or any other Compliance Program with absolute certainty lies in the province of science fiction, as does the ability to evaluate the exact

---

10. U.S. Department of Justice and the Federal Trade Commission, 2023 Meger Guidelines, Dec. 18, 2023, [hereafter "Merger Guidelines"], at 5, available at https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf.

11. *State of N.Y. v. Kraft Gen. Foods, Inc.*, 926 F.Supp. 321, 362 (S.D.N.Y. 1995), emphasis added. RTE refers to the ready-to-eat cereal market. The Court explained that, "In this regard, the Merger Guidelines advise consideration of the Herfindahl-Hirschman Index ("HHI") of market concentration. The HHI is calculated by summing the squares of the individual market shares of all the participants. The Merger Guidelines establish criteria for assessing the *HHI of an industry and the incremental change in the HHI caused by a given Acquisition*.") We note that our Settlement Analysis Report likewise takes guidance from the Merger Guidelines, despite Objector Huang's false assertion that we base our analyses on "ipse dixit" statements.

12. Huang Motion at 5.

13. John P. Sumpter, Tamsin J. Runnalls, Andrew C. Johnson, and Damia Barcelo, *A 'Limitations' section should be mandatory in all scientific papers*, SCIENCE OF THE TOTAL ENVIRONMENT, 857 (2023) at 1. *See also id.* at 5 ("We should be frank that all studies have their limitations, and that acknowledging this does not demean the scientists or their research. Openness and transparency is at the heart of science and is central to the confidence that society extends to scientists."). *See also* Paula Ross and Nikki Bibler Zaidi, Limited by Our Limitations, Perspect Med Educ. 2019 Jul 25;8(4):261–264 ("Researchers have an obligation to the academic community to present complete and honest limitations of a presented study.").

events that would have occurred in a counterfactual "but-for" world.[14] And yet, the fundamental problem of causal inference, i.e., the inability to observe the counterfactual condition, does not create an insurmountable hurdle for scientific research.[15]

15.    On this point, Objector Huang makes three additional incorrect claims that (1) "the authors conceded their analysis is unreliable from the start," (2) "The authors' base-less analysis is assured by data limitations," and (3) our acknowledgment of said limitations represents an admission that "the compliance program is mostly make it how you want it be."[16] Claim (1) is simply wrong. We never made such a concession because we had no need to do so. We supported our analysis with relevant data and analysis based on certain assumptions that we expect would yield consumer benefits in the form of increased price improvement. We further explained the mechanism that would generate such benefits. In doing so, we relied on commonly-accepted analytical methods.

16.    Regarding item (2), we never claimed that our analysis lacked sufficient data to generate reliable or reasonably accurate results. Our Settlement Analysis Report explicitly stated that we relied on limited data, *relative to the full complement of such data available to Schwab* and upon which it appears to have relied in its Order Routing Committee Meetings, as evident in the documents produced in discovery:

> This report details reasonable contingencies that would occur should Schwab implement a Compliance Program *with the features contemplated herein*. We caution that *the analyses contained in this report rely on limited data compared to that available to Schwab*, particularly the data that Schwab obtains from S3. Those data were only available to us in very limited scope, from several Schwab reports.[17]

17.    Regarding item (3), to the extent that the Compliance Program deviates substantially from how it was modeled in our report, we noted that the benefits could be materially smaller. We also reserve the right to update our estimates in the event that we learn of more specifics of the Compliance Program at a later time in the proceeding.

18.    Finally, we note that Objector Huang offers no specific, substantive criticisms of our results or methodologies. His objections are largely conclusory and do not reflect an understanding of the body of economic and statistical work that contributed to our analysis.

## C.    Objector Huang Misrepresents Our Qualifications

19.    Objector Huang claims that "Singer and Tatos were first hired as antitrust modelers" and that "They wisely did not claim to know anything remotely related to compliance programs. Therefore, they are unqualified."[18] Neither of these statements is true. We are empirical

---

14. Scott Cunningham, CAUSAL INFERENCE – THE MIXTAPE, Yale Univ. Press, 2021, ("Herein lies the fundamental problem of causal inference—*certainty* around causal effects requires access to data that is and always will be missing.")

15. Paul W. Holland, *Statistics and Causal Inference*, JOURNAL OF THE AMERICAN STATISTICAL ASSOCIATION, Vol. 81, No. 396 (Dec., 1986), 945-960 at 949, ("The important point is that the statistical solution replaces the impossible-to-observe causal effect of *t* [the treatment] on a specific unit with the possible-to-estimate average causal effect of t over a population of units.") The central importance of the average effect in causal inference also rebuts Objector Huang's dismissive view of averages.

16. Huang Motion, p. 7.

17. Settlement Analysis Report ¶55.

18. Huang Motion p. 8.

microeconomists with significant experience in antitrust matters within and outside the financial services industry (as our qualifications indicate). We have both been retained in previous matters, testified in deposition and at trial, and have authored on competition-related topics. What Objector Huang means by "antitrust modelers" remains unclear. To the extent that he means that we construct econometric models to evaluate antitrust harm and quantify damages, he is correct. If he also intends to suggest that the above reflects the full complement of our roles in financial matters, antitrust-related or otherwise, he is objectively wrong.

20.    Evaluating the likely benefits of a Compliance Program with respect to enhancing competition and generating price improvement falls precisely within the scope of our expertise and analyses in antitrust matters. Indeed, the construction of a counterfactual "but-for" world free of the relevant challenged conduct in a given antitrust case contemplates exactly such analysis and the attended expertise to conduct it. We offer no opinions on *legal* issues involved in constructing a Compliance Program. Consistent with our areas of expertise, we focus our analysis on the economic merits of potential provisions of the Compliance Program. We have performed similar analyses in dozens of antitrust matters and continue to do so, as described in our Curricula Vitae attached to this declaration as Exhibit 1 (Hal Singer) and Exhibit 2 (Ted Tatos).

21.    As explained in our Settlement Analysis Report, Hal Singer has testified as an economic expert in state and federal courts, as well as before regulatory agencies. He also has testified before the House Judiciary Subcommittee on Antitrust and the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on the interplay between antitrust and sector-specific regulation. Federal courts have relied on his models of common impact in certifying ten classes in antitrust matters,[19] and five classes in consumer protection matters.[20] He also served as a senior economist at the Securities and Exchange Commission, taught financial economics to undergraduates at both Georgetown and Johns Hopkins University, and published articles in the *Journal of Business and Finance* and the *Journal of Financial Transformation.* He

---

19.  *Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) (granting Plaintiffs' Motion for Class Certification); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58 (D. Mass. 2008) (granting Motion to Certify Class); *Se. Missouri Hosp. v. C.R. Bard, Inc.*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008) (granting in part Motion for Class Certification); *Johnson v. Arizona Hosp. & Healthcare Ass'n*, No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009) (granting in part Motion for Class Certification); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675 (N.D. Ga. 2016) (granting Motion to Certify Class); *In re Lidoderm Antitrust Litig.*, No. 12-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) (granting Motions for Class Certifications); *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JFD), 2023 WL 2696497 (D. Minn. Mar. 29, 2023) (granting Motion to Certify Class); *Le v. Zuffa, LLC*, No. 2:15-cv-01045-RFB-BNW, 2023 WL 5085064 (D. Nev. Aug. 9, 2023) (granting in part Motion to Certify Class); *Simon and Simon, PC d/b/a City Smiles and VIP Dental Spas v. Align Technology, Inc.*, No. 20-cv-03754-VC (N.D. Cal. Nov. 29, 2023) (granting in Part and Denying in Part the Motions for Class Certification; Denying Motions to Exclude Dr. Singer and Dr. Vogt); *In re: Broiler Chicken Grower Antitrust Litig. (No. II)*, No. 6:17-cv-00033-RJS-CMR (E.D. Ok. May 8, 2024) (granting Motion to Certify Class and denying *Daubert* motion as to Dr. Singer).

20.  *In re: MacBook Keyboard Litig.*, No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal., Apr. 5, 2021) (granting Motion to Certify Class); *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942 (N.D. Cal. 2022) (granting Motion For Class Certification); *In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*, No. CV 20-4066-DMG (PVCx), 2023 WL 6453814 (C.D. Cal. Sept. 29, 2023) (granting motion to certify a class*); In re Pepperdine Univ. Tuition & Fees Covid-19 Refund Litig.*, No. CV 20-4928-DMG (KSX), 2023 WL 6373845 (C.D. Cal. Sept. 26, 2023) (granting motion to certify a class); *Michael Miazza, et al. v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College*, No. C-696918 (Parish of East Baton Rouge Jul. 13, 2021) (granting motion to certify class).

also served as an economic expert for a class of investors in *In re Foreign Exchange Antitrust Litigation* and as the expert for the Plaintiff class in *In re GSE Bonds Antitrust Litigation*,[21] and *In re London Silver Fixing, Ltd., Antitrust Litigation*.[22]

22.    Ted Tatos has served as the expert for the Securities and Exchange Commission in an matter involving allegations of fraud on the market [23] and has testified in state and federal court. He also presented to the European Commission, Director General of Competition, Chief Economist's team on the antitrust issues regarding lock-in in the mainframe industry. Ted Tatos regularly performs financial valuation analyses for clients with respect to Stock Appreciation Rights, contingent obligations, down-round provision effects, and others. He has performed statistical and econometric analysis in many antitrust matters, including those in the financial sector, such as *In Re Silver Price Fixing Antitrust Litigation*, *In Re GSE Bonds Antitrust Litigation* and the Sumitomo copper antitrust matter. Ted Tatos is also the current associate economics editor of the Antitrust Bulletin Journal and has published in journals including the Harvard Journal of Sports and Entertainment Law, the Appraisal Journal, the Antitrust Bulletin, the Journal of Antitrust Enforcement, and others.

**D.    Contrary to Objector Huang's Misleading Claims That We Rely on "*Ipse Dixit*" Assertions, We Ground Our Analysis in the Facts of the Case and Commonly Accepted Methodologies and Data**

23.    Objector Huang begins his argument by claiming, incorrectly, that we "cited zero sources"[24] in the section of the Settlement Analysis Report (Part IV), in which we calculated the expected impact of provisions that we reasonably anticipate may be included in the Compliance Program. *First*, this claim is false. We cited to both internal and public documents in Part IV the Settlement Analysis Report, which details our analysis (see, e.g., notes 45-69 of our report). *Second*, Objector Huang fails to recognize that we also cited myriad sources, including regulatory agencies, research papers, internal documents, and so on in the previous sections of our report. Published papers commonly begin with a discussion of the literature, and we followed a similar methodology in our report. We also provided references as needed in our methodology section.[25]

24.    Far from relying on *ipse dixit* assertions, the proposals contemplated in our Settlement Analysis Report align directly with the DOJ Antitrust Division's own guidelines. In its Evaluation of Corporate Compliance Programs, the DOJ proffered multiple factors that contribute to an effective antitrust compliance program, including three factors most relevant to our analysis.[26] Table 1 below juxtaposes the DOJ's criteria and our provisions, indicating that our proposal takes guidance from the DOJ's own recommendations and considerations.

---

21.   *In re GSE Bonds Antitrust Litigation*, Case No. 1:19-cv-01704 (JSR).
22.   *In re London Silver Fixing, Ltd., Antitrust Litigation*, Case No. 1:14-F-02573.
23.   *Securities and Exchange Commission v. Colin McCabe (D/B/A Elite Stock Report, The Stock Profiteer, and Resource Stock Advisor)*, Civil Action No. 2:13-cv-00161
24.   Huang Motion p. 9.
25.   Objector Huang acknowledges that his criticism may stem from certain redactions. We have not reviewed the redacted version of our Settlement Analysis Report and had no role in making any such redactions.
26.   DOJ Evaluation of Corporate Compliance Programs p. 9, 13.

TABLE 1. DOJ GUIDELINES AND SETTLEMENT ANALYSIS REPORT PROPOSED PROVISIONS

| DOJ Guidelines for Effective Antitrust Compliance Program | Included Provision in Singer/Tatos Settlement Analysis Report |
|---|---|
| What information or metrics has the company collected and used to help detect antitrust violations? How has the information or metrics informed the company's antitrust compliance program, *e.g.*, through training, modifications, or internal controls? | The formal inclusion in the Compliance Program of a periodic reporting requirement and review for market makers that purchase Schwab's order flow. (Settlement Analysis Report, ¶54.) |
| Is the company's antitrust risk assessment current and subject to periodic review? | The periodic analysis and reporting of such data, detailing not only the price improvement that each market maker has provided over the previous period, but also a comparison of the price improvement provided with the long-term trend. (Settlement Analysis Report, ¶54, point 2) |
| Does the company use any type of screen, communications monitoring tool, or statistical testing designed to identify potential antitrust violations? | Schwab's Exhibit 3 data in its White Paper show that annual E/Q ratios did not follow a smooth decline. As a result, some deviation is expected. To account for such stochastic variation, an additional criterion may be imposed such that the deviation must exceed some threshold. Such a threshold may be based on the variation that the E/Q ratio has demonstrated in the past, thus permitting the construction of a confidence interval. (Settlement Analysis Report, ¶65.) |

25.     The rest of Objector Huang's arguments highlight the lack of substance in his criticisms of our methodology, which he appears not to understand. He claims that "Authors' methodology one made a causal remark that Schwab's 'E/Q ratio' declined by the year between 2006-2021."[27] Rather than directly cite our report, he misrepresents it. We stated that

> Methodology One relies on the following logic. Schwab has reported that its E/Q ratio has dropped by approximately 67 percent over the 2006-2021 time period. Using this trend as a competitive benchmark, we expect its continuation in the future. Decreases in the trend

---

27.  Huang Motion p. 9.

(higher E/Q ratios) would represent deviations potentially resulting from anticompetitive conduct, which the Compliance Program would attempt to either prevent or terminate.[28]

We find Objector Huang's reference to "a causal remark" unclear. We simply noted that, treating this decline in E/Q ratio (meaning better pricing for consumers) as a competitive benchmark, we would expect this largely pre-merger trend to continue. Though the merger was finalized in October 2020, Schwab did not complete integration of all TD Ameritrade accounts until May 2024.[29] Objector Huang criticizes us for only using one year of pre-merger data (2021), but the benchmark period should reflect the pre-merger conditions, not those occurring thereafter. Moreover, Objector Huang again criticizes our "complexity-ridden CAGR calculation." We reiterate that CAGR is a simple formula that refers to the annual growth rate and represents a ministerial accounting calculation.

26.    By Schwab's own analysis, the E/Q ratio has declined over the 2006-2021 period by approximately 67 percent, implying an average compounded annual decline of 7.13 percent. Our methodology one contemplates a Compliance Program provision that identifies potential deviations from this trend in the form of higher-than-expected E/Q ratios (meaning lower price improvement). Contrary to Objector Huang's incorrect criticisms, such a provision would hold Schwab accountable to ensuring continued (and increasingly better) price improvement. In the event of such deviations, Schwab would need to provide reasonable explanations for why deviations occurred (e.g., idiosyncratic economic factors). The rest of Objector Huang's statement on causation versus correlation has no bearing on our analysis.

27.    In critiquing our second methodology, Objector Huang again misrepresents our analysis. His criticisms are riddled with inaccuracies. He claims that,

> Authors' methodology two largely hopes for an ideal world where other parties not named in this lawsuit will deliver the relief sought: the orders will be assigned pro rata to cheapest market makers...Authors dedicated paragraphs to complicated (sic) average-of-averages calculations, and they ultimately found Jane Street helps improve average prices. Table 9 (ibid.) showed Jane Street always had the best "average" price for every dimension, but authors stopped short from an obvious fix to have Jane Street in all orders, recalling a basic adage that "plans based on assumptions about average conditions usually go wrong.[30]

We begin by noting that Table 9 in our Settlement Analysis Report uses the very data that market makers provided in their forms 605. These data showed that Jane Street offered the highest price improvement but did not receive the most order flow from Schwab. We explained that,

> We anticipate that the Compliance Program will require documentation of such potential reasons to the extent that order-allocation wheel ranking deviates from the price

---

28. Settlement Analysis Report ¶¶58-59, referencing Schwab White Paper at Exhibit 3, p. 9. ("The Effective/Quoted (E/Q) Ratio measures the average effective spread of order execution vs. the NBBO's spread at the time of order entry. Lower ratios represent greater cost savings to clients, as they indicate executions at spreads below the NBBO spread.") These data apply order sizes in the 0-499, and 500-1999 size groupings.

29. Charles Schwab Corporation, Form 10-Q, for the quarterly period ending June 30, 2024, ("In May 2024, the Company completed the final client account conversions to CS&Co from the Ameritrade broker-dealers, TD Ameritrade, Inc. and TD Ameritrade Clearing, Inc. (TDAC)."), *available at* https://www.sec.gov/Archives/edgar/data/316709/000031670924000060/schw-20240630.htm. In our Settlement Report, we inadvertently listed September 2023 as the date that Schwab completed the integration of TDA. We correct that date as well by reference.

30. Huang Motion p. 10.

improvement ranking among market makers. To the extent that the Compliance Program finds no such valid reasons, the Compliance Program may require that allocation match the price improvement ranking, with the market maker that offers the greatest price improvement taking first position on the wheel. The benefits of the Compliance Program could then be measured as the difference between the price improvement in this scenario compared to the scenario where the allocation wheel does not match the price improvement rankings.[31]

We further acknowledged that re-allocating order flow percentages based on price improvement will need to account for the possibility that the market maker offering the most price improvement (Jane Street in this example) might be unable handle the full amount of order flow that Citadel purchases from Schwab, at least not without a decrease in other execution quality. Thus, to balance shares and orders, we proposed "re-allocating the shares such that market makers receive the same proportion of shares as their percentage of orders."[32]

28.    Schwab, not the market makers, conducts the allocation. As such, an allocation that explicitly uses price improvement as the lodestar and accounts for order vs. share differentials falls under Schwab's purview, not that of "parties not named in the lawsuit" as Objector Huang claims. Further, we reiterate our reliance on Form 605 and 606 data, which contradicts Objector Huang's claims that our analyses rely on "*ipse dixit*" claims or that they lack sources. Finally, his formalistic criticism of averages appears to be a general argument, without any explanation of (1) what averages he believes are inapposite, (2) what other data we should have used, and (3) what alternative descriptive statistic he would have recommended.

29.    Finally, Objector Huang reserves a two-sentence critique of our final order wheel allocation scenario based on effective retained profit percentage (ERPP). Objector Huang refers to this proposal as "doomsday (sic) scenario" and a "race to the bottom."[33] He appears unaware that what we described, and what he derides in his report, is nothing more than the crucible of competition. One can also describe firms competing by offering lower prices as a "race to the bottom," but the benefit of this race redounds to consumers. We contemplate the same motivation in our final proposed scenario. To the extent that Objector Huang finds market makers disclosing their profits unlikely, it bears mentioning that such firms ***already*** disclose their spreads and price improvement in their Rule 605 reports.

---

31. Settlement Analysis Report ¶72.
32. Settlement Analysis Report ¶76. By order and share percentages, we mean that that the percentage of orders should match the percentage of shares. Otherwise, two market makers may receive the same percentage of orders, but if one market maker's order sizes are much larger, it will have obtained a much larger percentage of the total order flow based on shares.
33. Huang Motion p. 11.

-11-

### III.    CONCLUSION

30.    We have considered the criticism of initial report in Objector Huang's self-styled "*Daubert* motion." He repeatedly misrepresents our analysis, proffers false claims to support his baseless critiques, and appears unfamiliar with the basic terms used in this industry. Based on the foregoing, we find no reason to amend our analysis or opinions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on August 14, 2025.



_____

Hal J. Singer, Ph.D.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on August 14, 2025.

_____

Ted P. Tatos, MS, Pstat

Exhibit 1 – Curriculum Vitae of Hal J. Singer

## Curriculum Vitae of Hal J. Singer



**Hal J. Singer**

Econ One Research
Suite 04-125 1701 Rhode Island Ave, N.W.
Washington,   D.C.  20036
Phone: 202.312.3065
hsinger@econone.com

**Education**

Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics

B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor Scholar (full academic scholarship). Senior Scholar Prize in Economics.

**Current Positions**

ECON ONE, Washington, D.C.: Managing Director 2018-present.

UNIVERSITY OF UTAH, ECONOMICS DEPARTMENT, Salt Lake City, UT: Career Line Professor 2022 - present.

THE UTAH PROJECT, Salt Lake City, UT: Director 2022-present.

**Employment History**

GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF BUSINESS, Washington, D.C.: Adjunct Professor 2010, 2014, 2016, 2018, 2019, 2020, 2021, 2022

ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-2018.

NAVIGANT ECONOMICS, Washington, D.C.: Managing Director, 2010-2013.

EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and President, 2008-2010.

CRITERION ECONOMICS, L.L.C., Washington, D.C.: President, 2004-2008. Senior Vice President, 1999-2004.

LECG, INC., Washington, D.C.: Senior Economist, 1998-1999.

-14-

U.S. SECURITIES AND EXCHANGE COMMISSION, OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.: Staff Economist, 1997-1998.

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS DEPARTMENT, Baltimore: Teaching Assistant, 1996-1998.

**Honors**

Honoree, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *In re Lidoderm Antitrust Litigation,* Oct. 9, 2018.

Finalist, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *Tennis Channel v. Comcast*, Dec. 4, 2013.

**Authored Books and Book Chapters**

*Do Municipal Broadband Networks Stimulate or Crowd Out Private Investment? An Empirical Analysis of Employment Effects*, in THE IMPACT OF THE INTERNET ON JOBS (Lorenzo Pupillo, ed. Palgrave 2017).

THE NEED FOR SPEED: A NEW FRAMEWORK FOR TELECOMMUNICATIONS POLICY FOR THE 21ST CENTURY, co-authored with Robert Litan (Brookings Press 2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with Robert Litan, in THE ECONOMISTS' VOICE 2.0: THE FINANCIAL CRISIS, HEALTH CARE REFORM AND MORE (Aaron Edlin and Joseph Stiglitz, eds., Columbia University Press 2012).

*Valuing Life Settlements as a Real Option*, co-authored with Joseph R. Mason, in LONGEVITY TRADING AND LIFE SETTLEMENTS (Vishaal Bhuyan ed., John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, co- authored with J. Gregory Sidak, in HANDBOOK OF TRANS-ATLANTIC ANTITRUST (Philip Marsden, ed. Edward Elgar 2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE THE INFORMATION SOCIETY, co-authored with Dan Maldoom, Richard Marsden and J. Gregory Sidak (Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated ISPs (and Should We Care)?*, co-authored with Robert W. Crandall, in ACCESS PRICING: THEORY, PRACTICE AND EMPIRICAL EVIDENCE (Justus Haucap and Ralf Dewenter eds., Elsevier Press 2005).

**Journal Articles**

*Competitive Effects of Fixed Wireless Access on Wireline Broadband Technologies* REVIEW OF NETWORK ECONOMICS, vol. 22, no. 4, (2023), pp. 241-283, co-authored with Augustus Urschel.

*Addressing the Power Imbalance: A Legislative Proposal for Effectuating Competitive Payments from Platforms to Newspaper,* COLUMBIA JOURNAL OF LAW AND THE ARTS (2023)

*The Abuse of Offsets as Procompetitive Justifications: Restoring the Proper Role of Efficiencies After Ohio v. American Express and NCAA v. Alston*, GEORGIA STATE LAW REVIEW (2022), co-authored with Ted Tatos.

*Antitrust Anachronism: The Interracial Wealth Transfer in Collegiate Athletics Under the Consumer Welfare Standard,* ANTITRUST BULLETIN (2021), co-authored with Ted Tatos.

*Competing Approaches to Antitrust: An Application in the Payment Card Industry,* 27(3) GEORGE MASON LAW REVIEW (2020), co-authored with Kevin Caves.

*Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2020), co-authored with Ted Tatos.

*Antitrust Out of Focus: The FTC's Myopic Pursuit of 1-800 Contacts' Trademark Settlements,* ANTITRUST SOURCE (2019), co-authored with Geoff Manne and Josh Wright.

*Countervailing Coordination Rights in the News Sector Are Good for the Public (A Response to Professor Yun),* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2019), co-authored with Sanjukta Paul.

*When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer Welfare Standard,* 26 GEORGE MASON LAW REVIEW (2019), co-authored with Kevin Caves.

*Applied Econometrics: When Can an Omitted Variable Invalidate a Regression?,* ANTITRUST SOURCE (2017), co-authored with Kevin Caves.

*Paid Prioritization and Zero Rating: Why Antitrust Cannot Reach the Part of Net Neutrality Everyone Is Concerned About,* ANTITRUST SOURCE (2017).

*The Curious Absence of Economic Analysis at the Federal Communications Commission: An Agency in Search of a Mission,* INTERNATIONAL JOURNAL OF

COMMUNICATIONS (2017), co-authored with Gerald Faulhaber and Augustus Urschel.

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2015), co-authored with Kevin Caves.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?*, 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions*, 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?*, ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co-authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co-authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co-authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co- authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

## Expert Testimony Since 2013

*Jonathan Corrente, et al. v. The Charles Schwab Corporation,* No.4:22-cv-00470 (E.D. Tex. 2025)

*In re Red River Talc LLC v. Debtor,* No. 24-90505 (CML) (S.D. Tex.)

*Omar Hernandez et al v. Illinois Institute of Technology*, No. 1:20-cv-3010 (N.D. Ill. Jun. 15, 2023)

*In re California Bail Bond Antitrust Litigation*, No. 4:19-cv-00717-JST (N.D. Cal. May. 9, 2022)

*In re Google Digital Advertising Antitrust Litigation*, Civil Action No. 21-MD-3010 (PKC) (S.D. NY Dec 2, 2022)

*Connecticut v. Sandoz*, No. 2:20-CV-03539 (MDL 2724 Nov. 1, 2023)

*Vakilzadeh v. The Trustees of the California State University,* Los Angeles County Superior Court, Case No. 20STCV231344 (C.D. Cal Oct. 25, 2023)

*In re Google Play Consumer Antitrust Litigation*, 3:20-cv-05761-JD (N.D. Cal Aug. 28, 2023)

*Simon & Simon, PC v. Align Tech.*, 3:20-CV-03754-VC (N.D. Cal. Jul. 25, 2023)

*Borozny et al. v. RTX Corporation, Pratt & Whitney Division, et al,* Case No. 3:21-cv-01657-SVN (D. Conn. May. 30, 2023)

*Garavanian et al v. JetBlue Airways Corporation, et al*, 1:23-cv-10678-WGY (D. Mass. Mar. 29, 2023)

*In re EpiPen Direct Purchaser Litig.*, 20-CV-827 (ECT/JFD) (D. Minn. Mar. 29, 2023)

*In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P.* (Major League Baseball Revenue Sharing Definitions Committee) (2023)

*Weidman v. Ford Motor Co.*, 18-cv-12719 (E.D. Mich. Dec. 16, 2022)

*Fed. Trade Comm'n v. Meta Platforms Inc.*, 5:22-cv-04325-EJD (N.D. Cal. Nov. 2, 2022)

*Estate of Berland v. Lavastone Capital LLC*, 1:18-cv-02002-SB (D. Del. Sep. 28, 2022)

*McKinney v. Cosair Gaming, Inc.*, 22-cv-00312-CRB (N.D. Cal. Jul. 19, 2022)

*Henry et al v. Brown University et al,* Case No. 1:22-cv-00125 (N.D. Ill. Jul. 7, 2022)

*Estate of Phyllis Malkin v. Wells Fargo Bank, N.A.,* 17-cv-23136 (S.D. Fl. Jun. 23, 2022)

*(Im)Balance of Power: How Market Concentration Affects Worker Compensation and Consumer Prices* (U.S. House Committee on Economic Disparity and Fairness in Growth) (Apr. 6, 2022)

*In re Pork Antitrust Litig.*, 18-1776 (JRT/HB) (D. Minn. Nov. 12, 2021)

*Chelsea Jensen, et al. v. Samsung Electronics et al.,* T-809-18 (Federal Court in Canada Nov. 5, 2021)

*In Re: Broiler Chicken Growing Antitrust Litigation (No. II)*, 6:20-MD-02977-RJS-CMR (E.D. Ok Aug. 19, 2021)

*Deslandes et al v. McDonald's USA, LLC*, 17-cv-04857 (N.D. IL Jul. 28, 2021)

*Zydus Pharmaceuticals Inc. and Cadila Healthcare Limited v. Takeda Pharmaceutical Company Limited et al.,* 18-01994 (FLW)(TJB) (D. N.J. Jul. 26, 2021)

*Miazza v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. 2021 CW 0750 (La. Ct. App. Jul. 13, 2021)

*Dr. Rachael Kent v Apple Inc. and Apple Distribution International Ltd,* 1403/7/7/21 (U.K. Competition Appeal Tribunal)

*Elizabeth Helen Coll v Alphabet Inc. and Others,* 1408/7/7/21 (U.K. Competition Appeal Tribunal)

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 1:13-cv-07789-LGS (S.D.N.Y. Jun. 7, 2021)

*Mark Shaffer et. Al v. The George Washington University and The Board of Trustees of George Washington University*, 1:20-cv-01145-RJL (D. D.C. Apr. 28, 2021)

*Fernandez v. CoreLogic Credco, LLC*, Case No.: 3:20-cv-1262-JM-(AGS) (S.D. Cal. Apr. 8, 2021)

*Reviving Competition, Part 1: Proposals to Address Gatekeeper Power and Lower Barriers to Entry Online* (U.S. House of Representatives Subcommittee on Antitrust) (Feb. 23, 2021)

*In re MacBook Keyboard Litig.*, Case No. 5:18-cv-02813-EJD (N.D. Cal. Oct. 13, 2020)

*Manmohan Dhillon et al. v. Anheuser-Busch, LLC et al.*, 14CECG03039 MBS (Cal. Fresno Aug. 18, 2020)

*Fusion Elite All Stars et al v Varsity Brands, LLC et al,* 2:20-CV-03390 (SHL-tmp) (W.D. Tenn. Jul. 10, 2020)

*In Re: Pepperdine University Tuition and Fees Covid-19 Refund Litigation*, No. 2:20-cv-04928-DMG (C.D. Cal. Jun. 3, 2020)

*In Re: University of Southern California Tuition and Fees COVID-19 Refund Litigation*, 2:20-cv-4066-DMG (C.D. Cal. May 4, 2020)

*In Re: Boston University COVID-19 Refund Litigation*, 1:20-cv-10827-RGS (D. Mass. Apr. 29, 2020)

*Breaking the News – Journalism, Competition, and the Effects of Market Power on a Free Press* (U.S. Senate Subcommittee on Competition Policy) (Feb. 2, 2020)

*In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation*, 19-md-02913-WHO (N.D. Cal. Oct. 2, 2019)

*In Re GSE Bonds Antitrust Litigation*, No. 1:19-cv-01704-JSR (S.D. N.Y. Nov. 8, 2019)

*beIN Sports, LLC v. Comcast Cable Communications, LLC*, CSR-8972-P (FCC) (Jul. 1, 2019)

*Donald Conrad et al. v. Jimmy John's Franchise LLC, et al.,* 3:18-cv-00133-NJR (S.D. Ill. May 21, 2019)

*Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada,* 17-10189 (S.D. Fla. Sep. 18, 2018)

*In Re: London Silver Fixing, Ltd. Antitrust Litigation*, 1:14-md-02573-VEC (S.D. N.Y. Jul. 25, 2018)

*Authenticom, Inc. v. CDK Glob., LLC*, 17-cv-318-jdp (W.D. Wis. Jan. 12, 2018)

*Sun Life Assurance Company of Canada v. U.S. Bank National Association*, 2:14-cv-04703-SJF-GRB (E.D. N.Y. Jun. 12, 2017)

*Cung Le v. Zuffa, LLC*, Lead Case No. 2:15-cv-01045-RFB-PAL (D. Nev. Feb. 13, 2017)

*In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 14-50 (Federal Communications Commission) (Dec. 1, 2016)

*In re Lidoderm Antitrust Litig.*, Case No. 14-md-02521-WHO (N.D. Cal. Aug. 9, 2016)

*Omni Healthcare et al. v. Health First Inc. et al.*, 6:13-CV-01509-RBD-DAB (M.D. Fla. Jul. 14, 2016)

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 634 (N.D. Ga. 2016)

*Game Show Network, LLC v. Cablevision Systems Corp.,* File No. CSR-8529-P (Federal Communications Commission) (Oct. 21, 2015)

*Mazda v. Carfax, Inc.*, 13-CV-2680 (AJN)(RLE) (S.D.N.Y. Jul. 24, 2015)

*Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology*, 3:11-CV-1781 JCS (N.D. Cal. Jun. 3, 2015)

*In re New York City Bus Tour Antitrust Litigation*, 13-CV-07I1 (S.D. N.Y. Nov. 21, 2014)

*STB Ex Parte No. 722 Railroad Revenue Adequacy* (Surface Transportation Board) (Nov. 4, 2014)

*Krouch v. Wal-Mart Stores, Inc.*, Case No. 12-cv-02217-YGR (N.D. Cal. Oct. 28, 2014)

*In re Capacitors Antitrust Litigation*, 14-cv-03264-JD (N.D. Cal. Oct. 2, 2014)

*In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule,* MB Docket No. 12-3 (Federal Communications Commission) (Sep. 30, 2014)

*In re Myford Touch Consumer Litigation*, 3-13-cv-3072-EMC (N.D. Cal. Aug. 7, 2014)

*Altergy Systems v. Enersys Delaware Inc.*, 3:14-CV-02212 JD (N.D. Cal. Aug. 6, 2014)

*Marchbanks Truck Service, et al. v. Comdata Network Inc., et al.*, cv- 07-1078-JKG (E.D. Pa. May. 5, 2014)

*In re Photochromic Lens Antitrust Litig.*, MDL Docket No. 2173 (M.D. Fla. Apr. 3, 2014)

*Philip R. Loy and Sharon Loy v. Womble Carlyle Sandridge & Rice, et al.*, 2014-cv-254012 (Ga. Super.)

*In the Matter of Flat Wireless, LLC, for and on behalf of its Operating Subsidiaries, v. Cellco Partnership d/b/a Verizon Wireless, and its Operating Subsidiaries*, EB-15-MD-005 (Federal Communications Commission)

*Massachusetts Technology Park Corporation v. Axia Netmedia Corporation, KCST USA, Inc.,* 01-17-0004-3049 (American Arbitration Association)

*Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor Distribution, Inc.,* 12-cv-07065-JS (E.D. Pa. Dec. 13, 2013)

*Crafting a Successful Incentive Auction: Stakeholders' Perspectives* (U.S. Senate, Committee on Commerce, Science, and Transportation) (Dec. 10, 2013)

*SOCAN Tariff 22.A* (Online Music Services, 2011-2013), *CSI Online Music Services* (2011-2013), *SODRAC Tariff 6 - Online Music Services, Music Videos* (2010-2013) (Copyright Board Canada)

*Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp.,* 01-14-0001-6315 (Am. Arbitration Ass'n)

*In Re: Lipitor Antitrust Litigation End Payor Actions*, 12-cv-02389-PGS-DEA (D. N.J. Sep. 5, 2013)

*The Satellite Television Law: Repeal, Reauthorize, or Revise?* (U.S. House of Representatives, Committee on Energy and Commerce) (Jun. 12, 2013)

*Salud Services, Inc. et al v. Caterpillar, Inc.,* 1:12-cv-23927 (S.D. Fla. Oct. 20, 2012)

*Wallach v. Eaton Corp.*, Civ. No. 10-260-SLR (D. Del. Sep. 26, 2012)

*In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb* (N.D. Ga. Aug. 31, 2012)

*In the Matter of Review of Wholesale Services and Associated Policies*, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission)

*Patricia Reiter v. Mutual Credit Corporation, et al.*, 8:09-cv-0081 AG (RNBx) (C.D. Cal.)

*Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation*, 2:06-CV-3830 (DMC) (D.N.J.)

*Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc.,* 2:06-cv-02768-MSG (E.D. Pa. Feb. 23, 2011)

*The Ohio State University v. New Par D/B/A Verizon Wireless*, 2:15-cv-2866 (S.D. Oh.)

**Memberships**

American Economics Association

American Bar Association Section of Antitrust Law

**Reviewer**

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy

Exhibit 2 – Curriculum Vitae of Ted P. Tatos

**Ted P. Tatos, MStat, PStat®**
**Economist and Statistician – EconONE**

| | |
|---|---|
| Email: | ttatos@econone.com |
| Web: | https://www.econone.com/staff-member/ted-tatos/ |
| Office: | (213) 612-7510 |
| Mobile: | (801) 541-6696 |
| Research: | https://utah.academia.edu/TedTatos |
| | https://www.researchgate.net/profile/Ted_Tatos |

### *Professional Experience*

| | |
|---|---|
| August 2019-Present | Consultant to the Firm<br>EconONE Research |
| January 2010<br>to Present | Empirical Analytics<br>Managing Director |
| July 2008<br>to January 2010 | Wasatch Economics<br>Partner, Salt Lake City, Utah |
| January 2007<br>to July 2008 | Keystone Strategy/North Harvard Group<br>Statistician, Salt Lake City, Utah |
| September 2001<br>to January 2007 | LECG, LLC<br>Managing Economist, Washington DC & Salt Lake City, UT |
| January 2000<br>to September 2000 | DynCorp – Healthcare Information Technology Services<br>Statistical Analyst, Reston, Virginia |
| March 1997<br>to January 2000 | LECG, LLC<br>Research Analyst, Associate<br>Washington, DC |

### *Education*

Duke University, Durham, NC
    A.B. Economics, 1995 (*double major, Economics, Psychology*)

University of Utah, Salt Lake City, Utah
    M.S. Statistics - Econometrics, 2005 – Thesis published in <u>Intellectual Property Damages: Guidelines and Analysis, 2004 Supplement</u> – *Applying Statistical Analysis to the Market Approach*

### *Published Research Papers*

Ted Tatos, *Upward Pricing Pressure from Digital Platforms' Imposition of Take Rates on App Developers*, CPI Antitrust Chronicle, February 2023



Ted Tatos and Hal Singer. *Alston v NCAA: lessons American college athletics can offer about concentration and monopsony power in labour markets*. Journal of Antitrust Enforcement, 2022, 00, 1–14, https://academic.oup.com/antitrust/advance-article-abstract/doi/10.1093/jaenfo/jnac007/6599234.

Ted Tatos and Hal Singer. *The Abuse of Offsets as Procompetitive Justifications: Restoring the Proper Role of Efficiencies after Ohio v. American Express and NCAA v. Alston*, Georgia State University Law Review, Vol. 38, No. 4, 2022, https://readingroom.law.gsu.edu/gsulr/vol38/iss4/10/.

Ted Tatos and Hal Singer. *Antitrust Anachronism: The Interracial Wealth Transfer in Collegiate Athletics Under the Consumer Welfare Standard*, The Antitrust Bulletin, Vol. 63, Issue 3, Nov. 2021. https://journals.sagepub.com/doi/10.1177/0003603X211029481.

Hal Singer and Ted Tatos. *Intro to Antitrust and Race Symposium,* The Antitrust Bulletin, September 2021. https://journals.sagepub.com/doi/pdf/10.1177/0003603X211032773.

Ted Tatos. *Relevant Market Definition and Multi-Sided Platforms Post Ohio v. American Express: Evidence from Recent NCAA Antitrust Litigation*. Harvard Journal of Sports and Entertainment Law, 10.2, May 2019. https://harvardjsel.com/wp-content/uploads/sites/9/2019/05/HLS205.pdf.

Ted Tatos. *NCAA Amateurism as an Anticompetitive Tying Restraint*. The Antitrust Bulletin, September 2019; 64(3). https://journals.sagepub.com/doi/10.1177/0003603X19863588.

Keith Leffler and Ted Tatos. *Competitive Injury and Damages Under the Robinson-Patman Act - Morton Salt and Statistical Analysis*. The Antitrust Bulletin. December 2015 vol. 60 no. 4 318-344. https://journals.sagepub.com/doi/full/10.1177/0003603X15602400.

Hal Singer and Ted Tatos. *Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies*, Antitrust Chronicle, Jan. 23, 2020. https://www.econone.com/wp-content/uploads/2020/02/CPI-Singer-Tatos.pdf.

Ted Tatos. *Deconstructing the NCAA's Pro-Competitive Justifications to Demonstrate Antitrust Injury and Damages: The Evidence Against NCAA Amateurism*. The Antitrust Bulletin. March 2017; 62(1). (Special symposium guest editor). https://journals.sagepub.com/doi/full/10.1177/0003603X16688968.

Mark Glick, David Mangum, and Ted Tatos. *The 'Book of Wisdom' Contains Little Wisdom and Creates Significant Risk of Bias.* The Federal Circuit Bar Journal, 2017, Vol. 27, No. 1. https://heinonline.org/HOL/LandingPage?handle=hein.journals/fedcb27&div=5&id=&page=.

Ted Tatos, Troy Lunt, and Mark Glick. *Property Value Impacts from Transmission Lines, Sub-Transmission Lines, and Substations*. The Appraisal Journal Summer 2016 (featured article). https://www.appraisalinstitute.org/transmission-lines-increase-and-decrease-property-values-the-appraisal-journal/.

Ted Tatos, Troy Lunt, and Mark Glick. *Taking a Closer Look at Proximity Damages. –Results from Large Data Analytics*. Right of Way Magazine, March/April 2016. https://eweb.irwaonline.org/eweb/upload/web_marapr16_Procimity.pdf.

econ ONE

Ted Tatos. *An Empirical Evaluation of EADA and NCAA College Sports Financial Data: Applications for Research and Litigation*. Marquette Sports Law Review, Vol. 29, No. 2 (May 2019. https://scholarship.law.marquette.edu/sportslaw/vol29/iss2/5/.

Ted Tatos. *Abuse and Mistreatment of Athletes at US Universities: Legal Implications for Institutional Duty-to-Protect*, Texas Review of Entertainment & Sports Law, Summer/Fall 2020. https://heinonline.org/HOL/LandingPage?handle=hein.journals/tresl21&div=3&id=&page=.

Ted Tatos and Don Comrie. *Cognitive Deficits and LD/ADHD Among College Football Athletes and Undisclosed Inclusion in Concussion Research*. Journal of Scientific Practice and Integrity 1(1), 2019. https://www.jospi.org/article/8883-cognitive-disorders-among-incoming-college-football-athletes-legal-and-medical-implications-of-undisclosed-inclusion-in-concussion-research.

Stephen T. Casper, Kathleen E. Bachynski, Michael E. Buckland, Don Comrie, Sam Gandy, Judith Gates, Daniel S. Goldberg, Kathryn Henne, Karen Hind, Daniel Morrison, Francisco Ortega, Alan J. Pearce, Sean Philpott-Jones, Elizabeth Sandel, Ted Tatos, Sally Tucker and Adam M. Finkel. *Toward Complete, Candid, and Unbiased International Consensus Statements on Concussion in Sport*, 49 Journal of Law, Medicine & Ethics 372–377 (2021). https://www.cambridge.org/core/journals/journal-of-law-medicine-and-ethics/article/toward-complete-candid-and-unbiased-international-consensus-statements-on-concussion-in-sport/54233A9E24B851E9288AEFD03E1C58CE.

Ted Tatos and Rick Hoffman. *Applying Statistical Analysis to the Market Approach.* Intellectual Property Damages: Guidelines and Analysis, 2004 Supplement

### *Published Articles*

Ted Tatos. The NCAA Goes After College Athletes' NIL Money—Here are the Antitrust Implications for Workers and Consumers, PROMARKET, May 20, 2022, available at https://www.promarket.org/2022/05/20/ncaa-goes-after-college-athletes-nil-antitrust/.

Ted Tatos. *NCAA's Mistreatment of Athletes Should Worry Workers Everywhere*, SPORTICO, April 13, 2022, *available at* https://www.sportico.com/leagues/college-sports/2022/ncaas-mistreatment-of-athletes-1234670609/.

Ted Tatos and Hal Singer. *College Sports Amateurism Costs Black Athletes Billions*, GLOBAL SPORTS MATTERS, Oct. 25, 2021, available at https://globalsportmatters.com/opinion/2021/10/25/college-sports-amateurism-costs-black-athletes-billions-nil/.

Hal Singer and Ted Tatos. *America's Owners Still Want More: How the MLB Lockout Mirrors the U.S. Economy*, GLOBAL SPORTS MATTERS, March 10, 2022, available at https://globalsportmatters.com/business/2022/03/10/how-mlb-lockout-mirrors-us-economy-labor-market/.



Ted Tatos and Stephen Casper. *Using College Athletes as Concussion Test Subjects Makes Nobody Safer*, THE AMERICAN PROSPECT, Aug. 27, 2019. https://prospect.org/culture/using-college-athletes-concussion-test-subjects-makes-nobody-safer/.

Ted Tatos. *College Athletes Should Be Able to Earn Money From Their Likeness*, THE AMERICAN PROSPECT, Sept. 16, 2019. https://prospect.org/education/college-athletes-should-be-able-to-earn-money-from-their-lik/.

Ted Tatos. *Playing Games with College Athletes' Lives*. THE AMERICAN PROSPECT, May 20, 2020. https://prospect.org/health/playing-games-with-college-athletes-lives/.

### *Presentations, Amicus Briefs, and White Papers*

Assisted in drafting and co-authored *Brief of Economists as Amici Curiae in Support of Plaintiffs-Appellants and Reversal*, State of New York et al. v. Facebook. Brief *available at* https://www.cohenmilstein.com/sites/default/files/New%20York%20v%20Facebook%20-%20Economists%20Amicus%20-%20Filed%2001282022.pdf

Hal Singer and Ted Tatos. Subsidizing Universal Broadband Through a Digital Advertising Services Fee: An Alignment of Incentives, October 2021, *available at* https://www.econone.com/wp-content/uploads/2021/09/Digital-Divide-HSinger-TTatos-2.pdf.

Hal Singer and Ted Tatos. Protecting the U.S. Postal Service from Amazon's Anticompetitive Assault. January 2022, *available at* https://www.econone.com/news-article/read-hal-singer-and-ted-tatos-article-protecting-the-u-s-postal-service-from-amazons-anticompetitive-assault/.

Relevant Market Definition and Multi-Sided Platforms After Ohio v. American Express: Evidence from Recent NCAA Monopsony Antitrust Litigation – Presentation at the University of Utah Antitrust Conference, October 2019, Panel discussion *available at* https://www.youtube.com/watch?v=vjJahNWNkes&list=PLqm-AKklxwfYBpEX4vyd0CyKRZ2RiIAbl&index=5

Advanced Patent Litigation: *Maximizing Returns and Protecting Core Technologies* (CLE presentation), Santa Clarita, CA. Oct. 2018. With Bret Bocchieri, Aaron Fahrenkrog, Christine Yun Sauer of Robins Kaplan, LLC.

Clear Law Institute presentation. *Statistics in Class Certification and at Trial: Leveraging and Attacking Statistical Evidence*, with Paul Karlsgodt of Baker Hostetler, LLC, Feb. 25, 2019.

Paul Seabright and Ted Tatos. Presentation before the European Commission – Director General of Competition - Chief Economist's team, Brussels, Belgium pursuant to a white paper co-authored with Mark Glick and Paul Seabright regarding competition and antitrust issues in the computer mainframe industry. August 2009.

Presentation to the Utah Bar Association Annual Summer Convention, Jul. 15-18, 2009. *Economics and the Theory of Your Case*. With Hon. Clark Waddoups, Hon. Deno Himonas, Mark Glick, Steve Hill.



Steve Waters and Ted Tatos. *Determining the Choice Set in a Random Utility Model* - Presentation to American Agricultural Economics Association, Toronto, Ontario, Canada, July 1997

---

### *Teaching Credentials*

- Adjunct Professor – Spring 2023 – Economics 6630 – University of Utah

- Adjunct Professor – Spring 2006 – Economics 7801 – University of Utah

- Adjunct Professor – Spring 2005 – Economics 7801 – University of Utah

- Adjunct Professor – Spring 2004 – Economics 7801 – University of Utah

---

### *Testifying Credentials*

- Trial testimony in the matter of Sarah Price v. United States (DOJ Natural Resources Div.), United States Court of Federal Claims, July 2024.

- Deposition testimony in the matter of Garavanian et al. v. JetBlue Airways and Spirit Airlines (antitrust, merger), September 2023.

- Deposition testimony in the matter of Sarah Price v. United States (DOJ Natural Resources Div.), July 2023.

- Deposition testimony in the matter of Davia Bunch and Casey Kelly et al. v. the University of South Carolina (class action tuition refund matter), In the Court of Common Pleas, Fifth Judicial Circuit, South Carolina, February 15, 2023

- Before the State of California Legislature, Judiciary Committee, pursuant to Assembly Bill 983, June 28, 2022.

- Trial testimony in the matter of Roberts v. Tim Dahle Imports, United States District Court, District of Utah, June 2022.

- Deposition testimony in the matter of Hunter v. Booz Allen Hamilton et al., August 2021 (class action)

- Deposition testimony in the matter of Sypherd v. Lazy Dog Restaurants, July 2021 (class action)

- Deposition testimony in the matter of Brittain v. United States (DOJ Natural Resources Div.), May 2021

- Deposition testimony in the matter of Michael Mendell v. American Medical Response, August 2020 (class action)

- Deposition testimony in the matter of Ademola Adetula and Homer Strickland v. United Parcel Service, January 2020.

- Hearing testimony – Cruz v. Chunga. August 2017.

- Trial testimony – Young Living Essential Oils v. doTerra. June 2017.

- 2nd deposition in the matter of Young Living Essential Oils v. doTerra. October 2016.

- Deposition in the matter of Kinum v. American Agencies. April 2016.

- Deposition in the matter of Young Living Essential Oils v. doTerra. February 2015.

- Deposition in the matter of the Utah Jazz NBA team v. individual members of the Jazz 100. October 2014.

- Deposition in the matter of California College, Inc. v. In Contact. September 2014.

- Testimony in arbitration hearing in Robinson-Patman price discrimination antitrust matter. MB Signal v. AT&T Wireless. June 2014.

- 2nd Deposition testimony in Robinson-Patman price discrimination antitrust matter. Cellular Cellutions/MB Signal v. AT&T Wireless. April 2014.

- Trial testimony in Robinson-Patman price discrimination antitrust matter – 3rd District Court, district of CO. Western Convenience Stores, Inc. v. Suncor Energy USA., March 2014.

- Deposition testimony in Robinson-Patman price discrimination antitrust matter. Cellular Cellutions v. AT&T Wireless. January 2014.

- Trial testimony in breach of contract involving alleged loss of employees to competitor, Layton Construction v. SIRQ, February 2013.

- Trial testimony in breach of contract claim involving purchase of residential and commercial development. Traverse Mountain Enterprise v. Fox Ridge Investments, November 2012

- Deposition testimony in breach of contract claim involving purchase of residential and commercial development. Traverse Mountain Enterprise v. Fox Ridge Investments,



February 2011

- Presentation to Utah Public Service Commission on behalf of Utah Industrial Energy Consumers (UIEC) regarding Rocky Mountain Power's use of statistical sampling in estimating cost allocation among consumer classes. July 2010.

- Deposition testimony in matter involving alleged damages to an internet-based entertainment shopping site. PrizeWise v. Oppenheimer, November 2009.

- Presentation before the European Commission – Director General of Competition - Chief Economist's team pursuant to a paper co-authored with Mark Glick and Paul Seabright regarding competition in the computer mainframe industry. t3 Technologies v. IBM, August 2009.

- Deposition testimony in matter involving paid search advertisement bidding on competitor keywords on the Google search engine – 1-800 Contacts v. Lens.com, November 2008

- 2nd District Court, District of Utah. Trial testimony in breach of contract matter involving transfer of insurance agents to a rival firm. Farm Bureau v. American National Insurance Company, August 2008

- Testified before Administrative Law Judge on the use of the Consumer Price Index as a measure of inflation and offered testimony on inflationary pressure on fuel prices – July 2008

- Deposition testimony on statistical sampling issues, Catholic Healthcare v. Blue Cross/Blue Shield of California – March 2008

- Trial testimony in breach of contract matter involving transfer of insurance agents to a rival firm. Farm Bureau v. American National Insurance Company, November 2006

- Testified before Administrative Law Judge on the matter of whether taxicab rates in Salt Lake City should be increased as a result of increased gasoline prices resulting from Hurricanes Katrina and Rita. – January 2006

- Testified before Administrative Law Judge on the matter of whether taxicab rates in Salt Lake City should be increased to reflect inflationary trends – January 2005

- Testified before Administrative Law Judge on the matter of whether Salt Lake City



should issue additional taxicab licenses – November 2004

### Declarations

- Dalke v. Central Michigan University, State of Michigan Court of Claims, Case No. 20-000068-MK, Nov. 17, 2020

- Horrigan v. Eastern Michigan University, State of Michigan Court of Claims, Case No. 20-000075-MK, January 29, 2021

- Stenger v. Ferris State University, State of Michigan Court of Claims, Case No. 20-000075-MK, January 29, 2021

- Zwiker v. Lake Superior State University, State of Michigan Court of Claims, Case No. 20-000070-MK, January 13, 2021

- Simmons v. Northern Michigan University, State of Michigan Court of Claims, Case No. 20-000083-MK, November 3, 2020

- Garland v. Western Michigan University, State of Michigan Court of Claims, Case No. 20-000063-MK, October 27, 2020

- Mendell v. American Medical Response, Case No. 3:19-cv-01227-BAS-KSC, Southern District of California, July 1, 2019

- Roberts v. CR England, Case No. 2:12-CV-00302-RJS-BCW, Utah, Central District

### Private & Public Sector Consulting and Litigation Experience

**Selected Class Action, Antitrust and Intellectual Property Matters**

- Bunch et al. v. University of South Carolina (class action) – prepared expert report at class certification stage in matter involving tuition and fees refunds resulting from transition to emergency remote teaching in Spring 2020.
  *Client: Plaintiffs*
  *Law Firms: Kabat Chapman & Ozmer, Bayuk Pratt*

- Cross et al. v. University of Toledo (class action) – prepared expert report at class certification stage in matter involving tuition and fees refunds resulting from transition to emergency remote teaching in Spring 2020.
  *Client: Plaintiffs*
  *Law Firm: Milberg Coleman, New York, NY*



- Hunter et al. v. Booz Allen Hamilton et al. (class action) – prepared report in class action matter involving no-poach agreement between defense contractors

  *Client: Plaintiffs*

  *Law Firm: Saveri Law Firm, San Francisco, CA*

- Sypherd et al. v. Lazy Dog Restaurants (class action) – prepared expert report and offered deposition testimony in matter involving age discrimination claims against a restaurant chain

  *Client: Plaintiffs*

  *Law Firm: Hogue Belong, San Diego, CA*

- Michael Mendell v. American Medical Response (class action) – Prepared declaration and offered deposition testimony in class action matter involving notice of recording pursuant to California Invasion of Privacy Act (CIPA).

  *Client:  American Medical Response*

  *Law Firm: Akin Gump, Los Angeles, CA*

- Lenhoff Enterprises, Inc. v. United Talent Agency, Inc. & International Creative Management Partners, LLC:  Prepared statistical analysis and submitted declaration in the matter of regarding antitrust issues in the scripted television market.

  *Client:  Lenhoff Enterprises*

  *Firm:    Blecher Collins & Pepperman, Los Angeles, CA*

- Luxe Hospitality Co. v. SBE et al. - Prepared two expert reports and declaration in matter regarding trademark dispute. Prepared critique of consumer confusion and secondary meaning surveys prepared by SBE experts.

  *Client:  Luxe Hospitality Company*

  *Law Firm: Robins Kaplan, Los Angeles, CA*

- Western Convenience v. Suncor - Prepared expert reports and testified in deposition and trial on Robinson-Patman price discrimination matter dealing with competitive injury and antitrust damages in retail gasoline industry.

  *Client:  Western Convenience Stores*

  *Firms:  Polsinelli, Denver, CO*

  *Bennington Johnson, Biermann & Craigmile, Denver, CO.*

- 1-800 Contacts v. Lens.com - Prepared expert report, declaration, and gave deposition testimony in matter involving trademark dispute and keyword bidding on online search engines. Prepared critique of reports prepared by 1-800 Contacts' damages and survey experts.



> Client: Lens.com
>
> Firm: Ray Quinney & Nebeker, Salt Lake City, UT

- <u>Sport Court v. Rhino Sports</u>: Prepared expert report in matter of in matter involving trademark dispute and keyword bidding on online search engines.

  > Client: SportCourt, Inc.
  >
  > Law Firm: Ray, Quinney & Nebeker, Salt Lake City, UT

- <u>J.D. Fields, Inc. v. Nucor</u> - Retained as expert & prepared analysis on competitive injury in Robinson-Patman antitrust price discrimination matter in steel industry.

  > Client: J.D. Fields, Inc.
  >
  > Firm: Hill Rivkins, Houston, TX.

- <u>Cellular Cellutions v. AT&T, M.B. Signal v. AT&T</u>: Prepared expert reports, declaration, and gave testimony at arbitration hearing in Robinson-Patman antitrust case involving price discrimination in retail cellular telephone industry.

  > Client: Cellular Cellutions, M.B. Signal
  >
  > Firm: Plunkett Cooney, Bloomfield Hills, MI.

- Prepared econometric and statistical analysis in price-fixing matters in the following matters:

  > In Re Industrial Silicon Antitrust Litigation
  >
  > Contact Lens Antitrust Litigation
  >
  > Commercial Tissue Antitrust Litigation
  >
  > Flat Glass Antitrust Litigation
  >
  > Vitamins Antitrust Litigation
  >
  > Window Blinds Antitrust Litigation

- Co-Authored report with Prof. Paul Seabright and Prof. Mark Glick regarding customer lock-in in the mainframe market. Presented results to European Commission-DG Comp Chief Economist's team. Matter: t3 v. IBM litigation.

- Prepared analysis of online advertising market pursuant to investigation of potential competitive effects of Google-DoubleClick merger.

- Prepared analysis of click-through rates, impressions, search terms, and usage rates for online search advertisements pursuant to proposed merger between Microsoft and Yahoo.

- Prepared geographic market analysis for various clients involving mergers in the defense, healthcare, explosives, aircraft engines, and others.

**Employment Discrimination, Fair Labor Standards Act, and Benefits Consulting**

econ ONE

- <u>Melissa Roberts v. Tim Dahle Imports</u> – Prepared expert report in matter involving the calculation of commissions on new and used automobiles.

  *Client: Tim Dahle Imports*

  *Law Firm: Ray Quinney & Nebeker, Salt Lake City*

- <u>Gutierrez v. Stericycle</u> - Prepared declaration in matter involving class action wage and hour claims for Stericycle employees in California.

  *Client: Stericycle*

  *Law Firm: Parsons Behle & Latimer, Salt Lake City, UT*

- <u>Land v. EG&G (and other cases in UT, OR, AL)</u> - Retained as expert to prepare analysis on wage and hour matters for various client locations in Utah, Oregon, Arkansas, and Alabama.

  *Clients: EG&G division of URS; Battelle Memorial Institute*

  *Law Firm: Holland & Hart, Salt Lake City, UT*

- <u>Jordt v. Federal Express</u> - Retained as consulting expert to advise on statistical matters involving claims of age discrimination.

  *Client: Federal Express Freight*

  *Law Firm: Ray Quinney & Nebeker, Salt Lake City, UT*

- <u>Gray v. Oracle</u> - Retained as consulting expert to analyze claims of age discrimination in layoff of employees from major information technology firm. Reviewed layoff records and performed logistic regression to analyze relevant factors in the layoff.

  *Client: Oracle, Inc.*

  *Law Firm: Parsons Behle & Latimer*

- Developed regression models to test for statistically significant differences in gender pay rates for big four accounting firm.

- Used parametric and nonparametric statistical techniques to compare gender promotion rates in employment discrimination litigation case.

- Developed statistical models to ensure a company undertaking layoffs is conducting the process randomly without discriminating with respect to gender, race, or age.

**Selected Breach of Contract, Non-Solicitation Provisions, and Fraud Matters**

- <u>Securities & Exchange Commission v. Colin McCabe/Elite Stock Report</u> – Prepared analysis of stock touting and impacts on stock prices. Issued expert report.



*Client: Securities and Exchange Commission*

*Law Firm: Securities and Exchange Commission-Nancy Ferguson-Denver Office*

- <u>Young Living Essential Oils v. doTERRA</u> – Prepared expert report, declaration, two depositions, and gave trial testimony in matter involving breach of non-solicitation agreement. Prepared statistical model of lost profits.

  *Client: Young Living Essential Oils*

  *Law Firm: Ray Quinney & Nebeker*

- LIMU v. Zija – submitted expert disclosure detailing calculation of lost revenues – case ongoing.

  *Client: LIMU*

  *Law Firm: Ray Quinney & Nebeker*

- <u>SIRQ, Inc. v. Layton Companies</u> – Prepared expert report, gave deposition and trial testimony in matter involving breach of non-solicitation agreement and breach of contract.

  *Client: Layton Companies*

  *Law Firm: Parr Brown Gee & Loveless, Salt Lake City, UT*

- <u>Traverse Mountain Enterprises v. Fox Ridge, LLC</u>. – Prepared expert reports, gave deposition testimony, and testified at trial in issue involving breach of contract. Valued property and investments at Traverse Mountain.

  *Client: Traverse Mountain Enterprises*

  *Law Firm: Durham Jones & Pinegar, Salt Lake City, UT*

- <u>Farm Bureau v. American National</u> – Gave deposition and trial testimony in matter involving non-solicitation and breach of contract.

  *Client: Farm Bureau Life Insurance*

  *Law Firm: Morgan Minnock Rice & James, Salt Lake City, UT*

- Prepared statistical and economic analysis in breach of contract/breach of non-solicitation matters in direct sales/multi-level marketing industry for clients including: Neways, Organo Gold, Max International, LIMU and others.